ROGER M. MANSUKHANI (SBN: 164463)
DAVID L. JONES (SBN: 112307)
STEVEN R. INOUYE (SBN: 245024)
GORDON REES SCULLY MANSUKHANI, LLP
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071
Telephone: (213) 576-5000
Facsimile: (213) 680-4470

Attorneys for Defendants
Moore Law Firm, A.P.C.; Tanya E. Moore;
Kenneth Randolph Moore; Ronald D. Moore;
Zachary M. Best; Marejka Sacks; Mission Law
Firm, A.P.C.; Elmer LeRoy Falk; Geoshua
Levinson; Rick D. Moore; West Coast CASp and
ADA Services; and Ronny Loreto

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FATEMEH SANIEFAR<br><br>Plaintiff,<br><br>vs.<br><br>RONALD D. MOORE, TANYA E. MOORE, KENNETH RANDOLPH MOORE, MAREJKA SACKS, ELMER LEROY FALK, ZACHARY M. BEST, MOORE LAW FIRM, a California Professional Corporation, MISSION LAW FIRM, a California Professional Corporation, GEOSHUA LEVINSON, RICK D. MOORE, WEST COAST CASP AND ADA SERVICES, a California Corporation, RONNY LORETO, and DOES 1 THROUGH 100, inclusive<br><br>Defendants. | CASE NO. 1:17-cv-00823-LJO-BAM<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date: November 14, 2019<br>Time: 8:30 a.m.<br>Dept: 4<br>Judge: The Hon. Lawrence J. O'Neill |

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................... 1

STATEMENT OF FACTS ....................................................................................... 3

    I.    Ronald is substantially limited in his ability to walk, a condition all Defendants believe to be true based upon evidence and observation. .................... 3

        A.    Ronald is disabled. ...................................................................... 3

        B.    Defendants reasonably believe Ronald is substantially limited in his ability to walk. ................................................................. 6

        C.    Ronald's visit to Zlfred's and ensuing litigation. ...................... 8

        D.    Ronald presents his claim to the Moore Law Firm via his receipt and questionnaire. ........................................................ 8

        E.    The Moore Law Firm receives Ronald's information, prepares a "Barrier Memo," and investigates Ronald's claims. ................. 9

        F.    The federal and state lawsuits against Saniefar. ...................... 9

    II.    The Moore Law Firm "pattern" is legitimate and nothing like the claimed scheme. .................................................................................. 11

        A.    The law firm "pattern" is a stringent set of protocols to ensure only meritorious lawsuits are filed. ................................... 11

        B.    Ronald Moore's ADA cases evince the firm's admirable pattern. ........... 12

    III.    Marejka Sacks had no knowledge of or participation in any fraudulent conduct. .................................................................................... 15

    IV.    Rick Moore has no knowledge of or participation in any fraudulent scheme. ..................................................................................... 16

    V.    Ronny Loreto had no knowledge of or participation in any fraudulent scheme. ..................................................................................... 17

LEGAL STANDARDS ............................................................................................ 17

    I.    Summary judgment/partial summary judgment standard ..................................... 17

    II.    RICO elements ................................................................................... 18

LEGAL ARGUMENT .............................................................................................. 20

    I.    Saniefar's RICO claim. ....................................................................... 20

        A.    Saniefar is limited to the specific predicate acts pled in the FAC. ........... 20

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

II.     There is no evidence to support Saniefar's RICO scheme or pattern. ................. 21

III.    Even if Ron was not disabled, there is no evidence Sacks had any
        knowledge of it, let alone that they agreed to participate in or directed the
        enterprise. .......................................................................................................... 22

IV.     There is no evidence Rick or Ronny had any knowledge of or participation
        in any fraudulent scheme. ................................................................................. 23

CONCLUSION ...................................................................................................................... 23

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

# **TABLE OF AUTHORITIES**

**Cases**

*Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) .................................................................... 19

*Celotex Corp. v. Catrett*,
477 U.S. 317, 323-324 (1986) .................................................................................... 17, 18

*Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000) ........................................ 20

*Coons v. Sec'y of the United States Dep't of the Treasury*,
383 F.3d 879, 884 (9th Cir. 2004) .................................................................................. 7

*H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989) ......................................................... 19

*Hernandez v. Hughes Missile Sys. Co.*,
298 F.3d 1030, 1037 n.20 (9th Cir. 2002) .................................................................... 20

*IV Sols., Inc. v. Conn. Gen. Life. Ins. Co.*, No. CV 13-9026-GW(AJWx),
2015 U.S. Dist. LEXIS 189753, at *35 (C.D. Cal. Jan. 29, 2015) ............................... 20

*Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) ........................................... 18

*Living Designs, Inc. v. E. I. Dupont de Numours and Co.*,
431 F.3d 353, 361 (9th Cir.2005) ................................................................................... 19

*Luria Steel & Trading Corp. v. Ford*, 9 F.R.D. 479, 481 (D.Neb.1949) ................................. 18

*Matsushita Electric Industries Co. v. Zenith Radio Corp.*,
475 U.S. 574 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) .............................................. 18

*McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1139 (9th Cir. 2004) ....................................... 20

*Moore v. Millennium Acquisitions, LLC*,
708 F. App'x 485, 485-86 (9th Cir. 2018) ...................................................................... 7

*Oscar v. University Students Co-operative Ass'n*,
965 F.2d 783, 786 (9th Cir. 1992) .................................................................................. 20

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
457 F.3d 963, 968-69 (9th Cir. 2006) ............................................................................ 20

*Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) .................................................................. 19

*Salinas v. United States*, 522 U.S. 52, 63 (1997) ...................................................................... 19

*Sedima v. Imrex Co., Inc.*, 473 U.S. 479, 496 (1985) ............................................................... 18

*Ticor Title Ins. Co. v. Florida*, 937 F.2d 447, 450 (9th Cir. 1991) .......................................... 19

*United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992) ............................................... 19

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

-iii-

**Statutes**

Fed. R. Civ. P., Rule 56(c) ................................................................ 17, 18

Title 18 U.S.C. §§ 1341, 1343 ................................................................ 19

Title 18 U.S.C. § 1962 ................................................................ 18

**Rules**

Federal Rules of Civil Procedure rule 56(c) ................................................................ 17

Federal Rules of Civil Procedure rule 56(e) ................................................................ 18

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Between 2009 and 2017, Ronald Moore ("Ronald")[1] asked that the Moore Law Firm, P.C. represent him in at least 450 cases alleging violations of the Americans with Disabilities Act and parallel California law. However, after a careful review and investigation of the information provided to them by Ronald, the Moore Law Firm only accepted representation in about 250 of those cases. Accordingly, the Moore Law Firm rejected at least 200 potential cases from Ronald because its lawyers did not wish to pursue legal action in those cases.

