ROGER M. MANSUKHANI (SBN: 164463)
DAVID L. JONES (SBN: 112307)
STEVEN R. INOUYE (SBN: 245024)
GORDON REES SCULLY MANSUKHANI, LLP
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071
Telephone: (213) 576-5000
Facsimile: (213) 680-4470

Attorneys for Defendants
Moore Law Firm, A.P.C., Tanya E. Moore,
Kenneth Randolph Moore, Ronald D. Moore,
Zachery M. Best, Marejka Sacks, Mission Law
Firm, A.P.C., Elmer Leroy Falk, Geoshua
Levinson, Rick D. Moore, West Coast Casp and
ADA Services, and Ronny Loreto

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FATEMEH SANIEFAR<br><br>                Plaintiff,<br><br>vs.<br><br>RONALD D. MOORE, TANYA E. MOORE, KENNETH RANDOLPH MOORE, MAREJKA SACKS, ELMER LEROY FALK, ZACHARY M. BEST, MOORE LAW FIRM, a California Professional Corporation, MISSION LAW FIRM, a California Professional Corporation, GEOSHUA LEVINSON, RICK D. MOORE, WEST COAST CASP AND ADA SERVICES, a California Corporation, RONNY LORETO, and DOES 1 THROUGH 100, inclusive<br><br>                Defendants. | CASE NO. 1:17-cv-00823-LJO-BAM<br><br>**DECLARATION OF DEFENDANT MAREJKA SACKS IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ SUMMARY ADJUDICATION**<br><br>Date: November 14, 2019<br>Time: 8:30 a.m.<br>Dept: 4<br>Judge: The Hon. Lawrence J. O'Neill |

DECL. MAREJKA SACKS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/SUMMARY
ADJUDICATION

1.      I am over the age of 18 years, and a defendant in this action. I have personal knowledge of the following facts and if called as a witness, could and would testify competently thereto.

2.      From around 1982 to 1990, I worked in various legal positions, beginning as a legal secretary for various law firms, and then as a paralegal. My work varied from part-time to full-time. Around 1990, I left the legal field to run and operate a printing company which I did for the next approximately 20 years.

3.      In July 2010, I obtained my paralegal certification and AS in paralegal studies from West Valley College. I thereafter posted my resume on Craigslist, and received a call in or around September 2010 from Tanya Moore at the Moore Law Firm, P.C. ("Moore Law Firm"). While I had previous legal experience, I considered my application to be for an entry level paralegal position since so much time had elapsed since I had worked in the legal field.

4.      I interviewed at the Moore Law Firm in downtown San Jose, first with Tanya Moore, and then Tanya and Randy Moore together. They explained that the firm specialized in criminal defense and other related matters, but had begun a civil rights practice, representing persons with disabilities in federal court. I volunteered that my father was disabled, both visually and in his mobility.

5.      I visited with my dad at least once a week to take him out to dinner or otherwise, and witnessed firsthand how difficult it was for him to get around. My dad suffered several strokes (amongst many other medical conditions), and was very unstable walking. He always had to have his hands on my shoulders for support, and even then, we walked very slowly. I urged him to use his wheelchair, but he would usually refuse. He fell several times at home, and had to receive assistance from emergency responders.

6.      Because of my experience with my dad, I knew that being disabled does not mean that a person cannot walk – it means that walking is very difficult or even dangerous. My dad had a disabled placard, and it was critical that we park as near an entrance as possible because if

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

we couldn't, there would be no way he could make it inside because he could not walk very far. In those instances, we would leave, or I'd pull as close to the door as possible and ask strangers for assistance helping my dad to the door while I then parked the car and met up with him at the entrance. We would then do the same thing getting back to the car.

7.      The Moore Law Firm offered me a position as a paralegal at a rate of $20 per hour. I accepted the position, and began working for the firm in late September 2010 under the supervision of attorneys Tanya Moore, Kenneth Randolph Moore and later Zachary Best.

8.      When I first joined the firm, I worked alongside their senior paralegal, Martha Alvizo ("Martha"). Martha handled client communications and drafting complaints, under the supervision of Tanya Moore. Martha also assisted with the firm's criminal practice, mostly working with Randy Moore.

9.      Immediately upon hiring me, I was tasked with drafting a motion for default judgment. Thereafter, I was tasked with drafting joint scheduling reports. I had no experience with federal practice, and it took me a while to get up to speed with federal procedure. I also spent a lot of time reorganizing the firm's calendaring and document management systems.

10.     Within a few months, I became responsible for most of the firm's research and writing. Because the firm's practice had primarily focused on criminal defense, learning the civil rights practice was new for everyone, including Randy and Tanya Moore. Because I demonstrated proficiency with research and writing (as I had during my paralegal studies), that became my primary responsibility in both trial and appellate work, a responsibility that continued until I left the firm in August 2019.

11.     My pay was increased over my employment with the Moore Law Firm as my value to the firm increased. My pay was ultimately increased to $65 per hour, and stayed at that for approximately three years, and remained at $65 an hour when I left in August 2019.

12.     During my time at the Moore Law Firm (as well as when it became the Mission Law Firm, A.P.C.), I was also responsible for preparing matters for and attending trial, including drafting trial briefs and pre- and post-trial motions, and direct and cross-examination outlines. I

prepared clients for deposition and trial. I also had extensive contact with opposing counsel working on settlements – including attorneys at Sheppard Mullin. I further stayed abreast of evolving, relevant case law and advised the attorneys on integrating relevant developments into the litigation practice. Because of my background in printing, I also created firm marketing collateral and media responses. I also solicited pro bono opportunities in both the Eastern and Northern Districts, and assisted attorney Tanya Moore with pro bono prisoner actions.

13. Shortly after joining the Moore Law Firm, I noticed that our receptionist/office manager, Meylin Solozabal, was getting large envelopes in the mail full of receipts from clients. I asked her what the process was and why we were being given so many receipts. She told me that clients go to businesses, experience access issues, and then send receipts. Thereafter, Meylin explained, the client would be called to find out about what happened. It seemed to me this was a wildly inefficient way of getting information about the client's experience. I therefore suggested to Tanya Moore that clients be required to provide contemporaneous notes of their visits to businesses along with their receipts. In this manner, the client's recollection would be fresher, and Meylin and the firm's paralegals would not have to spend as much time obtaining the client's information.

14. Although I had substantial involvement in the firm's federal practice, I did not get involved in pre-filing matters or drafting complaints. I did not speak to investigators Geoshua Levinson or Rick Moore regarding investigations, or coordinate with them in any manner with regards to investigations. In fact, I knew (and still know) very little about the details of how the investigators go to businesses to verify client complaints or how we get the information back from them. Likewise, I do not draft the complaints or interact with the clients before a complaint is filed, except in very limited circumstances.

15. I did speak to Geoshua Levinson in matters unrelated to investigations involving problems with the firm's information technology because he handled that for the firm. I also had occasion to speak with Geoshua Levinson when drafting motions for summary judgment, or other dispositive or related motions (and oppositions). I have no recollection of ever

communicating with Rick Moore regarding any investigations.

16.     While I was at the Moore Law Firm (and Mission Law Firm), office manager/receptionist Meylin Solozobal, and paralegals Martha Alvizo, Kathy Powell, Whitney Law, and David Guthrie (and possibly others), were the employees whose responsibilities included working with investigators, communicating with clients, and drafting complaints.

17.     For the most part, I did not even know we had filed any actions until a defendant appeared and I was contacted, usually for an extension of time to respond to the complaint. When defense counsel would inquire about the action itself, I would have to pull up the complaint and look at it for the first time, and review the client file. Until then, I knew nothing about the cases that were filed except for a very few limited instances.

18.     However, based upon my review of the cases once a defendant appeared, it was always my understanding that all cases were initiated when a disabled client sent in a receipt and notes of his or her experience at a business. Thereafter, the law firm would send Geoshua Levinson or Rick Moore to go to the business with the list of conditions the client had complained about. The investigator would report back his findings, and provide his photographs. From there, the attorney assigned to the case would make a decision as to whether he or she would agree to represent the client in an action involving that business.  If the attorney agreed to representation, one of the paralegals would draft a complaint, the client would sign off on it via a verification, and a complaint would be filed.   My belief is based upon reviewing medical records, observing the process of firm employees receiving receipts from clients, seeing email exchanges between attorneys and other paralegals evaluating cases, being asked if certain conditions encountered by the client are worth pursuing, observing that quite a few cases were rejected, reviewing client Questionnaires (after lawsuits are filed), and sometimes reviewing client photographs showing the client at the business.

19.     I did draft template complaints, especially when necessary to conform to changing law.  Likewise, when a new legal issue arose outside Title III of the Americans with Disabilities Act, I would draft the legal portions of those claims. However, the factual details were still left to

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

other paralegals/attorneys at the firm.

20.    I was involved in Ronald Moore's case against Robinson Oil Corporation which went to trial in the Northern District of California. Approximately one week prior to the February 2012 trial, as we were preparing for trial, I met Ronald Moore for the first time when he came to the Moore Law Firm office to prepare for his testimony.  Ronald Moore walked up the stairs to the office from the parking lot using his cane, and with what appeared to be a great deal of difficulty and pain.   During the time he was at the office, he complained frequently about his pain, and he had difficulty concentrating. Whenever we travelled to trial, he used his wheelchair. I would offer to open doors for him, but he would sternly tell me that he could do so himself, and would often use his cane to help him.

21.    During my interactions with Ronald Moore, he told me some days are good, and some days are bad. On good days, he is able to do more than on bad days.  He told me some days he cannot even get out of bed.  Ronald Moore's report to me was consistent with what I have learned in my experiences with people, especially my parents.  My mother suffered from myriad ailments including chronic pain, and she could be good one day, and unable to do anything the next.

22.    I believe the only time I met Ronald Moore was when we were preparing for, and attending, the Robinson Oil trial. At all times he appeared to me to be a person who struggled with pain, and who evinced difficulty walking.

23.    In Ronald Moore's case against Zlfred's restaurant in Fresno, California, I did not become substantively involved until March 2015.  Prior to that, my only involvement was to address a scheduling issue that arose with attorney Tanya Moore, about which I emailed defense counsel Moji Saniefar.

24.    Once I became involved in the action, I reviewed the file.  My review of the file included: a) a review of Ronald Moore's case questionnaire wherein he detailed his April 14, 2014 visit to Zlfred's restaurant; b) Ronald Moore's receipt from his visit; and c) the investigator's photographs.  That review gave me no reason to believe anything other than that

Ronald Moore had visited Zlfred's. Further, during discovery, defendants' attorney, Moji Saniefar, requested that we provide the meta data for the photographs investigator Geoshua Levinson took of the restaurant. When I reviewed the metadata, it showed that Levinson's photographs were taken months after Ronald Moore's visit, which is exactly what I anticipated. Ms. Saniefar also requested that Ronald Moore provide his credit card statement containing the April 14, 2014 purchase Ronald Moore made. That information was obtained from Ronald Moore, and once again, my review evidenced that the credit card used for the April 14, 2014 purchase at Zlfred's was Ronald Moore's credit card.

25. Also during my work on the Ronald Moore action relating to Zlfred's, I reviewed Ronald Moore's medical records. I saw many references to chronic pain, degenerative disc disease, and hydrocephalus. It never occurred to me that Ronald Moore was faking it, or was not disabled. At all times I believed him to be disabled, especially since he was Randy Moore's brother, and Randy seemed fully assured of Ronald's disability.

26. During the Zlfred's lawsuit, and two other lawsuits in which attorney Moji Saniefar appeared to have some involvement and relationship with the defense attorney, Ty Kharazi, it became apparent that Ronald Moore's disability would be challenged. It seemed to me that Ronald Moore's testimony should be sufficient to establish his disability, but after talking to attorney Tanya Moore, it was decided that having an expert opine on his disability would be wise. As I recall, we had very little time to find an expert in time for expert witness disclosures, and so I searched for an expert witness service that could find us an expert in short order. Ultimately, I found American Medical Experts ("AME"). We provided AME Ronald Moore's medical records – the same medical records that had been obtained by attorney Moji Saniefar in the Zlfred's action.

27. AME found an expert witness who was qualified to opine on Ronald Moore's medical conditions. As I recall, AME kept the identity of the expert secret until after the report was provided. Ultimately, we learned the identity of the expert, Dr. Mark Levin. Dr. Levin reviewed Ronald Moore's medical records, and spoke to Ronald Moore as well. I reviewed Dr.

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

Levin's report, and it supported that Ronald Moore was substantially limited in his ability to walk.

28. Also during the Zlfred's action, attorney Moji Saniefar retained investigators Nick and Raymond Franco to surveil Ronald Moore. I reviewed the video surveillance on numerous occasions. Nothing about the surveillance led me to believe that Ronald Moore is not disabled. There was one segment showing Ronald Moore walking in his front yard without any assistance. I viewed this as being a "good day" for Ronald. In the other segments, it showed Ronald Moore using his vehicle as support. But what stood out to me in all the surveillance is that when Ronald Moore was out in public, he always travelled with his wheelchair. The video showed him consistently getting out of his vehicle, using his cane to get to the back, unloading his wheelchair, transferring to his wheelchair, and then wheeling to his destination. I fully believe Ronald Moore had no idea he was being watched, and therefore, it would make no sense to me that he would go through the effort of unloading his manual wheelchair or using it for transportation. And in many of the scenes, Ronald Moore was going to some type of alcohol or drug support facility – a place I do not believe he ever sued. In other words, he wasn't just travelling around in his wheelchair to support lawsuits.

29. Further, about five or so years ago, I spent a few hours in a manual wheelchair, and wheeled myself around my neighborhood. I found it extremely difficult, especially where there were slopes and cross-slopes. Where there were curb cuts that were not perfectly smooth, I would nearly topple over. Having had this experience, it would seem to me utterly implausible for someone to ever choose to use a wheelchair if he could easily walk. The burden would be far too great.

30. I do not know how anyone could conclude that Ronald Moore is not disabled. I do not know how people can look at another person from the outside and know what they are going through, or what they are at that moment working to overcome. Even so, I for one have at all times believed, and continue to believe, that Ronald Moore is substantially limited in his ability to walk, based upon my personal observations, review of his medical records, and his

DECL. MAREJKA SACKS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

expert's report.

31. While I did not work with investigators, or draft complaints (other than in limited circumstances), I would be shocked if the law firms ever filed complaints for clients who had never visited the businesses against whom we filed a lawsuit on the client's behalf. Still, if this were the case, I was not in a position to have any knowledge of such activities because they were far outside my responsibilities.

32. While working at the Moore Law Firm and Mission Law Firm, I would give Tanya Moore ideas about better ways to run the practice. However, I was not involved in the ultimate decision making which was left primarily to Tanya Moore, and occasionally Randy Moore while he was still at the firm. Likewise, I was not involved in the day-to-day operations of the firm. At all times I was employed at the Moore/Mission law firms, I was nothing more than an employee, and I was compensated like every other employee at the firm.

33. I did not know attorney LeRoy Falk had filed for bankruptcy, or that the Mission Law Firm had dissolved, until reading motions to stay/motions for reconsideration filed by Sheppard Mullin (the law firm representing Plaintiff in this action) in five cases in which they represented the defendants. In those motions, I learned for the first time about LeRoy Falk's bankruptcy and Mission Law Firm's dissolution. I was never involved in any type of substantive operational decision making at the firm. My involvement related to legal issues, with some marketing and employee management.

34. I have never met or communicated with Ronny Loreto or Jason Loreto.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. This declaration was signed by me in Saratoga, California on the date set forth below.

Dated: _____Oct 8, 2019_____

*Marejka Sacks*
Marejka Sacks (Oct 8, 2019)

Marejka Sacks

DECL. MAREJKA SACKS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION