ROGER M. MANSUKHANI (SBN: 164463)
DAVID L. JONES (SBN: 112307)
STEVEN R. INOUYE (SBN: 245024)
GORDON REES SCULLY MANSUKHANI, LLP
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071
Telephone: (213) 576-5000
Facsimile: (213) 680-4470

Attorneys for Defendants
Moore Law Firm, A.P.C., Tanya E. Moore,
Kenneth Randolph Moore, Ronald D. Moore,
Zachery M. Best, Marejka Sacks, Mission Law
Firm, A.P.C., Elmer Leroy Falk, Geoshua
Levinson, Rick D. Moore, West Coast Casp and
ADA Services, and Ronny Loreto

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FATEMEH SANIEFAR<br><br>Plaintiff,<br><br>vs.<br><br>RONALD D. MOORE, TANYA E. MOORE, KENNETH RANDOLPH MOORE, MAREJKA SACKS, ELMER LEROY FALK, ZACHARY M. BEST, MOORE LAW FIRM, a California Professional Corporation, MISSION LAW FIRM, a California Professional Corporation, GEOSHUA LEVINSON, RICK D. MOORE, WEST COAST CASP AND ADA SERVICES, a California Corporation, RONNY LORETO, and DOES 1 THROUGH 100, inclusive<br><br>Defendants. | CASE NO. 1:17-cv-00823-LJO-BAM<br><br>**DECLARATION OF MEYLIN SOLOZOBAL IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT/ SUMMARY ADJUDICATION**<br><br>Date: November 14, 2019<br>Time: 8:30 a.m.<br>Dept: 4<br>Judge: The Hon. Lawrence J. O'Neill |

-1-

Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd floor
Los Angeles, CA 90071

I, Meylin Solozobal, declare as follows:

1. I am over the age of 18 years, and a resident of the State of Florida. I am not a party to this action. I have personal knowledge of the following facts and if called as a witness, could and would testify competently thereto.

2. I began working for the Moore Law Firm, P.C. on August 30, 2007. At the time, the law firm practiced criminal defense. In around 2009 or so, the law firm began doing work relating to the Americans with Disabilities Act ("ADA") as well as continuing its criminal practice.

3. My job functions increased during my time at the law firm. At first, I answered phones, scanned documents, processed all mail, police reports, DMV discovery, ordered supplies and was responsible for filing. Later, I became more involved in bookkeeping, payment processing and assisting with client communications.

4. When the law firm first started the ADA practice, there were only a few clients, and several of them spoke Spanish. I speak Spanish fluently, and so I would talk to them about their problems at businesses. These clients would mail or fax receipts to the office from visits they made to businesses, and we would sometimes call them after receiving the receipts. I would work primarily with attorney Tanya Moore and, rarely, with Randy Moore to figure out what information I needed to get and what questions to ask.

5. Tanya Moore and paralegal Martha Alvizo trained me and explained to me how to obtain details and document information about what the client experienced at the facility. I would usually write a handwritten memo and later a typewritten memo to Tanya Moore regarding information communicated to me by the client. On occasion, I have also assisted during phone calls that Tanya Moore had with the Spanish-speaking clients.

6. Most of the clients sent their receipts to Moore Law Firm by mail and they often forward multiple receipts enclosed in one envelope. I had to follow procedures for safekeeping and later scanning receipts by saving them in proper folders, including sending clients a letter acknowledging that a new receipt was received and that we would investigate their complaints. Initially, we kept a log of receipts in so-called "ADA list" which was updated by Martha Alvizo,

myself and then Whitney Law, as new cases were received. The ADA list contained the name of the business, location of the business, and status of the case (e.g. rejected, pending investigation, etc.) Later on, as procedures developed, I became responsible for opening a Clio matter for each new receipt to make sure these were properly tracked and each one was documented. I would get a task through Clio from the attorney or paralegal as to what I had to do next.

7. I also responsible for answering the telephone and fielding certain client communications. Some of the clients would ask me about the status of their cases and why it was taking us such a long time to investigate their receipts. I would refer these clients to Tanya Moore or paralegals to discuss the process and any delays with the clients.

8. In the very beginning of ADA practice, once we figured out what problems the client experienced, attorneys Randy Moore, Tanya Moore, and/or their son/investigator, Geoshua Levinson, would go out to the business to see if the client's problems were still present at the facility and to take pictures to document them. I saw these visits on the calendar, and interacted with Randy Moore, Tanya Moore, and Geoshua Levinson so that I was aware they were visiting the businesses. I also assisted in making sure that the photographs that were taken ended up in the client files. I also, on occasion, assisted with putting together directions for the attorney to a business that they needed to visit.

9. Randy Moore's, Tanya Moore's, and Geoshua Levinson's visits to businesses always came after we had already received the clients' receipts and talked to the client about their problems.

10. In late 2010, paralegal Marejka Sacks joined the firm. Probably within the first six months of her being there, she noticed that I was receiving large envelopes from clients with many receipts enclosed. Ms. Sacks asked me how the firm learned what problems the client had experienced at the businesses listed on the receipts. I replied that we had to call the client to obtain that information from them. Ms. Sacks told me that the clients should have more involvement in providing information about their visit at the outset, rather than just sending us lots of receipts. After that, Tanya Moore implemented a new process where clients had to provide not only a

-3-
DECL. MEYLIN SOLOZOBAL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION

receipt, but also written notes about what problems they encountered.

11. Initially clients would send us handwritten notes, but at some point, the firm developed a formal questionnaire. I would provide the questionnaire to clients so they could fill out information about their experience. Then, the clients would send that completed questionnaire to us along with their receipt. This process cut down on a lot of work we had to do for each receipt and expedited processing of the cases, so that I would no longer receive envelopes full of receipts with no other information. However, some of the clients still had difficulties completing a questionnaire. For them, we continued to use primarily phone interviews in lieu of questionnaires.

12. If an attorney decided to accept the case after investigating the client's complaints, I was instructed to send a letter to the client with a fee agreement enclosed for their signatures. If the case was rejected, I was instructed to send a letter of rejection to the client. Once a signed fee agreement was received from the client, I would file it in the client's file. Letters of rejection were filed in a separate file. However, procedures for filing changed many times over the years.

13. Around 2014, the firm's procedures included both scanning of the original receipt and questionnaire after they were received from the client. We also filed these original documents in a bindertek file using plastic adhesive pockets for receipts and a plastic sleeve for questionnaires.

14. I left the firm in around June 2015 because I moved to Florida with my family. During my time at the firm, I gained intimate knowledge of the firm and its procedures in every area from clients, to bookkeeping, to invoicing, to firm management. I never had any knowledge of anyone at the firm, or Geoshua Levinson, or anyone else, going to investigate a business when the client had not already gone. In my experience, the firm's investigation efforts first began after a client mailed in his or her receipt and notes.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct. This declaration was signed by me in Miami, Florida on the date set forth below.

Dated: 09.30.19

Meylin Solozabal

-4-

DECL. MEYLIN SOLOZOBAL IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT/SUMMARY ADJUDICATION