Prior to accepting Ronald's representation in around 2009, attorney Tanya Moore ("Tanya") required Ronald to provide a document from his treating physician detailing his disabilities. Tanya later obtained and reviewed Ronald's full medical records in approximately 2011. These documents alone would lead any reasonable person to conclude Ronald is substantially limited in his ability to walk. But when Ronald's disability was called into question in the underlying action, Tanya further enlisted an expert witness service to locate an independent expert to review Ronald's medical records and evaluate him to assess his disability. The expert witness service contacted a doctor who specialized in Ronald's primary condition (hydrocephalus or "water on the brain"). That doctor evaluated Ronald's medical records and interviewed Ronald. After his independent review, he confirmed that Ronald's records support a conclusion that he is substantially limited in his ability to walk. Of course, it does not take an expert to recognize someone who has difficulty walking. Ronald's family members – including his estranged wife, daughters, and others who are not parties to this action – have all witnessed Ronald's suffering and struggling with his instability and pain.

Assured of his disability, the Moore Law Firm still only agreed to accept cases from Ronald that survived the firm's stringent protocols that ensures it only files meritorious claims. The firm required Ronald (and all of its clients) to provide receipts from his visits to offending businesses and later asked him to complete a formal questionnaire detailing how conditions at the business

---

[1] Because defendants Tanya Moore, Randy Moore, Ronald Moore, and Rick Moore all share a common last name, they will be referred to by their first names to avoid confusion.

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

adversely affected his full and equal access.[2] Upon receipt of a client's documentation of his or her visit, the firm would send the client a letter explaining that it was reviewing their request to be represented, and the firm would contact the client after an investigation was completed or if the firm had questions about the visit. The firm then prepared a "Barrier Memo" that summarily itemized the access problems described on the client's questionnaire (and/or as the client orally communicated). The firm then provided the Barrier Memo to its investigators with a blank column titled "Is it a valid barrier" to be completed after the investigator visited the subject business. The investigator would review the claims in the Barrier Memo, visit the business, take measurements and photographs, and place their answers in the blank column. The investigators returned the Barrier Memo and photographs to the firm, where a decision was made as to whether to file a legal action on behalf of the client. If the firm's attorneys determined that there was not a sufficient basis to file a legal action, the firm sent a rejection letter to the client. Otherwise, the firm sent a letter to the client agreeing to accept the particular case, along with a fee agreement. If a case was accepted, the firm drafted a complaint and sent it to the client for review and verification. Once the client approved the allegations in the complaint, it was filed.

That is the how the Moore Law Firm prosecutes cases for Ronald and all of its clients. No fraudulent conspiracy, enterprise, or pattern exists. The Moore Law Firm is a legitimate and very successful civil rights law firm that is resented by business owners such as Saniefar for daring to assist its clients in enforcing a nearly 30-year-old statute. Saniefar filed this Racketeer Influenced and Corrupt Organizations Act ("RICO") action simply because her family wants revenge for forcing them to make the Zlfred's restaurant accessible to the disabled as required by law. In that quest, Saniefar has paid little attention to the claims in her First Amended Complaint, but has instead used this lawsuit as a fishing expedition into any possible wrongdoing by the Defendants.

Defendants anticipate that Saniefar will ask this Court to ignore all of Ronald's medical records, receipts, questionnaires, the firm's Barrier Memos, photographs, letters of rejection, and

---

[2] Initially, the Moore Law Firm only required the clients provide receipts from their visit. In or about 2011, the Moore Law Firm required that the clients also provide written information about their visits, although the firm still spoke to clients about their experiences to gain a full understanding of barriers to access encountered by their clients.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

letters of acceptance (most of which are entirely privileged), as just "smoke and mirrors" to cover up an illegal scheme. But there is no evidence to support this conspiracy. Instead, Defendants present not only their own testimony, but the testimony of numerous third parties – former and current employees of the Moore Law Firm – all of whom corroborate the documents and testify with certainty that the firm is run legitimately and with due diligence.

In contrast, this RICO lawsuit was not brought based on a thorough investigation of the claims asserted. Rather, Saniefar relies upon rank speculation and innuendo to create a sensational story that appeals to those persons who wish to undo the ADA.

By positioning Defendants in her crosshairs, Saniefar has forced Ronald to produce hundreds of privileged communications with his attorneys in order to bring the truth to light. When Ronald and his attorneys privately communicated with each other over many years, they could never have envisioned that such communications would need to be disclosed in order to clear their good names. Likewise, as Ronald's attorneys worked on his lawsuits, they never envisioned the need to produce their work product to the public. What is before the Court now is thus the seldom seen, naked anatomy of a civil rights lawsuit. Ronald's sacred statutory and constitutional protections were voluntarily waived with a heavy heart. Ronald reached this decision because doing so is the only assurance the truth will prevail because Saniefar's top-dollar legal army has adopted a scorched earth strategy. Now, the truth is unveiled.

## STATEMENT OF FACTS

**I.    Ronald is substantially limited in his ability to walk, a condition all Defendants believe to be true based upon evidence and observation.**

### A.    Ronald is disabled.

Sometime around 2002 to 2003, Ronald began to experience pain in his neck, back, and knees. (SUF 1.) Ronald was diagnosed as having degenerative disc disease and chronic pain syndrome. (SUF 2.) Ronald's pain levels fluctuate, but he always feels some degree of pain. (SUF 3.) On a good day, Ronald ventures out of his home to go shopping, out to eat, visit with friends, and similar activities. But on bad days, he seldom leaves his home. (SUF 4.) When Ronald first

began experiencing pain, he took significant amounts of narcotics, but that resulted in difficulty in his personal life. (SUF 5.) In 2014 and for several years thereafter, Ronald switched to over-the-counter medication to try to manage his pain. (SUF 6.)

Ronald also began experiencing problems with instability and dizziness in the early to mid-2000s. (SUF 7.) During this time period, he was diagnosed with hydrocephalus, or "water on the brain." (SUF 8.) Since that time, Ronald has felt unstable when he attempts to walk or stand – he can get dizzy very quickly and feel unstable. (SUF 9.) Ronald understood from conversations with his doctors that unless he underwent surgery to put a device in his head to drain the water, his instability would not improve. (SUF 10.) Ronald chose not to undergo this surgery, and thus he continues to experience dizziness and instability. (SUF 11.)

As a result of his pain and instability, Ronald began using a wheelchair in around 2005 – long before he filed his first ADA lawsuit in 2009. (SUF 12.) While Ronald can walk at times, he risks falling when he does so, and therefore, he seldom chooses to walk without any assistance. (SUF 13.) When Ronald is not using a wheelchair, such as when he is inside his home, he usually uses his cane, furniture, walls, and the like to provide him stability. (SUF 14.) Even when Ronald chooses to walk with support, he cannot do so for long periods of time because he fatigues easily from the pain, and needs to sit. (SUF 15.)

Ronald usually drives himself to his destinations, and keeps his wheelchair in the back of his vehicle. (SUF 16.) He retrieves his wheelchair upon arrival, using his cane to get to the back of his vehicle, or occasionally, using his hand alongside his vehicle to maintain stability. (SUF 17.)

In August 2007 – still years before any ADA lawsuits were filed or even contemplated on behalf of Ronald – Dr. Patrick Yun Kee C. Kan, M.D., Ronald's treating physician at the time, diagnosed Ronald with "hydrocephalus [fluid on the brain], B knee arthritis, degenerative disc disease of the lower back, cervical radiculopathy [pinched nerve] and chronic pain syndrome since 2002 and is ongoing." (SUF 18). At his attorney Tanya's request, in around 2009, Ronald provided Tanya with the letter from Dr. Kan reflecting these diagnoses. (SUF 19.) After reviewing Dr. Kan's medical note, Tanya developed a belief that Ronald Moore was disabled and relied upon the note

before accepting him as a disability client. (SUF 20.) In 2011, the Moore Law Firm reviewed copies of Ronald Moore's medical records. (SUF 21.) Ronald's medical records included a letter from his neurologist, Dr. Brian H. Clauge, M.D. addressed to his physician Dr. Kevin Wingert, M.D. dated September 21, 2011 which stated in pertinent part as follows:

> I had the pleasure of seeing [Ronald Moore] on 09/21[/2011] for consideration of the possibility of occult hydrocephalus. This patient is rather complicated as you know. … One of his complaints was he had sudden unsteadiness. Symptoms would be up and down. … He was complaining of severe dizziness and Dr. Brant did an MRI scan suggesting hydrocephalus and recommended a shunt. … He still has episodes of unsteadiness wherein he feels as though he is on a ship rocking up and down, but no true vertigo. … He does have chronic disability, having been injured years ago. He has chronic back pain. He has lost over 80 pounds in the last year, but at times uses a wheelchair. … His main complaint is episodic unsteadiness. He did have a recent MRI scan and he was confused by the report that suggested that he really had cerebral atrophy rather than hydrocephalus. … I suspect he probably has hydrocephalus ex vacuo …

After reviewing Ronald Moore's medical records, the Moore Law Firm maintained a belief that Ronald Moore was disabled and relied upon the records in continuing to represent him in legal actions. (SUF 23.)

Ronald's attorney, Tanya Moore ("Tanya"), understood that Saniefar was disputing Ronald's disability in the underlying action. (SUF 24.) While Ronald's own testimony as to his disability, coupled with his medical records, would seem adequate to establish his disability, Tanya decided that it was best to obtain a medical expert to offer independent testimony confirming Ronald's disability – a disability his attorney never doubted. (SUF 25.) Tanya retained American Medical Experts ("AME"), an expert witness service she had never before worked with, to identify an expert capable of evaluating Ronald's medical records, and someone familiar with hydrocephalus. (SUF 26.) AME provided an expert report to Tanya, and ultimately revealed the expert as Dr. Mark Levin, also an individual Tanya had never before known. (SUF 27.) On or about July 28, 2015, Dr. Mark Levin, M.D. prepared an expert report in the Zlfred's action which stated, in pertinent part, as follows:

In my opinion with a reasonable degree of medical certainty, **Mr. Moore is substantially limited in his ability to walk and a wheelchair would help ameliorate his pain**, and that a cane would assist on occasion. In my opinion and based on the records reviewed and the interview with Mr. Moore, as well as my experience and training, Mr. Moore has been 100% disabled since 2008 because of above symptoms. Maximum medical improvement was reached in 2008 and no farther (sic) improvement is expected. (Bold added; SUF 28.)

Although never in doubt, Tanya's review of the expert report further confirmed her understanding of Ronald's disability. (SUF 29.)

In addition, Ronald's daughter and his estranged wife, both of whom have known Ronald since before his disability and have intimate knowledge of Ronald's progressive physical demise, have witnessed and testified in their depositions about Ronald's difficulty walking and how he has struggled with increasing pain and instability. (SUF 34.) And Ronald's grandsons, Ronny and Jason Loreto, have also witnessed and testified regarding their grandfather's struggle with pain and maintaining his balance, and have watched their grandfather consistently use a wheelchair for mobility when out in public. (SUF 35.)

Furthermore, Saniefar retained private investigators Nick and Raymond Franco to surveil Ronald over a period of three months and over 77 hours. (SUF 36.) The investigators testified that to their knowledge, Ronald had no idea he was being watched, and yet every time he left his house to go out in public, he brought his wheelchair. (SUF 37.) The investigators testified that Ronald would arrive at a location and park, get out of his vehicle using his cane, go to the back of his vehicle, retrieve the wheelchair, then use the wheelchair to travel to his destination. (SUF 38.) In fact, the investigators testified that this was always the case when Ronald travelled to a public place. (SUF 39.)

### B. Defendants reasonably believe Ronald is substantially limited in his ability to walk.

Defendants Tanya Moore and Marejka Sacks reviewed Ronald's medical records in the course of Ronald's representation by the Moore Law Firm, and concluded that Ronald's claim that he was substantially limited in his ability to walk was well supported. (SUF 23.) Tanya and Sacks

also reviewed the expert report prepared by Dr. Mark Levin that concluded Ronald's medical

conditions support a conclusion that he is substantially limited in his ability to walk. (SUF 29.)

Further, Tanya and Sacks have each also personally witnessed Ronald using a wheelchair

for mobility and complaining of pain. (SUF 30 and 31.) Likewise, defendants Rick Moore ("Rick")

and Ronny Loreto have personally witnessed Ronald using a wheelchair for mobility and

struggling with pain for many years. (SUF 32 and 33.)

If Ronald is not disabled (as Saniefar alleges), then he has done a remarkable job

convincing his medical providers, an expert doctor, family, and legal representatives otherwise for

over 15 years. But even if Ronald was "putting on an act" for all these years, there is no evidence

that any of the other Defendants believed, or had cause to believe, he was not disabled at any time.

Furthermore, the Ninth Circuit has recently affirmed an Eastern District court's finding

that Ronald is disabled, holding:

> Moore has produced evidence establishing that he suffers from
> hydrocephalus, degenerative disc disease, and chronic pain
> syndrome. He states in his declaration that he nearly always uses a
> wheelchair because his impairments make walking painful and
> create the risk of falling. This evidence establishes that Moore is
> disabled under the ADA because he suffers from physical conditions
> that substantially limit his mobility. *Coons v. Sec'y of the United
> States Dep't of the Treasury*, 383 F.3d 879, 884 (9th Cir. 2004). The
> evidence on which Millennium relies is not to the contrary.
> Millennium points to surveillance footage showing Moore
> walking short distances and a declaration from Dr. Miller, a
> physician who once treated Moore, indicating that Moore's
> wheelchair is not "medically necessary." But Moore does not
> dispute that he is capable of walking unassisted. Rather, he
> maintains that he uses a wheelchair because walking unaided is
> painful and difficult. Evidence that Moore physically can walk but
> chooses to use a wheelchair as a mobility aid does not raise a
> material factual dispute as to whether Moore is disabled under the
> ADA.

*Moore v. Millennium Acquisitions, LLC*, 708 F. App'x 485, 485-86 (9th Cir.
2018).

Even if Saniefar now attempts to challenge Ronald's prior diagnoses with her own new

doctors in 2019, their opinions are irrelevant in this RICO action because the record reflects that

each Defendant believed (as did the Ninth Circuit) that Ronald was disabled based upon the

information they possessed between 2009 and 2017 when they were prosecuting cases on his behalf.

### C. Ronald's visit to Zlfred's and ensuing litigation.

On April 14, 2014, Ronald, his now estranged wife, and two grandsons, visited Zlfred's restaurant located at 4030 North Blackstone Avenue in Fresno, California ("Zlfred's"). (SUF 40.) After exiting his vehicle and transferring to his wheelchair, Ronald encountered various conditions relating to his use of a wheelchair that prevented him from enjoying full and equal access to the restaurant ("Barriers"). (SUF 41.) Ronald and his family ate at Zlfred's, and their four meals together cost $85.57, and came to $98.00 after adding a tip, as reflected on the Zlfred's receipt. (SUF 42.) Ronald charged these meals on his credit card, a charge that is reflected on Ronald's own credit card statement for the account with the same last four digits of the credit card seen on the receipt. (SUF 43.)

### D. Ronald presents his claim to the Moore Law Firm via his receipt and questionnaire.

Within a week of his April 14, 2014 visit to Zlfred's, Ronald informed his attorneys at the Moore Law Firm about the Barriers he encountered at Zlfred's by sending them his receipt, as well as a questionnaire answering 41 questions in hand-written form that detailed Ronald's visit ("the Questionnaire"). (SUF 44.) The receipt and Questionnaire were received and reviewed by paralegal Whitney Law at the Moore Law Firm on April 21, 2014. (SUF 45.)

On the Questionnaire, Ronald also reported that he had dined at Zlfred's on three prior occasions. (SUF 46.) It also identified who he had dined with, the purpose of his visit, and all the inaccessible conditions he had encountered at Zlfred's. (SUF 47.)

On April 22, 2014, after receiving Ronald's receipt and Questionnaire, the Moore Law Firm sent Ronald a letter that acknowledged his inquiry regarding filing an ADA lawsuit against Zlfred's. (SUF 48.) In that letter, Tanya promised to investigate Ronald's claims in order to determine whether an ADA lawsuit was warranted. (SUF 48.)

/ / /

**E.    The Moore Law Firm receives Ronald's information, prepares a "Barrier Memo," and investigates Ronald's claims.**

After reviewing the Questionnaire and receipt provided by Ronald, Tanya instructed Ms. Law to prepare the Barrier Memo itemizing each of the inaccessible conditions at Zlfred's Ronald had reported on the Questionnaire. (SUF 49.)  Ms. Law did as instructed, and drafted the Barrier Memo on April 28, 2014.   (SUF 50.) She then provided it to investigator Geoshua Levinson ("Levinson") with instructions to visit Zlfred's, take photographs of the ten conditions identified in the Barrier Memo as appropriate, and to indicate whether the identified conditions existed. (SUF 51.).

Levinson completed the Barrier Memo and sent it along with the photographs he took to the Moore Law Firm for review by Ms. Law on July 7, 2014. (SUF 52.)   Levinson's completed Barrier Memo confirmed nine out of ten conditions Ronald Moore reported on his questionnaire he encountered. (SUF  53.)  Levinson did *not* confirm Ronald Moore's tenth reported violation that the checkout counter at Zlfred's was too high. (SUF 54.)

 After consulting with Tanya, Ms. Law then provided instructions to another legal assistant in the firm regarding drafting the complaint. (SUF 55.) Ms. Law reviewed the complaint after it was drafted, and she provided it to Tanya for final review and comment. (SUF 56.) Tanya went over the complaint with Ronald, and then sent it to Ronald for his review and verification. (SUF 57.) Because the investigator did not confirm Ronald Moore's claim regarding the height of the counter, Moore Law Firm did <u>not</u> include that claim in the complaint. (SUF 58.)  Ronald signed the verification on July 8, 2014, returned it to the Moore Law Firm, who then filed the complaint with the Eastern District of California against defendants Fatemeh Saniefar; Gholamreza Saniefar; Zlfred's Inc.; and Alireza Saniefar ("the Federal Action"). (SUF 59 and 60.)

**F.    The federal and state lawsuits against Saniefar.**

The Federal Action alleged that Ronald "requires the use of a wheelchair when travelling about in public" and that he is "'physically disabled' as defined by all applicable California and United States laws, and a member of the public whose rights are protected by these laws." (SUF

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

61.) The Federal Action also alleged that Ronald personally visited Zlfred's and encountered the nine Barriers that had been confirmed by Levinson. (SUF 62.)  Notably, the complaint did *not* include the tenth claim Ronald identified on his Questionnaire regarding the counter height – which Tanya and Levinson found not to be supported.[3] (SUF 63.)

In December 2014, Ronald hired a California Certified Access Specialist ("CASp") expert, Michael Bluhm, to inspect Zlfred's pursuant to a Rule 34 of the Federal Rules of Civil Procedure Demand for Inspection. (SUF 64.) Mr. Bluhm identified other conditions at Zlfred's that would interfere with access to the restaurant by individuals with mobility impairments, and he prepared a report of his findings for the Moore Law Firm. (SUF 65.) After reviewing Mr. Bluhm's report, Tanya caused a First Amended Complaint ("FAC") to be drafted and filed to include these additionally discovered conditions, which FAC was filed on January 29, 2015. (SUF 66.)

Subsequent to the filing of the FAC, Saniefar undertook remedial work at Zlfred's to address all the Barriers in the FAC.  (SUF 67.) In November 2016 – nearly two years after the FAC was filed – Saniefar filed a Motion for Summary Judgment on the basis that all the ADA violations identified in the FAC had been voluntarily repaired and the federal claims had become moot. (SUF 68.) In March 2017, the district court granted Saniefar's motion for summary judgment on the ground the federal claim had been rendered moot by Saniefar's remedial efforts and new policies.  (SUF 69.)  The district court refused to continue to exercise supplemental jurisdiction over Ronald's remaining state law claims, but dismissed those claims without prejudice to Ronald's ability to re-file them in state court. (SUF 70.)

On April 21, 2017, Ronald filed a complaint against Saniefar in the Fresno County Superior Court, case number 17CECG01361, for damages under the Unruh Civil Rights Act arising from his encounter with the inaccessible conditions he identified in the Federal Action (the "State Action"). (SUF 71.) On May 10, 2018, Saniefar filed a Motion for Summary Judgment on the basis

---

[3] Contrary to Plaintiff's allegations, the evidence shows that Levinson worked to *verify and reduce* (not supplement) the ADA claims against Zlfred's.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

that Ronald had failed to serve them with certain notices[4] pursuant to legislation enacted in October

2015, well after the Federal Action, but before the State Action. (SUF 72.) The state court granted

Saniefar's Motion for Summary Judgment on this procedural basis and dismissed the State Action

on or about July 26, 2018. (SUF 73.) The merits of Ronald's claims were never reached. (SUF 74.)

## II. The Moore Law Firm "pattern" is legitimate and nothing like the claimed scheme.

### A. The law firm "pattern" is a stringent set of protocols to ensure only meritorious lawsuits are filed.

In around 2009, the Moore Law Firm added the ADA practice to its existing

criminal/administrative practice. (SUF 79.) Initially, the firm only asked clients to provide receipts

of their visits to businesses where they encountered a condition(s) that interfered with their access

on account of their disability. (SUF 80.) At that time, the firm would receive the client's receipt,

usually in the mail or via facsimile, and would then call the client to find out what problems had

been encountered. (SUF 81.) The firm would take notes during this conversation, and the client

would be sent a letter stating that their claim would be investigated. (SUF 82.) Thereafter, Kenneth

Randolph Moore ("Randy"), Tanya, and/or Levinson would visit the business to confirm and

document the conditions. (SUF 83.)

By 2011, the firm began requiring its clients to provide written notes explaining their

experience at the businesses they visited, not just their receipts. (SUF 84.) Sometime in 2013, the

firm provided its clients questionnaires to be completed, questions that guided the client in

identifying with particularity the details of his or her visit to the business. (SUF 85.) And in 2013,

the firm began preparing the Barrier Memos and providing them to its investigators (usually

Levinson, and later, Rick) for use during the investigation of the business. (SUF 86.)

At all times, and usually after an investigation was undertaken, the responsible attorney

would determine whether the claims presented by its clients were sufficiently supported to warrant

the filing of a lawsuit. (SUF 87.) If not, the firm sent the client a letter rejecting the case. (SUF

---

[4] The notices require defendants in construction related accessibility claims to be advised of certain rights they may have should they choose to remediate the inaccessible conditions identified in the complaint. *See* Cal. Civ. Code §§ 55.53; 55.54.

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

88.) Otherwise, a paralegal prepared the complaint to be reviewed by the attorney and then sent it to the client for review. (SUF 89.) Once approved by the client, the complaint was filed. (SUF 90.)

The law firm's practice as described above was actually memorialized in a written checklist created by the firm's paralegal, Whitney Law, who was the person primarily responsible for pre-filing tasks when she was hired in January 2013. (SUF 91.) Ms. Law provided this checklist to the other paralegals and legal assistants at the firm who were involved in pre-filing matters for their use as well. (SUF 92.) That checklist continues to reflect the process of the firm to today. (SUF 93.)

Ms. Law also maintains a database of all potential cases that have been rejected by the Moore Law Firm (and Mission Law Firm) since she joined the firm in January 2013. (SUF 94.) Out of the 450+ claims submitted to the Law Firms by Ronald Moore from 2009 to the present, the firms have rejected over 200 cases. (SUF 95.)

Thus, the Federal Action against Saniefar is but one exemplar in the thousands of cases filed by the Moore Law Firm that follow the same practice: the law firm obtains a receipt from the client; reviews written information about the visit provided by the client and/or client interviews; investigates the claim; rejects cases that it does not believe have sufficient support; and drafts complaints for client review where the firm determines a client's claims are supported by sufficient evidence.

### B. Ronald Moore's ADA cases evidence the firm's admirable pattern.

As of the drafting of this motion, Saniefar has limited the scope of her RICO action to approximately 95 cases specifically filed by Ronald, which were identified in Saniefar's Supplemental Responses to Special Interrogatories, together with several other cases identified in her FAC here as supporting her claim that the law firm files fraudulent lawsuits. (SUF 111.) Each of those cases are separately discussed in Defendants' Statement of Undisputed Facts, numbers 112 - 604. (SUF 112 to 604.)

Even though Saniefar claims to have limited the scope of this action to those cases, Defendants have gone over and above the identified scope of this lawsuit to look at every federal

ADA lawsuit filed by Ronald, identified in SUF numbers 605 - 606. Defendants have dissected each of Ronald's ADA lawsuits to establish that the pattern of the firm is the same, and involves absolutely no fraudulent conduct. (SUF 605 to 606.)

Therefore, Defendants' Undisputed Fact numbers 102 to 606 demonstrate the following *for each and every case* filed by Ronald, unless otherwise noted, supported by substantial current and former Moore Law Firm employees' testimony and the parenthetically referenced documents that are attached to the supporting declarations:

1. From 2009 to approximately 2011, the Moore Law Firm received receipts from Ronald, who the firm later contacted by telephone to go over his experiences (receipts only);

2. After 2010-2011, Ronald provided his receipts along with notes of his visit/questionnaires that were received by law firm employees and provided to Tanya for her review (receipts, notes and questionnaires);

3. Ronald was sent a letter letting him know his information was received and that it would be investigated (acknowledgment letters to Ronald);

4. Prior to 2012, law firm staff provided information from Ronald's telephonic interviews (that took place after the receipt was received) to Randy, Tanya, and/or Levinson who then went to the business to inspect and document Ronald's claims;

5. After 2012, paralegals created a Barrier Memo from the Questionnaire (and at times further communications with Ronald to clarify the claims) (incomplete Barrier Memos);

6. The Barrier Memo was sent to an investigator with instructions to visit the subject business and report back whether the conditions Ronald reported were valid, as well as provide photographs (completed Barrier Memos);

7. If Tanya determined that a lawsuit was not warranted after reviewing the Barrier Memo and photographs, Ronald was sent a rejection letter (rejection letters; SUF 94 and 95);

8. If Tanya reviewed the Barrier Memo and photographs and determined that a lawsuit was warranted, she would instruct a paralegal to draft a complaint, omitting any conditions reported by Ronald that were not validated by the investigator (draft complaints);

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

9.  Tanya would review the complaint, and discuss it as appropriate with Ronald to confirm facts;

10. The complaint was sent to Ronald for review and verification (verifications);

11. The complaint was filed by a paralegal (filed complaints).

Of particular note is a letter sent by paralegal Kathy Powell to Ronald Moore in April 2012 (two years before the Zlfred's action) memorializing a telephone conversation she had with Ronald and his wife, Lynn Moore. That letter explained the difficulty the firm was experiencing after Ronald had provided inadequate information about his visits to businesses. Ms. Powell advised Ronald as follows:

> Per out telephone conversation, I am enclosing copies for the first few pages of the complaints recently filed on your behalf against property owners and business owners.
>
> The paragraphs beginning "While visiting …, Plaintiff personally encountered the following barriers" **comes from your experiences**. The list of items (a), (b), (c), etc. following each of these paragraphs are the words I take from your notes and comments. **Each receipt MUST BE accompanied with your notes and/or comments. If receipts come in blank, I will give you a call and get your comments.** (Another note: all receipts must be dated either by the facility or you and include the address of the Facility.) Without comments, I can't send our investigator out to investigate for violations or proceed with any action against any entity.
>
> On occasion, I will need better details or have additional comments after looking at the photographs provided by the investigation to clarify your complaints in the complaint. I will call you on those occasions." (Bold added; SUF 100.)

All the evidence shows conclusively that everyone at the law firm reasonably believed that Ronald visited the businesses he asked to sue. (SUF 79 to 110.) Otherwise, there would be no receipts; no questionnaires; no rejection letters; no barrier memos – none of Saniefar's sensational claims add up. The firm also would have no reason to repeatedly ask Ronald to provide detailed information about experiences if anyone thought he never actually had them. All the evidence shows diligence on the part of Ronald's attorneys to ensure that they only filed valid lawsuits on his behalf.

**Marejka Sacks had no knowledge of or participation in any fraudulent conduct.**

Saniefar alleges that paralegal Marejka Sacks worked with investigators to gather information for her use in drafting fraudulent ADA complaints where that Sacks knew the ADA plaintiff never visited the business. (FAC ¶¶ 41-43; 51.) Specifically, Saniefar alleges that Sacks received information and photographs from Levinson and/or Rick after their covert inspections of Zlfred's, and that Sacks then prepared or assisted in the preparation the complaint against Saniefar knowing Ronald had never visited. (*Id.*, ¶ 44.) Saniefar further alleges Sacks also filed documents with the courts and served discovery containing information she knew to be fraudulent – all based upon Saniefar's allegation that Sacks worked with investigators to manufacture "standing" for the firm's ADA clients. (*Id.*, ¶¶ 52, 65, 78-83; 103; 148-150; 158; 170-172; 181; 187.)

However, Sacks was not hired to join a criminal enterprise – she was hired as a paralegal in September 2010 for a civil rights firm at $20 an hour in an entry level position after she had completed her paralegal certification. (SUF 607.) Sacks accepted this position in part because her father was disabled, and she had witnessed first-hand how difficult the built environment was for him to navigate. (SUF 608.)

Sacks did not become substantively involved in the Federal Action until March 2015. (SUF 614.) Sacks's review of the Zlfred's file wholly supported her belief that Ronald personally visited Zlfred's and actually encountered the barriers himself. (SUF 614 to 615.) Nothing in the file suggested to Sacks that any of the allegations in the complaint or FAC were untrue. (SUF 614 to 615.) And as discussed above, Sacks had no reason to doubt Ronald's claim that he is substantially limited in his ability to walk. (SUF 614 to 615.)

Sacks at all times believed, and continues to believe, that each and every client of the firm is disabled and went to the business he or she sued. (SUF 612.) Sacks' belief is based upon reviewing medical records, observing the process of firm employees receiving receipts from clients, seeing email exchanges between attorneys and other paralegals evaluating cases, being asked if certain conditions encountered by the client are worth pursuing, observing that quite a few

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

cases were rejected, reviewing client Questionnaires (after lawsuits are filed), and sometimes reviewing client photographs showing the client at the business. (SUF 613.)

Even if Ronald (or any other of the firm's clients) had never visited the business he sued or if Ronald (or any of the firm's clients) is not in fact disabled, Sacks had no knowledge of such facts or any fraudulent scheme, and did not agree to or in fact participate in any such scheme. (SUF 607 to 618.)

**IV.  Rick Moore has no knowledge of or participation in any fraudulent scheme.**

Rick Moore also has no knowledge of or involvement in any fraudulent scheme. (SUF 619.) Rick began working for the firm as an investigator in around December 2014. (SUF 620.) During the course of his work, the firm would send him a Barrier Memo which contained a list of conditions he was told the firm's client had complained about at the business.  (SUF 621.)  He would go to the business, make observations and take measurements, and take photographs of the conditions identified on the Barrier Memo. Rick would then send the completed Barrier Memo and photographs back to the firm via Dropbox. (SUF 622.)  At no time has Rick ever investigated a business for the Moore Law Firm, Mission Law Firm, their employees, agents, investigators, clients or anyone else, that he believed or knew the law firm's client did not visit.  (SUF 623.)  At all times Rick believed the Barrier Memos accurately reflected conditions the law firm's clients had specifically complained about experiencing.  (SUF 624.)  Rick always believed that he began his investigation after a client sent the firm receipts and notes of his or her visit. (SUF 625.)   Rick also had no involvement in investigating the Zlfred's restaurant. (SUF 627.)

Rick has observed that his uncle Ronald uses a wheelchair and will use a cane when walking shorter distances.  (SUF 32.)  He has also observed Ronald to be in frequent pain and unstable when he uses cane to walk. (SUF 32.)  Based upon his personal observations, Rick has always believed that Ronald was had difficulty walking due to his pain and instability.  (SUF 626.)

Even if Ronald (or any other of the firm's clients) had never visited the business he sued or if Ronald (or any of the firm's clients) is not in fact disabled, Rick had no knowledge of such

facts or any fraudulent scheme, and did not agree to or in fact participate in any such scheme. (SUF 619.)

**V.     Ronny Loreto had no knowledge of or participation in any fraudulent scheme.**

Ronny Loreto ("Ronny") similarly has no knowledge of or participation in any fraudulent scheme. (SUF 628.)  Ronny's only involvement in the Zlfred's action was that he ate there in April 2014 with his grandfather Ronald, his grandmother Lynn Moore and his brother Jason Loreto - when Ronny was 16-years old. (SUF 634.)  Ronny helped his grandfather use the Zlfred's bathroom when he could not get his wheelchair into the stall.  (SUF 635.)  Ronny also helped his grandfather exit the bathroom when Ronald's wheelchair got stuck between the two exit doors. (SUF 635.)

Ronny lived with grandfather when he was a teenager, and Ronny would help Ronald with various chores and tasks. (SUF 629.)  Ronny would often accompany Ronald on outings both as a companion and to offer Ronald assistance, although Ronald always drove them when Ronny was a teenager. (SUF 630.) Ronny observed that Ronald used a wheelchair or cane whenever they went out in public.  (SUF 631.) Ronny further observed Ronald to be frequently in pain and struggling to move around the house.  (SUF 632.)

Ronny never used Ronald's credit card outside his grandfather's presence. (SUF 636.) Likewise, Ronny never provided any receipts for his own purchases to the Moore Law Firm or Mission Law Firm.  (SUF 637.)  Ronny has never provided any written information about his visits to business to anyone at the Moore Law Firm or Mission Law Firm. (SUF 638.)

## LEGAL STANDARDS

**I.     Summary judgment/partial summary judgment standard**

Under the Federal Rules of Civil Procedure, summary judgment is proper where the pleadings and evidence before the court "show that there is no genuine issue as to any material fact and that moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The purpose of summary judgment "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-324 (1986). Under such circumstances,

summary disposition of the case or issue(s) is favored "to secure the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327.

As to Rule 56's inclusion of "partial summary judgment" (although a misnomer), it permits "a determination before the trial that certain issues shall be deemed established in advance of the trial," and it "was intended to avoid a useless trial of facts and issues over which there was really never any controversy and which would tend to confuse and complicate a lawsuit." *Lies v. Farrell Lines, Inc.*, 641 F.2d 765, 769 n.3 (9th Cir. 1981) (quoting Professor Moore from *Luria Steel & Trading Corp. v. Ford*, 9 F.R.D. 479, 481 (D.Neb.1949).)  Thus, Defendants ask that the Court adjudicate all facts over which Plaintiff can establish no reasonable dispute so that any trial of this matter (set to be heard by a jury) can be greatly circumscribed and focused.

When the defendant is the party moving for summary judgment, it meets its burden of proof by establishing a lack of any genuine issue of material fact as to plaintiff's claims and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex*, 477 U.S. at 325 (the moving party has met its burden of showing the absence of a material issue by demonstrating "that there is an absence of evidence to support non-moving party's case."). Once the moving party has met its initial burden, the opposing party has the affirmative burden of coming forward with specific admissible evidence showing a genuine issue of fact. Fed. R. Civ. P., Rule 56(e). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industries Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

## II. RICO elements

A private civil action may be brought by a plaintiff under the provisions of RICO, alleging a violation of Title 18 U.S.C. § 1962(a), (b), (c) or (d). A plaintiff must prove the following elements: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. 18 U.S.C. § 1962(c), *see Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985).

A "pattern of racketeering activity" exists when a person commits two or more specified acts ("predicate acts") that have sufficient continuity so as to pose a threat of continued criminal

activity. *Ticor Title Ins. Co. v. Florida,* 937 F.2d 447, 450 (9th Cir. 1991). The Supreme Court, noting that the RICO does not define what constitutes a "pattern," turned to the legislative history of the statute, finding that a pattern cannot be established by "sporadic activity," and that "a plaintiff or prosecutor must show that the racketeering predicates are related, *and* that they amount to or pose a threat of continued criminal activity." *H. J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989).

To adequately allege the continuity prong, a plaintiff must allege either "a closed period of repeated conduct" that persisted over a "substantial period of time" ("closed-ended" continuity) or "past conduct that by its nature projects into the future with a threat of repetition" ("open-ended" continuity). *Id.* at 241-42.

"Racketeering activity" is defined as any "act" indictable under federal criminal statutes, including mail fraud and wire fraud. 18 U.S.C. §§ 1341, 1343.

Liability under RICO requires that each defendant have "conducted or participated in the conduct of the *enterprise's* affairs. . . . " *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993) (internal quotation marks removed; emphasis in original). While each defendant need not have committed the fraudulent act himself, liability attaches "where one acts with the knowledge that the prohibited actions will follow in the ordinary course of business or where the prohibited acts can reasonably be foreseen." *United States v. Lothian*, 976 F.2d 1257, 1262 (9th Cir. 1992).

In an alleged RICO conspiracy, a defendant must have been "aware of the essential nature and scope of the enterprise and intended to participate in it." *Baumer v. Pachl*, 8 F.3d 1341, 1346 (9th Cir. 1993) (internal quotation marks omitted). A conspirator must also "intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 63 (1997).

The RICO plaintiff can only recover to the extent she has been injured in her business by the conduct constituting the violation. *See also Living Designs, Inc. v. E. I. Dupont de Numours and Co.,* 431 F.3d 353, 361 (9th Cir.2005). RICO was intended to combat organized crime, not to

provide a federal cause of action and treble damages to every tort plaintiff. *Oscar v. University Students Co-operative Ass'n,* 965 F.2d 783, 786 (9th Cir. 1992).

**LEGAL ARGUMENT**

**I.      Saniefar's RICO claim.**

    **A.      Saniefar is limited to the specific predicate acts pled in the FAC.**

It is well-settled in the Ninth Circuit that parties generally cannot assert unpled theories for the first time at the summary judgment stage. *See Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1294 (9th Cir. 2000); *Hernandez v. Hughes Missile Sys. Co.*, 298 F.3d 1030, 1037 n.20 (9th Cir. 2002); *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1139 (9th Cir. 2004); *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968-69 (9th Cir. 2006). That is particularly true when the complaint is based on fraud and thus subject to the requirements of Rule 9 of the Federal Rules of Civil Procedure.

In her FAC, Saniefar included certain specific allegations to support her RICO theory of liability. Saniefar is therefore limited to the fraud as pled in her FAC. *IV Sols., Inc. v. Conn. Gen. Life. Ins. Co.*, No. CV 13-9026-GW(AJWx), 2015 U.S. Dist. LEXIS 189753, at *35 (C.D. Cal. Jan. 29, 2015) ("Allowing a party to pursue an unpled fraud claim at summary judgment essentially negates these requirements; more than that, it allows the party to mislead an opponent as to the true nature of his claims, and promotes the 'sue first, ask questions later' approach that Rule 9(b) exists to prevent.")

Saniefar's RICO claims are based upon the alleged predicate acts of mail and wire fraud. Specifically, Saniefar alleges that Ronald's initial disclosures and responses to interrogatories in the Federal Action contain fraudulent representations relating to 1) Ronald's disability; and 2) visit to Zlfred's. (FAC, ¶¶ 142 -153.) Saniefar's allegations of wire fraud identify documents that the firm electronically transmitted regarding 1) Ronald's disability; and 2) visits to Zlfred's and several other businesses.  (FAC, ¶¶ 154-204.)

Saniefar alleges that these predicate acts further the RICO scheme detailed in paragraphs 39 to 59 of the FAC. The scheme goes like this: ADA plaintiffs are paid a set fee for every

complaint in which they agree to be a plaintiff, and they are told by Randy and/or Tanya that they need not actually go to the businesses sued. Instead, defendants Rick and/or Levinson visit the businesses and provide a list of ADA violations they discover to defendants Tanya and/or Sacks who thereafter prepare a complaint. The complaints filed on behalf of ADA plaintiffs falsely allege that the plaintiff visited the business and encountered barriers to access that caused him or her difficulty, discomfort or embarrassment. Rick and Levinson also obtain receipts from their visits which receipts are then falsely claimed to be those of Ronald's or other ADA plaintiffs. Ronald's grandson, defendant Ronny Loreto, allegedly provides false testimony that he visited businesses with his grandfather, and apparently like Rick and Levinson, Loreto visits businesses without his grandfather to obtain receipts and then lie about having been there with his grandfather.

## II. There is no evidence to support Saniefar's RICO scheme or pattern.

Plainly and simply, Ronald is disabled under the ADA because he is substantially limited in his ability to walk. His medical records confirm that fact, as did an independent expert, Dr. Mark Levin. Even if Ronald were not disabled (and has been putting on an incredible act for the past 15 years), there is no evidence that any of the other Defendants knew or should have known that he was not disabled. After all, Ronald's own medical providers and experts believed him. Through personal observation and/or review of Ronald's medical records, each Defendant reasonably believed Ronald was disabled.

The pattern and practice of the firm is nothing like the story fabricated by Saniefar. Ronald visited Zlfred's. That visit is evinced by 1) his receipt; 2) his credit card statement showing that his credit card was used to pay for the Zlfred's meals; 3) the testimony of Ronald, his estranged wife and two grandsons; and 4) the Questionnaire Ronald completed and sent to his attorneys. Contrary to Saniefar's bare assertions, the evidence demonstrates that it was not until months after Ronald's April 2014 visit that Levinson went to Zlfred's to conduct his investigation.

The same pattern seen in Zlfred's is evidenced across the spectrum of cases Saniefar has identified are the subject of this action, as well as every case Ronald has filed: (1) clients visit a business and encounter conditions that affect their full and equal access; (2) the clients are

contacted about their experience, or fill out a Questionnaire about their experience and send it to the law firm for review; (3) the law firm sends a letter to the client confirming receipt of the client's information and promising to review; (4) the law firm reviews the Questionnaire and creates a Barrier Memo; (5) the law firm sends an investigator to the business to review the claims in the Barrier Memo; (6) the investigator reports back on the Barrier Memo and with photographs his findings; (7) the investigator's information is reviewed; a complaint is prepared and sent to the client for review and verification; and finally, a complaint is filed with the court.

There is no evidence of any RICO conspiracy or scheme because there has never been one. Saniefar filed this RICO lawsuit without any investigation into her claims. As we are now able to pierce the pleadings, this lawsuit will be seen for the travesty it is: a vehicle for Saniefar to conduct discovery into the depths of the law firms and individual defendants to find wrongdoing in retaliation for Ronald ever having dared to sue her family.

**III.    Even if Ron was not disabled, there is no evidence Sacks had any knowledge of it, let alone that they agreed to participate in or directed the enterprise.**

Even in the wild scenario where Ronald is not disabled and never visited Zlfred's, every piece of evidence demonstrates that Marejka Sacks believed otherwise.

Sacks was not involved in the Zlfred's action until well after the case was filed, and like Best, assumed the truth of the information in the file as just identified. Sacks further relied upon her personal observations of Ronald in February 2012 (during another trial involving Robinson Oil) where Ronald complained of pain, and evinced difficulty walking. Sacks did not know of any fraudulent conduct, and was no position to know it since none of the allegations in the FAC connecting her to it are true. Sacks did not work with investigators, did not communicate with clients, and did not draft complaints. All she could see was that the firm had a legitimate process of vetting client claims, and she would not even get involved until a defendant had appeared in the action.

The allegations in the FAC that Sacks was at the forefront of a fraudulent conspiracy similarly lack any evidence. Sacks has never been involved in the pre-filing procedures of the firm,

nor is she involved in the direction or operation of the firm. Sacks was a paralegal heavily involved in the law firm's legal practice, not its management or operation. The RICO claim against her fails as well.

**IV.     There is no evidence Rick or Ronny had any knowledge of or participation in any fraudulent scheme.**

Saniefar has also sued Ronald's nephew, Rick Moore, and his grandson, Ronny Loreto, for allegedly being involved in a scheme to file fraudulent ADA lawsuits.  However, there is no evidence that they did anything improper or that they knew of any alleged scheme.  Although Rick worked as an investigator for the firm, Rick was only asked to investigate businesses *after* he was told the client had already visited the business and provided a receipt confirming the client's visit.  In fact, Rick had no involvement in the Zlfred's lawsuit whatsoever and did not conduct the pre-filing investigation for that case.  Rick was only ever asked to confirm or deny the existence of ADA violations previously discovered by a client.  He never conducted any investigation for the purpose of "supplementing" complaints as alleged by Saniefar.

As for Ronny, his only involvement in the Zlfred's action was that he had dinner with his grandparents and helped his grandfather use the bathroom.  But since Ronny was a witness to the meal and Zlfreds' admitted violations of law, he has been an unwarranted target of this malicious RICO action.  There is no evidence that Ronny ever fraudulently used his grandfather's credit cards or collected any receipts on his grandfather's behalf for the purpose of filing any disability lawsuit.

Accordingly, Saniefar's claims against Rick and Ronny have no support under RICO and should be dismissed.

**<u>CONCLUSION</u>**

Based upon the foregoing, all of the undisputed evidence demonstrates that the Moore Law Firm and Mission Law Firm filed valid ADA lawsuits after conducting a diligent investigation. None of the Defendants had any knowledge of or participation in any fraudulent scheme or conspiracy.  As such, Defendants respectfully request that the Court dismiss this RICO case in its

entirely, or as to each defendant against whom Saniefar has failed to show was a knowing part of any RICO scheme.

Alternatively, Defendants ask that the Court enter an Order adjudicating those material facts and/or issues about which Saniefar can establish no reasonable dispute. This matter is set to be heard by a jury, and at present, involving approximately a hundred of ADA cases filed by Ronald. Defendants have voluntarily offered up evidence as to each of those cases, secure in the knowledge that they have done no wrong, but mindful of the rights they have had to waive in doing so. Adjudicating all facts and/or issues that are undisputed will streamline any trial and avoid a further waste of party and judicial resources necessitated by Saniefar's fishing expedition.

Dated: October 10, 2019

GORDON REES SCULLY MANSUKHANI, LLP

By: */s/ Steven R. Inouye*
Roger M. Mansukhani
David L. Jones
Steven R. Inouye
Attorneys for Defendants
Moore Law Firm, A.P.C.; Tanya E. Moore;
Kenneth Randolph Moore; Ronald D.
Moore; Zachary M. Best; Marejka Sacks;
Mission Law Firm, A.P.C.; Elmer LeRoy
Falk; Geoshua Levinson; Rick D. Moore;
West Coast CASp and ADA Services and
Ronny Loreto

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT