# Exhibit 121

1              UNITED STATES DISTRICT COURT

2            EASTERN DISTRICT OF CALIFORNIA

3                 ---oOo---

4

5  RONALD MOORE,                )
                           )

6          Plaintiff,     )
                           )

7        vs.             )No. 1:14-cv-01067-SKO
                           )

8  FATEMAH SANIEFAR dba ZLFRED'S, et)
  Al,                   )

9                           )
          Defendants.     )

10  _____)

11

12

13                  DEPOSITION OF

14                  NICK FRANCO
               FRESNO, CALIFORNIA

15               JULY 15, 2015

16

17

18

19

20

21
  ATKINSON-BAKER, INC.

22  COURT REPORTERS
  (800) 288-3376

23  WWW.DEPO.COM

24  REPORTED BY:    THERESA G. MENDOZA, CSR NO. 12338

25  FILE NO.:      A9077BE

```
 1   making his way to the back of his SUV?
 2              A.  He would leave the building and use his
 3   wheelchair to get to the back of the SUV, and from
 4   there he would load his wheelchair into the back of the
 5   SUV by standing up from the wheelchair and folding it,
 6   folding his wheelchair up and lifting it into the back
 7   of his SUV.
 8              Q.  And when -- how did he open the door, back
 9   door of the SUV?  Was it still as he was seated down,
10   or when he was -- or after he stood up?
11              A.  I do know that I got that on film.  I
12   cannot, I can't exactly remember right now, but I would
13   have to refer to the film.
14              Q.  You don't have the film with you?
15              A.  I don't.
16              Q.  Was there any difference that you ever
17   observed in the way that Mr. Moore, the subject,
18   transferred from his wheelchair onto the driver's seat
19   of the car as he was leaving the club?
20              A.  If I understand you correct, your
21   question, he did use his cane to get -- after he was
22   done loading his wheelchair, he did use his cane to get
23   from the back of the SUV to the driver's side.  As far
24   as the days that I would see, it was all the same
25   routine of doing what he did, from loading his
```

21

1    wheelchair to get into the driver's seat of the SUV.

2         Q.  All right.  So nothing stands out in your

3    mind about any different way that he transferred on any

4    day that you observed?

5         A.  No.

6         Q.  And you mentioned that after that, you --

7    after Alano Club, you followed him to his house,

8    correct?

9         A.  Correct.

10        Q.  Did you observe any activity at the house

11   after that?

12        A.  When I followed the subject home?

13        Q.  Yes.

14        A.  The SUV would park, or he would park in

15   the residence driveway, and no activity would happen

16   after that.

17        Q.  When was the next time that you worked on

18   this project?

19        A.  The 22nd of April.

20        Q.  You didn't work on April 21st?

21        A.  Okay.  Yes.  I'm sorry, the 21st of April

22   would be my next time.

23        Q.  Okay.

24        A.  That was from 10:00 a.m. to 7:30 p.m.

25        Q.  And tell me, on that day, what activities

1    transferred into wheelchair on the way in and back into

2    the Suburban on the way out, any different than the way

3    you described happened on April 20th, 2013?

4           A.  On that, I'd have to refer to film,

5    because I can't remember exactly.

6           Q.  You don't have to refer to film.  I have

7    that film.  I'm asking if you remember anything that

8    was different.

9           A.  From what I can remember, nothing had

10   changed in his routine of getting to and from his

11   vehicle.

12          Q.  Okay.  And any notes that you have don't

13   indicate that there was something different as if he

14   all of a sudden, for example, decided to walk back and

15   forth to the club?

16          A.  No.

17          Q.  By the way, have you seen Mr. Moore walk

18   into any public establishments without using a

19   wheelchair?

20          A.  In my days of watching him, no I have not.

21          Q.  So you have never seen him walk into a

22   store from his vehicle, for example?

23          MS. SANIEFAR:  Objection.  Asked and answered.

24          MS. MOORE:

25          Q.  Have you seen him walk into any store from

24

# Exhibit 122

1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF CALIFORNIA

3                  ---oOo---

4

5    RONALD MOORE,                    )
                                      )
6            Plaintiff,               )
                                      )
7         vs.                         )No. 1:14-cv-01067-SKO
                                      )
8    FATEMAH SANIEFAR dba ZLFRED'S, et)
     al,                              )
9                                     )
             Defendants.              )
10   _____)

11

12

13

                   DEPOSITION OF
14                 RAYMOND FRANCO
                 FRESNO, CALIFORNIA
15                 JULY 15, 2015

16

17

18

19

20

21
     ATKINSON-BAKER, INC.
22   COURT REPORTERS
     (800) 288-3376
23   WWW.DEPO.COM

24   REPORTED BY:    THERESA G. MENDOZA, CSR NO. 12338

25   FILE NO.:       A9077BE

```
1          Q.  And then what did he proceed doing after
2   he took the wheelchair out of his Suburban?
3          A.  To my recollection, Mr. Moore used a cane
4   to get from the driver's seat to the rear of the
5   vehicle.  He placed his cane, after retrieving his
6   wheelchair out of the rear of the vehicle, placed his
7   cane inside the vehicle and got into his wheelchair.
8          Q.  Okay.  And then what did he do after he
9   got into his wheelchair?
10          A.  He wheeled himself into the building.
11          Q.  Were you able to observe him while he was
12   in the building?
13          A.  No.
14          Q.  At any occasion when you were following
15   him, were you able to observe or document anything
16   inside any building, that would include his residence,
17   for example, Kelly's Pet Store, the Alano Club?
18          A.  No.
19          Q.  Did you follow Mr. Moore on any of these
20   occasions into the building, any building, be it the
21   residence, be it the store, Alano Club?
22          A.  No.
23          Q.  So you were only surveilling the exterior
24   of common area?
25          A.  On this particular case, we only observed
```

```
1    again went to Alano Club and back home.

2              Q.  Doing everything basically the same thing?

3              A.  Same thing.  Same way.

4              Q.  When you say, same way, what do you mean

5    by that?

6              A.  He exits the vehicle, retrieves the

7    wheelchair from the rear of the vehicle and then wheels

8    himself into the building.  Then, when he's finished,

9    he wheels himself out, places the wheelchair into the

10   back of the vehicle, enters the vehicle and departs.

11             Q.  Okay.  Anything out of the ordinary that

12   you observed that day during this visit to Alamo Club?

13             A.  No.

14             Q.  After that visit to Alano Club, he drove

15   straight home, correct?

16             A.  Yes.

17             Q.  And did he stay at the residence with his

18   Suburban parked in the driveway for the rest of your

19   observation period?

20             A.  Yes.

21             Q.  So no other activity?

22             A.  Not from him.

23             Q.  All right.  Then the next one I believe

24   was April -- oh, wait.  That was April 24th.  Okay.

25   Next one was, correct me if I'm wrong, May 3rd,
```

```
 1   did see him walk along the, not the street per se, but

 2   the sidewalk.

 3              Q.  Okay.

 4              A.  And he --

 5              Q.  Sorry about that.  How many occasions did

 6   you see that Mr. Moore walked on the sidewalk?

 7              A.  I'd say two occasion.

 8              Q.  Okay.

 9              A.  At least.

10              Q.  All right.  So let me go back for a

11   second.  Other than when Mr. Moore arrived at his house

12   and goes and leaves his Suburban and goes, you assume,

13   inside his home, because he's going out of your sight,

14   right?  Have you ever seen him, in any public location

15   whatsoever, office building, Alamo Club, whatever else,

16   where he would get out of his Suburban and not use his

17   wheelchair?

18              A.  No.

19              Q.  No?

20              A.  No.

21              Q.  Okay.  Now let me go back to the occasion

22   you say you saw him walk, actually, two occasions you

23   said he walked on the sidewalk.  When was that?

24              A.  Let's see.  Am I allowed to look at my

25   video?
```

# Exhibit 123

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

_____

RONALD MOORE,                        )
                                     )
            Plaintiff,               )
                                     )
      vs.                            ) No. 1:14-cv-01067-SKO
                                     )
FATEMAH SANIEFAR dba                 )
ZLFRED'S, et al,                     )
                                     )
            Defendant.               )
                                     )
_____)

DEPOSITION OF LYNN MOORE

Friday, June 19, 2015

Fresno, California

Reported by:  Nannette R. DeGough, CSR No. 13872

APPEARANCES

For Plaintiff:        Moore Law Firm
                      By MS. TANYA E. MOORE
                      Attorney at Law
                      332 North Second Street
                      San Jose, California 95112
                      (408) 298-2000
                      tanya@moorelawfirm.com


For Defendant:        Saniefar Law
                      By MS. MOJI SANIEFAR
                      Attorney at Law
                      533 Airport Boulevard
                      Suite 400
                      Burlingame, California 94010
                      (650) 401-2222
                      moji@saniefarlaw.com

I N D E X

EXAMINATION BY                                      PAGE


MS. SANIEFAR                                        04

EXHIBIT INDEX

Defendant's Exhibits

1 - Copy of Subpoena to Testify              18

2 - Copy of a Complaint                      73

3 - Copy of a Complaint                      74

4 - Medical Records of Ronald Moore          75

<u>Fresno, California</u>

<u>June 19, 2015; 10:19 a.m.</u>

<u>Offices of Wood & Randall</u>

LYNN MOORE,

called as a witness by counsel for Defendant, being

first duly sworn, testified as follows:

EXAMINATION BY MS. SANIEFAR

Q.   Good morning.  My name is Moji Saniefar.

I represent the Defendant in a case brought by

Ronald Moore, who is your husband; correct?

A.   Yeah.

Q.   Okay.

A.   We're still married.  We're separated.

Q.   Right.  He mentioned that, actually.

Have you ever had your deposition taken before?

A.   Yes.

Q.   How many times?

A.   I think, twice.

Q.   And what cases were those?

A.   I had a medical malpractice lawsuit.  I had a

hip surgery when I was supposed to have a back surgery.

Q.   Okay.  So both depositions were related to

that --

A.   Uh-huh.

1 years.

2    Q.   Okay.  And do you know why he stopped doing

3 that job?

4    A.   He was having a lot of problems, medical

5 problems.

6    Q.   And were those medical problems related to his

7 disability?

8    A.   Yes.

9    Q.   As far as his disability, do you know what

10 condition he has that makes him disabled?

11    A.   Yes.

12    Q.   Or conditions.

13    A.   Uh-huh.

14    Q.   Can you list those, please.

15    A.   Well, he has water inside and outside his

16 brain.

17    Q.   That's the hydrocephalus?

18    A.   Cephalus, uh-huh.

19         He has severe degenerative disc disease.  And

20 they can't do surgery, because it's several levels.

21    Q.   Okay.

22    A.   He had a problem with using his arms.  He was

23 not able to use his arms.

24    Q.   Okay.

25    A.   But they did surgery on his neck, and that

1   helped.

2       Q.   Okay.

3       A.   He has problems with his knees.

4       Q.   Okay.   Anything else?

5       A.   (Witness shakes head.)

6       Q.   Okay.   The water on the brain, do you recall

7   when that was first diagnosed?

8       A.   No.

9       Q.   No.

10      A.   I just remember that he was really -- on the

11  floor.   Could not even like stand up or --

12      Q.   Okay.

13      A.   And he was -- couldn't hold anything down.

14      Q.   So how -- since he was diagnosed with the water

15  on the brain condition, how has his condition been since

16  that diagnosis until today?

17      A.   Kind of up and down.   I mean, sometimes he's

18  really bad, and he'll just stay in bed.   And sometimes

19  he's feeling, you know, better, and he'll get out and do

20  things.

21      Q.   Since there are ups and downs, is it then -- is

22  it then im -- not impossible.   Is it difficult to say if

23  he's gotten better or worse or the same?

24          MS. MOORE:   Objection to the extent it calls

25  for medical opinion.

BY MS. SANIEFAR:

    Q.    You can answer.

    A.    Well, he's certainly not gotten better.

    Q.    So does he have periods where he's still, like you said, on the floor, not holding down food?

    That still may occur?

    A.    It could.

    Q.    Okay.  So other than what you mentioned with the water on the brain -- about being on the floor, not being able to hold things down -- what other symptoms does it cause, that you've noticed?

    A.    He's in pain all the time.  He's like -- you know, he gets real dizzy.  He falls all the time.

    Q.    And these three things that you mentioned, the pain, the dizziness and the falling, those are associated with the hydrocephalus?

    A.    (Witness nods head.)

    Q.    I'm sorry, I should have mentioned that, yes.

    If you could, please --

    A.    Okay.

    Q.    -- verbalize the response.

    Sorry.  I was asking -- oh, are there any other symptoms, other than the pain, dizziness, falling at times, associated with the hydrocephalus?

    A.    Well, I was told that it causes rage --

1    Q.    Okay.

2    A.    -- but I don't know that.   I'm not a doctor.

3    Q.    Did you ever witness that happening?

4    A.    Uh-huh.

5    Q.    Oh, you did.   Okay.

6    A.    Yes.

7    Q.    Oh, thanks.   I'm terrible at reminding her.

8          Okay.   Anything else about the hydrocephalus,

9    that you know of, that you didn't share?

10   A.    No.

11   Q.    Okay.   So let's move to the severe degenerative

12   disc disease.

13         Do you know when he started experiencing that

14   illness?

15   A.    That's something that, I think, has come on

16   over, you know, a long period of time.

17   Q.    Okay.   So it's been gradually building up,

18   would you say?

19   A.    Yes.   And it just gets worse and worse.

20   Q.    Okay.   So that I understand, it hasn't gotten

21   better; correct?

22   A.    No.

23   Q.    It hasn't stayed the same?

24   A.    No.

25   Q.    It has gotten worse?

1     A.   Right.

2     Q.   And continues to get worse?

3     A.   And will continue to get worse, because there's
4 nothing they can do for it.

5     Q.   And so what symptoms does he have as a result
6 of the severe degenerative disc disease?

7     A.   He's in pain all the time.

8     Q.   Okay.

9     A.   He was on medication, and I went to the doctor
10 and told them that I was scared of the medication.
11 Because I had people telling me that it was killing
12 people, the pain medication.

13     Q.   Oh, it was for pain?

14     A.   Yeah.

15     Q.   So did he stop, then, taking the pain
16 medication?

17     A.   Yes.

18         The doctors told us that we couldn't stop, that
19 it could kill him.

20     Q.   Stopping the medication?

21     A.   Yes.  But we did it ourselves.

22     Q.   So he's no longer, at this time, on the
23 medication?

24     A.   No.  He hasn't been for years.

25     Q.   So does he take anything for pain, that you're

1  aware of?

2     A.   He'll take like aspirin or something, but he

3  doesn't take the pain pills.

4     Q.   So you mentioned that he has a lot of pain

5  associated with the disc disease.

6          Anything else, other than pain?

7     A.   Well, I mean, you know, when you have a back

8  problem, it causes all kinds of -- you know, your feet

9  going numb --

10    Q.   Okay.

11    A.   -- and problems with your knees and, you know,

12 sleep problems.

13    Q.   Okay.  Let's move to his arms.

14         You said that he's not -- he wasn't able to use

15 them, is that correct, until he had surgery?

16    A.   Right.

17    Q.   Okay.  When did he have the surgery?

18    A.   I knew you were going to ask me that.

19         I have no clue.

20    Q.   You can provide a range or an estimate of what

21 you think it was.

22    A.   I'm probably going to be way off.  You know, I

23 really --

24    Q.   It's okay.

25    A.   -- I really don't know.

1    Q.   So is it safe to say it was a long time ago?

2    A.   Uh-huh.

3    Q.   Would you say it's been over five years?

4    A.   Yes.

5    Q.   Do you think it may have been over ten years?

6    A.   I don't think so.

7    Q.   Okay.  And how did -- what were his symptoms

8    from having the arm problems?

9    A.   He was not able to hold things.

10   Q.   Okay.

11   A.   He would drop everything; his arms were numb.

12   Q.   And was there a particular -- you mentioned,

13   when he had neck surgery, that it got better --

14   A.   Uh-huh.

15   Q.   -- is that correct?

16   A.   Yes.

17   Q.   Did it completely alleviate those issues he was

18   experiencing; dropping, numbness?

19   A.   Not completely.

20   Q.   Okay.

21   A.   But it helped quite a bit.

22   Q.   Okay.  Does he still currently experience some

23   symptoms in his arms?

24   A.   Sometimes.

25   Q.   Oh, it's on and off?

1    A.    Yeah.

2    Q.    And what would be some examples of his current

3    symptoms when it's on?

4    A.    Just tingling in his hands and --

5    Q.    Anything else?

6    A.    Pain in his neck.

7    Q.    Okay.  Does he still have problems holding on

8    to something or dropping something?

9    A.    Not so much.

10    Q.    Okay.  His knees, you mentioned he also had

11    some issues with his knees.

12          Can you describe that?

13    A.    His -- I don't know which knee.  One of his

14    knees kept swelling up, like filling with water --

15    Q.    Uh-huh.

16    A.    -- and he'd have to keep going in and having it

17    drained.

18    Q.    Okay.

19    A.    And then his knees will just give out on him.

20    Q.    Both knees or just one?

21    A.    Both.

22    Q.    Both.

23    A.    Uh-huh.

24    Q.    And when both knees give out on him, is it due

25    to this water and swelling up, or is it a different

1   reason?

2          MS. MOORE:  Objection to the extent it calls

3   for a medical opinion.

4          THE WITNESS:  I don't know.

5   BY MS. SANIEFAR:

6       Q.   Did he have any surgery on his knees?

7       A.   Yes, I believe so.

8       Q.   And when do you think that was?

9       A.   I don't know.

10      Q.   Okay.  Was it over five years -- was it within

11  five years?

12      A.   I think maybe a little more.

13      Q.   More than five, you think?

14      A.   Yeah.  I'm not sure, though.

15      Q.   And since the surgery, how did it help?  How

16  did the surgery help?

17      A.   His knee doesn't swell up as much.

18      Q.   Okay.

19      A.   He doesn't have to keep going in there and

20  having it drained.

21      Q.   Okay.

22      A.   But his knees still hurt.

23      Q.   They hurt?

24           Do they ever give out still?

25      A.   Maybe sometimes.  I don't --

A. No.

Q. Okay. So did you look at any notes?

A. No.

Q. Did you talk to anyone?

A. No.

Q. Did you look at any pictures?

A. No.

Q. Okay. I don't think I asked, but did anything specific -- other than the items you mentioned happened over time with your husband's disability, for example, the lower back pain, were there any accidents that occurred that caused him any of the conditions that we talked about?

MS. MOORE: Objection. Compound and confusing and calls for speculation.

MS. SANIEFAR: I'll restate.

BY MS. SANIEFAR:

Q. Has your husband ever incurred any accident that caused him to be disabled?

A. He -- I'm not sure how to answer it. He has been in an accident, but it did not cause him to be disabled at the time.

Q. Okay. Do you recall when your husband started using a wheelchair?

A. No.

1    Q.   You don't.

2         Was it within the last five years?

3    A.   Maybe.  Maybe a little longer.

4    Q.   May be a little longer?

5         Would it have been over ten years ago?

6    A.   No.

7    Q.   Okay.  So would it be safe to say it's

8    somewhere between four to eight years?

9         Would you agree with that?

10   A.   Uh-huh.

11   Q.   Yes?

12   A.   Yes.  Sorry.

13   Q.   And do you know which symptoms he was

14   experiencing that caused him to start using a

15   wheelchair?

16   A.   Yes.  He was falling all the time.

17   Q.   Okay.  Anything else?

18   A.   He was in a lot of pain.

19   Q.   Anything else?

20   A.   Just he didn't really want to go out anywhere,

21   because he was afraid that he would fall and be

22   embarrassed or, you know, be in pain and not be able to

23   walk --

24   Q.   Okay.

25   A.   -- because he can't walk very far -- I mean,

1  without being in severe pain.

2      Q.   Okay.  So the falling, would that be associated

3  with the hydrocephalus?

4      A.   I believe so.

5      Q.   Any of the other conditions that we talked

6  about that would have caused the falling when he first

7  started using a wheelchair?

8      A.   I don't know.

9          MS. MOORE:  Objection.  That's compound,

10 confusing and calls for speculation.

11         MS. SANIEFAR:  You don't know.

12 BY MS. SANIEFAR:

13     Q.   Do you recall which one of his doctors, your

14 husband's doctors, suggested that he should use a

15 wheelchair?

16     A.   No.

17     Q.   No?

18         Now, when he was diagnosed with the

19 hydrocephalus, did his primary doctor diagnose him with

20 that, do you know?

21     A.   I don't believe so.  I know we were seeing a

22 lot of neurologists --

23     Q.   Okay.

24     A.   -- so I -- I couldn't really -- I really don't

25 remember.

1    A.   I have no idea.

2    Q.   Do you have an estimate of how many you believe

3  he's brought?

4    A.   No.

5    Q.   Do you think it would be over a hundred?

6    A.   No.

7        MS. MOORE:  Objection.  Asked and answered.

8  BY MS. SANIEFAR:

9    Q.   Do you think it would be over 50?

10   A.   Maybe.

11   Q.   Okay.  Would you be surprised if it was over

12  250?

13   A.   Yeah.

14   Q.   Of the cases that you can remember, do you know

15  of any of the cases initiated by Ronald Moore, whether

16  it went to trial?

17   A.   I don't know that.  I don't know.

18   Q.   Okay.  Do you have any knowledge about whether

19  most of the cases settled?

20   A.   You know, I wasn't really very involved in what

21  he was doing, because I worked 14 hours a day, came

22  home, and had to do laundry, cleaning, you know, dishes,

23  take care of the dogs, the yard, him, if he wasn't

24  feeling good.

25   Q.   Okay.  You mentioned that you worked a lot of

1      A.   No.  I'm sorry.

2      Q.   I just want to make sure, on April 14, 2014,

3  you did live on -- live at the Hughes address; correct?

4      A.   When was Mother's Day?

5      Q.   May -- May something.

6      A.   Yes.

7      Q.   Okay.  And I can't remember if I asked.  And

8  during -- well, strike that.

9           On April 14th, 2014, who else lived with you at

10 the Hughes address?

11     A.   Ronnie.

12     Q.   Okay.  And Ronald Moore?

13     A.   And Ron.  Uh-huh.

14     Q.   Okay.  No one else?

15     A.   No.

16     Q.   Do you recall the last time that Ronald Moore

17 went to see a doctor for his hydrocephalus?

18     A.   I'm not really sure.  We've been separated for

19 over a year.

20          But he was -- and I believe he still is seeing

21 a doctor, but I really -- I don't know.

22     Q.   Do you think he's still seeing a doctor for

23 hydrocephalus, specifically?

24     A.   Well, no, because I know they wanted him to put

25 a shunt in.

1          But when we went to San Francisco and talked to
2   the surgeon, because he has it inside and outside his
3   brain, she kind of talked him out of it.
4        Q.    Okay.  So he is no -- is it true to say that
5   he's no longer receiving treatment for the
6   hydrocephalus?
7        A.    Well, there's not really anything they can do
8   except put the shunt in.
9        Q.    Okay.
10       A.    And he doesn't want them going to the inside of
11  his brain.
12       Q.    And you mentioned he's not taking any
13  medication?
14       A.    Not taking any pain pills, no.
15       Q.    Oh, okay.  So is there any medicine you can
16  take for the hydrocephalus?
17       A.    No.
18       Q.    So as far as the hydrocephalus is concerned, it
19  is what it is?
20          He's living with it; correct?
21       A.    Uh-huh.
22       Q.    Okay.  How about the degenerative disc disease?
23          Does he currently see a doctor for that?
24       A.    I don't know.  I know he was seeing a doctor on
25  and off, but I really don't know what he's doing now.

1    Q.    Okay.  At the time that you were still living

2    at the Hughes address, so I'm talking about prior to

3    Mother's Day, 2014 --

4    A.    Uh-huh.

5    Q.    -- do you remember the last time that he had

6    seen a doctor for his back issues?

7    A.    No.

8    Q.    Do you have any knowledge as to whether he's

9    seen a doctor for his back after 2008?

10    A.    Yes.

11    Q.    Okay.  Do you know which doctor that would be?

12    A.    No, because I -- I switched -- he had Kaiser

13    for a while, and I took him off it, because all they

14    seemed to want to do is give him pain pills.

15          And every time he'd go in there, they'd give

16    him something else, until he had this big bag of pills.

17    Q.    So it -- do you recall when you transferred him

18    from Kaiser to another facility?

19    A.    No.

20    Q.    No?

21    A.    No.

22    Q.    Could it have been around 2008?

23    A.    Well, I'm not going to say it's not, but I just

24    -- I honestly don't remember.  I mean, you know, it

25    could have been; it could not have been.  I don't really

1    know.

2        Q.    Okay.  After he left Kaiser, where did he go

3    for his medical visits?

4        A.    I got him a different insurance through -- I

5    can't remember what it is --

6        Q.    Whatever you --

7        A.    -- but I got him a different insurance.

8        Q.    Okay.

9        A.    And I know we were seeing, actually, several

10   different doctors.  One at Peachwood Medical Group.

11       Q.    I'm sorry, what was that?  Peach --

12       A.    Peachwood Medical Group.

13       Q.    That's near Clovis?

14       A.    Uh-huh.

15       Q.    Okay.  Do you know what services they provided,

16   specifically?

17       A.    Well, you know, actually, it was -- it was

18   because I was trying to get him off the medication.

19       Q.    Okay.

20       A.    Because I thought it was causing more pain.

21             What I was told is that when you start taking

22   that medication, you build up a tolerance to it, and you

23   have to keep taking more and more and more.  And they

24   keep upping the dose, and it causes neurological damage.

25             So you think you're in more pain, so you keep

1    taking more, until you just die.

2      Q.    Okay.

3      A.    And so because Kaiser was not willing to help

4   me -- they're the ones that put him on all that

5   medication.   And I went down there, and told them they

6   did it, they need to fix it.

7         And they told me, no, they couldn't.   I started

8   seeking out another doctor.

9      Q.    Okay.

10      A.    And I know we went to several different

11   doctors --

12      Q.    Okay.

13      A.    -- trying to get help.   But everybody told me,

14   no, they couldn't -- there was nothing they could do for

15   me.

16      Q.    Okay.   And this Peachwood Medical Group was one

17   of the facilities you visited --

18      A.    Uh-huh.

19      Q.    -- for that?

20         And they were not able to help you, either?

21      A.    No.

22      Q.    Okay.

23      A.    She -- after a few visits, she refused to see

24   us anymore.

25      Q.    So as far back as you can remember, and I

1  understand you haven't been at home for a year or so, do

2  you know who his medical providers were, his most

3  recent, as far as you can recall?

4      A.   I do know.  I can't remember his name.  It's

5  over in Clovis, by the Clovis Medical Center.

6      Q.   It's a male physician?

7      A.   Yes.

8      Q.   And does he have a specialty, or is he a

9  general?

10      A.   I don't know.

11      Q.   And so do you know what Ronald Moore would go

12  to him for?

13      A.   You know, I really don't remember.

14      Q.   Other than this person at the Clovis Medical

15  Center, were there any other doctors that he went to?

16      A.   Like on a regular basis?

17      Q.   Yeah, exactly.  On a regular basis.

18      A.   Not since there's -- there's not really

19  anything they can do for him.  They can't do surgery on

20  his back, because there's too many levels.

21          There's nothing they can do about the

22  hydrocephalus, unless he wants to put a shunt in.  And

23  he won't do it, so --

24      Q.   Okay.  Again, just so I understand, of the

25  medical issues we specifically talked about that cause

1  him to be disabled, hydrocephalus, the knee issues, the

2  arms because of the neck --

3      A.    Uh-huh.

4      Q.    -- the lower back --

5      A.    Uh-huh.

6      Q.    -- for any of those four diagnoses, is he able

7  to do anything, other than some form of pain management?

8          MS. MOORE:  Objection.  That's confusing and

9  compound.

10  BY MS. SANIEFAR:

11      Q.    Would you like me to restate the question?

12      A.    Yeah.

13      Q.    Okay.  So I guess the easiest way is for me to

14  go through one by one.

15          His knees, does he still need to see a

16  physician regarding his knees?

17      A.    Not unless he starts swelling up again.

18      Q.    His back, does he still require to visit a

19  physician for his back?

20      A.    Well, not unless they come out with something

21  new to help him, because it's just -- it is

22  deteriorating.

23      Q.    Okay.  For his hands that are associated with

24  his neck, is there any physician that he could see to

25  assist him with any symptoms for that condition?

1    A.   Yes, but I -- I don't think that he would do
2  another surgery, unless it got bad enough that he
3  couldn't hold things again.
4    Q.   Okay.  And then we talked about the
5  hydrocephalus.
6         All he can do is a shunt, and that's not what
7  he wants to do?
8    A.   Yeah.  He doesn't want to do it.
9    Q.   Okay.  Now, you mentioned he has good days and
10  he has bad days?
11    A.   Uh-huh.
12    Q.   As far as you can recall from last being at the
13  house and seeing him on a regular basis, would he
14  require the use of a wheelchair all the time?
15    A.   If he went out, yeah.
16    Q.   If he went out.
17         And inside the home, how would he function --
18  or move about, I should say?
19    A.   He uses his cane or the wall --
20    Q.   Okay.
21    A.   -- or the railing.
22    Q.   Okay.
23    A.   Which is getting ready to fall off.
24    Q.   So can he just get up and walk to the kitchen?
25    A.   He has his cane most of the time.

1    Q.   If he had his cane.  Okay.

2    A.   I mean, he probably could.  Not saying he

3  can't.

4         But to avoid the pain, he usually has his cane

5  with him.

6    Q.   Okay.  I'm actually glad you made that

7  distinction.

8         So when you say "he probably could" --

9    A.   Uh-huh.

10   Q.   -- does he ever just deal with the pain and the

11  risk of perhaps falling?

12   A.   I don't -- I wouldn't say ever, because I don't

13  really -- I don't really know.  I mean, you know, I --

14  he usually uses his cane.

15   Q.   Okay.  So you --

16   A.   I'd say 99 percent of the time, he's got his

17  cane.

18   Q.   Okay.  Even inside the house; is that correct?

19   A.   Yes.

20   Q.   Okay.  At any point in the last five years,

21  have you personally seen Ronald Moore just get up and

22  walk without any cane or assistance?

23   A.   Possibly, I just can't recall a time.

24   Q.   Let's narrow it down.

25         How about in the last year preceding the time

1  that you moved out?

2      So prior to May of 2014, a year prior to that,

3  do you recall ever witnessing an incident where he just

4  got up and walked without any assistance?

5      A.   Well, if he didn't have his cane, normally he

6  would hold on to something --

7      Q.   Okay.

8      A.   -- like a wall or, you know, maybe have his

9  hand on the bed --

10     Q.   Okay.

11     A.   -- or I -- I can't -- I can't really recall any

12  time that he just got, you know --

13     Q.   Okay.

14     A.   -- gets up and walks.

15     Q.   We talked a little bit about Zlfred's.

16     A.   Uh-huh.

17     Q.   And I understand you can't recall,

18  specifically, the night of April 14th, 2014.

19         Do you recall ever there being an incident

20  where you had issues while you were there with your

21  husband, as far as accommodating his disability?

22         MS. MOORE:  Objection.  That's vague and

23  confusing, also compound.

24  BY MS. SANIEFAR:

25     Q.   Do you understand my question?

1      A.   Go ahead and repeat it.

2      Q.   Okay.  On any occasion where you and your

3   husband visited Zlfred's, do you recall, on any of those

4   occasions, an incident where he had trouble at Zlfred's

5   because of his disability?

6      A.   Since I don't recall the specific visit or the

7   date, it seemed like almost every time we went out,

8   there seemed to be something that there was a problem

9   with.

10      Q.   Okay.  Can you describe some episodes?

11      A.   There's been a few times that he's had to leave

12   restaurants to go use a restroom somewhere else, because

13   he couldn't get in.  He's very stubborn when it comes to

14   people helping him.  Like he wants to open the door.  He

15   wants to do everything on his own.

16           And so if he -- if he can't, then he gets very

17   frustrated.

18      Q.   Okay.  So you mentioned sometimes you'd have to

19   -- he'd have to leave because there is no restroom

20   facility that he could use.

21      A.   Correct.

22      Q.   Any other incidents that you can recall where

23   he was --

24      A.   Oh, there's been a few.

25      Q.   Can you name some examples.

1    A.    I don't remember where or when, but I know
2 there's been a few times when he's either called me to
3 come back to the restroom or called my grandson to come
4 help him or -- I don't know.

5    Q.    And when you say he calls you, how -- how does
6 he do that?

7    A.    Loudly.

8    Q.    Okay.  So --

9    A.    Very embarrassing.

10    Q.    So he yells out?

11         Would it be an accurate --

12    A.    Yeah.

13    Q.    -- way of describing it?

14    A.    Uh-huh.

15    Q.    So when he yells out and you go in to help, are
16 there other people who notice?

17    A.    Well, yeah, everybody in the restaurant is
18 staring at you like --

19    Q.    So it's that loud?

20    A.    It's kind of embarrassing, yeah.

21    Q.    Okay.  How often would you say that that's
22 happened?

23    A.    Well, I can recall it happening at least two or
24 three times.

25    Q.    Okay.  And those two or three times that you do

1    recall it happening, do you know what the result was?

2          Do you know who got up to help him, if anyone

3    got up to help him?

4        A.    Well, if Ronnie was with us, then, you know, I

5    would have Ronnie go help him.

6          But if it was just me and Ron, then, of course,

7    I would have to go help him.

8        Q.    Okay.  Were there ever any instances where a

9    fellow patron had to go and help him?

10          (Cellular telephone interruption.)

11          THE WITNESS:  I'm sorry.

12          You know, I do believe that I remember

13    something like that, but --

14          MS. MOORE:  Can we go off the record for just a

15    second?  Can we go off the record for just a second.

16          MS. SANIEFAR:  Oh, sure.  That's fine.

17          (Discussion off the record.)

18    BY MS. SANIEFAR:

19        Q.    I'm sorry.  You were saying you do recall an

20    incident.

21          I asked you if there was ever a patron that

22    helped --

23        A.    I think I do remember -- I think I do remember

24    either a patron or somebody from a restaurant --

25        Q.    Uh-huh.

1    A.    -- having to help him.

2    Q.    Okay.

3    A.    But I can't recall where or when.

4    Q.    Okay.  Do you recall if that ever happened at

5    Zlfred's?

6    A.    No.

7          (Cellular telephone interruption.)

8          THE WITNESS:  I'm so sorry.  I only have two,

9    no more.

10   BY MS. SANIEFAR:

11   Q.    If you remember, do you recall any time that

12   you've been to Zlfred's where you've also visited

13   another establishment around Zlfred's?

14   A.    I don't recall.

15   Q.    Have you ever gone to Zlfred's just to eat and

16   then go back home?

17   A.    Possibly.

18         Maybe if we didn't have kids with us.

19   Q.    Okay.

20   A.    I think it would just depend on whether we were

21   alone or whether we had the kids.

22   Q.    Okay.  Have you ever shopped at Big 5 Sporting

23   Goods?

24   A.    Uh-huh.

25   Q.    How often do you go there?

1  Q. Okay.  Do you know if it has ever happened,

2 specifically?

3  A. Well, I think so, yeah.

4  Q. Okay.  Is it a common occurrence?

5  A. Well, you know, I -- I really don't know, but I

6 -- I do know that Ron has him do a lot of stuff for

7 him --

8  Q. Okay.

9  A. -- when he's unable to.  Or, you know, if it's

10 too much trouble.

11  Q. Okay.  Have you ever signed a receipt on behalf

12 of Ronald Moore?

13  A. I don't remember a specific time, but it's

14 possible that I may have.

15  Q. Do you recall any time that you've signed a

16 receipt because he can't reach up to sign?

17  A. That's possible.

18  Q. Okay.  Do you recall a specific incident,

19 though --

20  A. No.

21  Q. -- where that has happened?  Okay.

22  Have you ever been present when Ronnie Loreto

23 has signed on behalf of Ronald Moore?

24  A. Not that I specifically remember.

25  Q. Okay.  But it could have happened?

1      A.    Yeah.

2      Q.    Okay.

3      A.    Because there's a lot of times when he'll go
4  someplace and he just can't reach.

5      Q.    Okay.  And when he can't reach, is it literally
6  because the height of the counter is too high?

7            Is that the reason?

8      A.    Yes.

9      Q.    And he can't -- he can't reach because of pain,
10  or he can't reach because of where he's sitting and the
11  height?

12            MS. MOORE:  Objection.  That calls for
13  speculation.

14  BY MS. SANIEFAR:

15      Q.    You can answer.

16      A.    Well, it could be both.

17      Q.    It could be both?

18      A.    Yeah.

19      Q.    Okay.

20      A.    Because standing up does cause him pain.

21      Q.    Right.

22      A.    And, you know, the reaching and then not be
23  able to --

24      Q.    Actually get --

25      A.    -- actually see --

1    Q.   Got it.

2    A.   -- you know, what he's signing --

3    Q.   Okay.

4    A.   -- so --

5    Q.   And in those instances, what happens?

6    A.   Well, there's been times when they've brought

7    something around the corner that's hard for him to be

8    able to sign on.

9    Q.   Okay.

10   A.   And then, you know, I'm sure, you know, if

11   Ronnie's there, maybe, you know, he would have him sign

12   it for him.

13   Q.   Okay.

14   A.   I don't know.

15   Q.   Do you personally ever recall Ronald Moore not

16   being able to reach, either because of pain or the

17   height difference, where he's asked you to sign for him?

18   A.   Possibly, but I don't specifically --

19   Q.    Recall an incident?

20   A.   -- recall.  Yeah.

21        MS. SANIEFAR:  I'm going to show you an

22   exhibit.

23        (Defendant's Exhibit 2 marked

24        for identification.)

25   ////

1 | pain medication.  I -- I don't know.

2 |     Q.   Have you ever seen Ronald Moore sign his name

3 | in this way?

4 |     A.   Well, not that I've really, I mean, looked at

5 | every signature that he signed at different points in

6 | his life.

7 |          But, no, that doesn't --

8 |     Q.   Okay.

9 |     A.   -- I would not think that was his signature.

10 |     Q.   Okay.  And is it your signature?

11 |     A.   I don't write that sloppy.

12 |     Q.   Okay.  We're finished with that exhibit.

13 |     A.   But this is possibly -- I mean, it could be

14 | his, because maybe he was on medication at that time,

15 | and he was pretty out of it.

16 |     Q.   So this time is 2006, May of 2006?

17 |     A.   Uh-huh.

18 |     Q.   Okay.

19 |     A.   He was going through a chronic pain management

20 | team at Kaiser.

21 |          Yeah, I don't -- I really don't know --

22 |     Q.   Okay.

23 |     A.   -- I couldn't tell you.

24 |     Q.   Would you describe your husband as an active --

25 | I understand he's disabled, but in his daily routine, is

1    he active, or does he stay home a lot?

2       A.    He -- he can be very active.   He'll be very

3    active for several days --

4       Q.    Uh-huh.

5       A.    -- and then he'll be in bed for several days.

6       Q.    Okay.  So when he is very active, describe that

7    for me.

8       A.    He'll get up and maybe go to like grandkids',

9    you know, games.  He goes to a meeting every day.

10      Q.    Uh-huh.

11      A.    He will go out with his friends and eat.

12            Just -- I mean, he just -- just different

13   things --

14      Q.    Okay.

15      A.    -- if there's -- like if he meets somebody new,

16   you know, that's from somewhere else, you know,

17   sometimes he'll give somebody a ride home that's from

18   another town or something.

19      Q.    Okay.

20      A.    It just depends.  Yeah.

21      Q.    When he goes out where he's either shopping or

22   eating, doing something retail oriented, would he ever

23   spend a great portion of his day doing that?

24            MS. MOORE:  Objection.  That's vague and

25   ambiguous.

1    BY MS. SANIEFAR:

2        Q.    You can answer.

3        A.    Sometimes, yeah.

4        Q.    So --

5        A.    Especially, if I wasn't home.  If I was

6    working.

7        Q.    So can you describe, kind of, a day like that?

8        A.    Just to keep his self busy.

9              And depending on whether had he the kids with

10    him or not --

11       Q.    Okay.

12       A.    -- because they want to stop everywhere.  They

13    constantly want stuff.

14       Q.    So he would be able, on a good day, to

15    accommodate the kids wanting to go out?

16       A.    Yes.

17       Q.    Okay.  And on a good day, that you've

18    witnessed, is there a particular length of time that's

19    his maximum, in terms of being active?

20       A.    It just depends on how much, you know, he's

21    having to get in and out of the car.  And it depends on

22    his day, you know, how he's feeling.

23       Q.    Okay.  Has he ever had such a great day that

24    he's able to, for the majority, if the not entire day,

25    be active?

1    A.    Sure.  But then he's also had his days where
2    he's in bed for two days.
3    Q.    Who is Rick D. Moore?
4    A.    Ricky D. Moore?  Ricky D --
5    Q.    Rick Moore.
6    A.    Rick.  You know, there's so many Ricks in this
7    family, I'm not sure.
8    Q.    Is there someone that goes just by the name
9    Rick Moore?
10   A.    Yeah, three of them.
11   Q.    Oh, there's three of them.  Okay.  Therefore,
12   that's why I'm confused.
13          So can you tell me who they are.
14   A.    He's got a brother, Rick.
15   Q.    Okay.  How old is he?
16   A.    I don't know.  I think a couple years older
17   than he is.
18   Q.    So in his 50's?
19   A.    Yeah.
20   Q.    Okay.
21   A.    I don't even know how old I am.
22   Q.    And that Rick, is he in Fresno?
23   A.    Yes.
24   Q.    Okay.  Who's the other Rick, the second Rick?
25   A.    His nephew.

1      A.   I have no idea.

2      Q.   Do you know if it was Visa, Mastercard,

3   American Express?

4      A.   I don't know.

5      Q.   You don't know.

6           And you don't know which bank it was with?

7           For example, do you recall where the money

8   orders would be sent to?

9      A.   Maybe Capital One.

10     Q.   This is not the one you have, right, this is --

11     A.   Well, mine's Capital One, too, but I'm kind of

12  thinking that maybe he has a different Capital One.

13     Q.   Okay.

14     A.   I really don't --

15     Q.   That's all you know?

16     A.   I can't think of any others.

17     Q.   Okay.  We talked a lot about the pain

18  medication and how you assisted Ronald to get off of

19  that.

20     A.   Uh-huh.

21     Q.   And you may have stated it, but I'm not clear.

22  When was it that you did this process of getting him off

23  of the medication?

24          I think I wrote in my notes --

25     A.   Honestly, I don't know.  I would have to go

1    back --

2        Q.    Okay.

3        A.    -- and check.

4        Q.    Is it over a year?

5        A.    Well, he was still with Kaiser, so -- and he

6    went through pain management.

7        Q.    The last medical record I have from Kaiser is

8    2008.

9              Does that refresh your recollection?

10       A.    That would probably be around the time, then,

11   because I took him off Kaiser --

12       Q.    Okay.

13       A.    -- and got him a different insurance.

14       Q.    So if it was 2008, and you mentioned how you

15   sort of started, by yourselves, weaning him off of the

16   pain medication, how long did that process take?

17       A.    A couple months before he really felt, you

18   know -- I mean, like he was really glad that I did it.

19       Q.    Okay.  So after a couple months, he was

20   completely just dealing with the pain?

21       A.    Yes.

22       Q.    Okay.  And so do you think, then, that would

23   have been 2008-2009?

24       A.    No, probably 2008.

25       Q.    2008.  Okay.

1    And then when we talked about the signature,

2  you said maybe he was in a lot of pain, and that's why

3  it looks -- you were just offering one possible

4  scenario?

5      A.   Yeah.

6      Q.   Since he has been off the pain medication, does

7  he still experience those episodes of severe pain that

8  would cause him to --

9      A.   Severe pain?

10     Q.   Uh-huh.

11     A.   Yes.

12     Q.   To the same extent that he had prior, when he

13  was at Kaiser?

14     A.   Well, I really couldn't answer that.  I mean --

15     Q.   Right.  Okay.

16     A.   -- because it's not -- not my pain.

17          But I don't -- I don't really know.

18          MS. SANIEFAR:  Okay.  Can we go off the record

19  for five minutes?  I think I'm done.  I just want to

20  check my notes.

21          (Short recess was taken.)

22  BY MS. SANIEFAR:

23     Q.   You mentioned that you were in San Jose for a

24  little while --

25     A.   Uh-huh.

1   A. -- you know, if they had like one and had to

2 play the next day or -- you know --

3   Q. And would you go --

4   A. -- so just depends.

5   Q. Would you go with him during those specific

6 times where he went for his nephew's games?

7   A. No, I didn't ever go to any of the games.

8   Q. Okay.

9   A. I would just go for visits.

10   Q. Okay.  Would you go as often as he would go?

11   A. No.

12   Q. We talked about his level of pain --

13   A. Uh-huh.

14   Q. -- correct?

15   And you said he has good days and he has bad

16 days.  And you said the bad days could be really bad.

17   On those really bad days where he was in a very

18 high level of pain, could he do anything?  Or was he

19 restricted to the house?

20   A. Well, usually, on those really bad days, he did

21 not even want to get out of bed.

22   Q. Okay.  So when the pain level was very high, he

23 would -- is it safe to say he would generally be at

24 home?

25   A. Uh-huh.

# Exhibit 124

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

_____

RONALD MOORE,                         )
                                      )
            Plaintiff,                )
                                      )
        vs.                           ) No. 1:14-cv-01067-SKO
                                      )
FATEMAH SANIEFAR dba                  )
ZLFRED'S, et al,                      )
                                      )
            Defendant.                )
                                      )
_____)

DEPOSITION OF RHONDA MOORE

Friday, June 19, 2015

Fresno, California

Reported by:  Nannette R. DeGough, CSR No. 13872

1                    APPEARANCES

2

For Plaintiff:          Moore Law Firm
3                       By MS. TANYA E. MOORE
                        Attorney at Law
4                       332 North Second Street
                        San Jose, California 95112
5                       (408) 298-2000
                        tanya@moorelawfirm.com
6

For Defendant:          Saniefar Law
7                       By MS. MOJI SANIEFAR
                        Attorney at Law
8                       533 Airport Boulevard
                        Suite 400
9                       Burlingame, California 94010
                        (650) 401-2222
10                       moji@saniefarlaw.com

11

12  Also Present:          Witness' son - Jason
                        Infant daughter
13

14

15

16

17

18

19

20

21

22

23

24

25

I  N  D  E  X

EXAMINATION BY                                    PAGE

MS. SANIEFAR                                       04

EXHIBIT INDEX

Defendant's Exhibits

1 - Copy of Subpoena to Testify                    5

2 - Copy of a Complaint                           20

3 - Copy of a Complaint                           20

4 - Medical Records of Ronald Moore               21

Fresno, California

June 19, 2015; 1:09 p.m.

Offices of Wood & Randall

RHONDA MOORE,

called as a witness by counsel for Defendant, being

first duly sworn, testified as follows:

EXAMINATION BY MS. SANIEFAR

Q.   Hello.  My name is Moji Saniefar.  I represent

the defendant in an action initiated by Ronald Moore.

A.   Uh-huh.

Q.   And Ronald Moore is your father; correct?

A.   Yes, he is.

Q.   Have you ever had your deposition taken before?

A.   No, I haven't.

Q.   So I'm just going to explain the process.

So you were just sworn in --

A.   Uh-huh.

Q.   -- so you have to testify truthfully.  And your

testimony has the same force and effect as if you're in

a courtroom with a judge.

A.   Right.

Q.   If you don't understand a question I'm asking,

don't answer it.  Just ask me to repeat myself or change

it, or just say, "I don't know what you're saying."

1    Q.    Okay.

2    A.    I think he said he was getting 10 to 20 hours

3  per week.  Just depends.

4    Q.    And does he work these days until --

5    A.    I'm sorry -- yeah, 10 to 20 hours a week, yeah.

6    Q.    Weekdays and weekends?

7    A.    Yes.  Uh-huh.

8    Q.    I understand Ronnie lives with your father;

9  correct?

10    A.    Correct.

11    Q.    How long has he lived with Ronald Moore?

12    A.    Maybe -- I'm not positive.  Rough estimate,

13  year, year and a half.

14    Q.    Okay.  And is there a particular reason why

15  he's living with your dad?

16    A.    My dad started needing more help.

17    Q.    Okay.  So he physically assists your dad --

18    A.    Right.

19    Q.    -- with his daily routine?

20    A.    Right.  And just household things and --

21    Q.    Okay.  And, currently, is it just Ronald Moore

22  and Ronnie Loreto that --

23    A.    Yes.

24          MS. SANIEFAR:  Let's go off the record.

25          (Short recess was taken.)

1  BY MS. SANIEFAR:

2      Q.   Is it just Ronald Moore and Ronnie Loreto that

3  live at the 80 Hughes address?

4      A.   Correct.

5      Q.   Rhonda, what can you tell me about your dad's

6  disability?

7           Do you remember when it started?

8      A.   Years ago.  I can't recall an exact date.

9      Q.   Okay.  And as far as you know, presently, can

10 you describe for me what his disabilities are?

11     A.   I mean, I haven't been to the doctor with him,

12 so I couldn't --

13     Q.   Right.

14     A.   -- you know, give you exact terms.

15          I know he has back problems, neck problems, leg

16 problems.  There was problems with his arms, at some

17 point.

18     Q.   Okay.

19     A.   I know he had an issue with -- let me think.

20 It was called hydrocephalus, where it was like water on

21 the brain --

22     Q.   Right.

23     A.   -- and it causes him to get really unsteady.

24 And he's fallen on several occasions, so he's just not

25 steady.

1    Q.   Okay.  Since he first started having these

2  symptoms, is he better, worse, or the same today?

3    A.   Which symptoms --

4    Q.   Okay, let's --

5    A.   -- specifically?

6    Q.   Hydrocephalus.  Do you know if the symptoms

7  from that are better, worse or the same?

8    A.   From my personal perspective --

9    Q.   Right.

10   A.   -- I would say worse.

11   Q.   Worse.

12        So how so?

13   A.   Just -- he just -- his ability to do things on

14 his own has just been declining.  He doesn't like to

15 admit it, because he's kind of a proud person, but his

16 ability to do things just for himself has just declined

17 over the last couple of years.

18   Q.   Okay.  And how does the hydrocephalus affect

19 that -- what symptoms has he actually experienced that

20 makes that difficult for him?

21   A.   Being unable to walk.  I guess, it makes him

22 real dizzy, and he just -- he'll fall.  Like I've seen

23 him just fall.

24   Q.   Okay.

25   A.   He's like a big tree.

1    Q.    And is there pain also associated with the
2  hydrocephalus, or is it just the dizziness?
3    A.    I couldn't tell you that.  I'm not sure.
4    Q.    How about -- I understand he has lower back
5  pain; correct?
6    A.    Right.  Yeah.
7    Q.    Since he started having those symptoms, from
8  what you see, is it, in your opinion, better, worse or
9  the same?
10    A.    I would say the same.
11    Q.    The pain --
12    A.    Yeah.
13    Q.    -- from that is the same?
14    A.    Yeah.
15    Q.    Okay.  Then I understand he had some arm or
16  hand problems?
17    A.    Yeah.
18    Q.    How has that gotten over the years; worse,
19  better, same?
20    A.    I would say maybe a little bit better, as far
21  as his hands go.
22    Q.    Okay.
23    A.    But, I mean, I know he still does have issues
24  with it.
25    Q.    Okay.

1    A.    But I believe it's gotten a little bit better.

2    Q.    To the extent you know, what issues does he

3    still have with his hands or arms?

4    A.    Just numbness.

5    Q.    Okay.

6    A.    I know he's -- oh, you just want to know about

7    his hands and arms?

8    Q.    Yeah.

9    A.    Okay.  Yeah, I believe, numbness and just, you

10    know, his strength, I guess, because it goes numb.  He

11    doesn't have the strength that he needs.

12    Q.    Okay.  And I think the other -- I'm trying to

13    find his other symptoms.

14          Okay.  Knees.  His knees.

15    A.    Uh-huh.

16    Q.    Do you know anything about that?

17    A.    I just -- I just know he has a hard time

18    getting around --

19    Q.    Okay.

20    A.    -- just because of his neck, back and knees.  I

21    know it causes him -- he struggles, significantly.

22    Q.    Is it both knees?

23    A.    I don't know.

24    Q.    Okay.  Are you in any way involved with taking

25    your father to medical appointments?

1          Is it on Blackstone, I believe?

2     Q.   Yeah.  So you've never been there.

3          Do you recall an incident where your parents

4     have said they've been there?

5     A.   No.  They go out to eat a lot, so, I mean --

6     Q.   And I think you answered this, but just so I

7     make sure, you don't recall a conversation with Ronnie

8     about having gone to Zlfred's?

9     A.   Not specifically, no.

10    Q.   Have you ever had a conversation with Ronnie

11    about places that he's gone to with your dad, Ronald,

12    and your father having experienced difficulty due to his

13    disability?

14    A.   Well, on several occasions, we talk about my

15    dad's struggles, but not specific to any one occasion or

16    any particular place.

17    Q.   Okay.  Can you provide any examples or specific

18    conversations that you've had, with either your dad or

19    one of your children, about your father having

20    experienced a difficulty at a retail or a public

21    establishment?

22    A.   Not -- I can't recall anything specifically.

23         Like I'll just talk to Ronnie, I'll say, "How

24    is your papa doing today?  Is he having a good day?  Is

25    he having a bad day?"  You know, "Did anything happen?"

1    Just --

2        Q.    Okay.

3        A.    Yeah.  So nothing real specific.  And I know my

4    dad is a proud person, so he probably asks Ronnie not to

5    tell us like, you know, all that he's struggling with.

6        Q.    Okay.

7        A.    So Ronnie tries to stay vague.

8              And, you know, I try to pry as much out of him

9    as possible, to make sure that everything is okay or I

10   don't need to intervene.  So I try to stay on top of

11   that as much as possible.

12             But I think Ronnie tries to respect him in

13   being vague with me.

14       Q.    Okay.  Has there ever been a time where you've

15   been with your father where you've witnessed him

16   experiencing difficulty at a place?

17       A.    All the time.

18       Q.    Can you name some examples of --

19       A.    Where was the last place I went with him?

20             I mean, he experiences difficulty all the -- I

21   don't know exactly what kind of difficulty you're

22   looking for.  He has difficulty getting out of the car,

23   getting his cane, getting his wheelchair.  I mean,

24   everything is difficult for him.

25       Q.    Okay.

1        A.    So any -- anything on top of that is just going
2    to add to his difficulty, you know.
3        Q.    Okay.  So I'm just going to go through some
4    examples, just to see if you've been present during one
5    of these potential episodes.
6              Have you ever been with your father when he's
7    not able to sit at a table that accommodates his
8    wheelchair?
9        A.    I've seen him -- well, I've seen him struggle
10   with -- yeah, when he was having trouble kind of
11   scooting in close enough to get to his meal, yeah.
12       Q.    Have you ever been a witness to a time where he
13   can't open a door?
14       A.    Yes.
15       Q.    Okay.  And what does he do in those
16   circumstances?
17       A.    Well, if I'm with him, you know, there's --
18   usually, if there's somebody with him, you know, we'll
19   try to handle it for him.  He doesn't like it, but, you
20   know, we just sort of step in and help him as much as we
21   can.
22       Q.    So is he usually with someone when he's out in
23   public, or not necessarily?
24       A.    As far as I know.
25              I mean, I don't know what he does when I'm not

1  there.

2      But as far as I know, he tries to have somebody

3  with -- he tries to have Ronnie with him, for the most

4  part.

5      Q.   Have you ever witnessed a time where your

6  father was stuck in a restroom at an establishment?

7      A.   I don't think he would tell me if he was stuck

8  in a restroom.

9      Q.   So you've never been there when it happened --

10     A.   No.

11     Q.   -- potentially?

12     A.   No.

13     Q.   And have you ever experienced a time when he

14  couldn't -- he had to leave an establishment because

15  they just couldn't provide him with the right access;

16  for example, if there was no bathroom?

17     A.   I've -- yeah, I've been with him where he was

18  frustrated to the point where he wanted to leave.

19          But, you know, everybody was there, and we were

20  helping him.

21          But he's been frustrated to the point where he

22  just wanted to go, because he doesn't like to struggle

23  in front of people.  It's embarrassing for him, so --

24     Q.   Okay.

25     A.   Yeah.

1      Q.    How about your father signing a receipt?

2          Have you ever been present when he's had

3  difficulty reaching up --

4      A.    Yes.

5      Q.    -- physically to sign the receipt?

6      A.    Yeah.

7      Q.    So what does he do in those circumstances?

8      A.    Usually one of us will sign it for him.

9      Q.    Okay.

10     A.    Whoever's with him, he just says, "Sign my

11  name."

12     Q.    Okay.  So when he does say that, are those the

13  times where he can't reach to sign the credit card

14  receipt?

15          Or are there other times where he says, "Sign

16  my credit card"?

17     A.    No.  It's usually when he can't do it himself,

18  then he'll just have us do it.

19     Q.    And those times where he can't do it himself,

20  other than reaching up, are there any other reasons why

21  he couldn't do it himself, that you know of?

22     A.    I would imagine -- I mean, if his -- if he's

23  having like the numbness in his hands or arms, he would

24  struggle doing that.

25          But other than that, I don't know.

# Exhibit 125

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

————————————

RONALD MOORE,                        )
                                     )
            Plaintiff,               )
                                     )
      vs.                            ) No. 1:14-cv-01067-SKO
                                     )
FATEMAH SANIEFAR; GHOLAMREZA )
SANIEFAR; ZLFRED'S INC., a   )
California corporation;      )
ALIREZA SANIEFAR, Trustee of )
the BOST TRUST,              )
                                     )
            Defendants.              )
                                     )
_____)


DEPOSITION OF RONNY LORETO

Tuesday, July 14, 2015

Fresno, California

Reported by:  Bree Mervin, CSR No. 13057, RPR, CRR

1                    <u>Fresno, California</u>

2          <u>Tuesday, July 14, 2015; 11:10 a.m.</u>

3               <u>Offices of Wood & Randall</u>

4

5                     RONNY LORETO,

6   called as a witness by counsel for Defendants, being

7   first duly sworn, testified as follows:

8                    EXAMINATION BY MS. SANIEFAR

9       Q.   Hi, Ron.  My name is Moji Saniefar.  I

10  represent the defendants in an action brought by Ronald

11  Moore, and I have asked you to come here today to

12  discuss some of the allegations in the complaint.

13      A.   Okay.

14           MS. SANIEFAR:  Counsel, do you want to

15  introduce everyone in the room for the record?

16           MS. MOORE:  Everybody can state their name for

17  the record.

18           I'm Tanya Moore.  I am here as the attorney for

19  Mr. Ronald Moore, who is the plaintiff in this action.

20           MR. MOORE:  Ron Moore.

21           MS. RHONDA MOORE:  I'm Rhonda Moore, Ronny

22  Moore's mother.  My daughters Olivia Morgan and Abigail

23  Morgan are here.

24           MR. LEVINSON:  Joshua Levinson.

25

1  doing something else.  It's always different days,

2  different times.

3       Q.   You do believe you're there a little more than

4  50 percent; correct?

5       A.   Yeah.

6       Q.   Do you drive?

7       A.   No, not yet.

8       Q.   So you don't own a car?

9       A.   I own a car.  It's under my mom's name.  She

10  had bought it for me as a birthday present.  It's been

11  sitting in my driveway.

12       Q.   You don't drive it?

13       A.   No.  I turn it on once a week, but that's it.

14       Q.   I'm sorry.  You don't have a license to drive?

15       A.   No, I don't.

16       Q.   When you do go out -- strike that.

17            How often do you go out with your grandfather?

18       A.   Whenever he feels good enough to get out of the

19  house or get out of bed to do something, whenever he has

20  enough energy to.

21       Q.   How often is that, in any given week, on

22  average?

23       A.   On any given week, when we go out, two, three,

24  sometimes four times a week.  It could be that.  It all

25  varies.

1    Q.    It varies depending on what?

2    A.    His, like, pain level, where he's at, how he's

3    feeling, what kind of day he's having.

4    Q.    Does he have more good days where he can go

5    out, or more bad days when he can't?

6    A.    Sometimes it's 50/50.  It's more bad days than

7    good.  Sometimes it's more good than bad.  It varies.

8    Q.    When you do go out on the good days with your

9    grandfather, where do you typically go with them?

10    A.    We'll go out to eat, go get our hair cut,

11    probably go get some ice cream.  Just hang out.

12    Q.    Do you suggest it, or does your grandfather

13    suggest it?

14    A.    Every once in a while, I'll make a suggestion.

15    It's always up to him if he wants to do that.  I don't

16    make the decisions.

17    Q.    Do you typically go alone with your

18    grandfather, or do you have more people go with you?

19    A.    Most of the time, it's just me and him.  I'll

20    have a little brother or cousin occasionally.

21    Q.    Would you say you're close to your grandfather?

22    A.    Yes.

23    Q.    Do you help your grandfather?

24    A.    Yes.

25    Q.    In what ways do you help him?

1    A.    I help him do chores around the house and help

2    them with normal everyday living.

3    Q.    Can you give me some examples?

4    A.    I do the dishes around the house, I do yard

5    work, clean the floors, the counters.  Stuff he can't do

6    because it puts him in too much pain.

7    Q.    Anything that you do outside of the house to

8    assist him?

9    A.    Every once in a while, like, if we go out, like

10   I said, we don't go out all the time.  Occasionally,

11   when we go out, I'll take his wheelchair out of the car

12   for him and put it up to the door so he can get out and

13   doors open for him sometimes.  Every once in a while, he

14   gets very prideful, and he won't let me help him.

15       Q.    When you do assist him during those times where

16   he allows you to assist him, would you say -- strike

17   that.

18            When you go out with him, do you assist him 50

19   percent of the time, less, more?

20       A.    More.

21       Q.    More than 50 percent?

22       A.    Yeah, I assist him more than 50 percent.

23       Q.    That would involve getting his wheelchair out,

24   taking it to the front of his door; correct?  Anything

25   else you assist him with when out?

1     A.    Sometimes I'll help him open up doors and

2     stuff, and I'll help him maneuver his chair places he

3     can't get it.

4     Q.    In 2015, do you still go out -- have you been

5     going out with your grandfather?

6     A.    Like I said, every once in a while, when he's

7     feeling all right.

8     Q.    Let's just take the last month, let's take the

9     month of June.  How did he feel in the month of June,

10    more good, more bad?

11    A.    I can't remember.

12    Q.    How about the last two weeks?

13    A.    It just all depends.

14    Q.    In the last two weeks, did he have good days or

15    bad days?

16    A.    Both.

17    Q.    Would you say it's 50/50, or some different

18    percentage?

19    A.    Probably, about, 60/40, 70/30.

20    Q.    70 good or --

21    A.    70 bad, but it's also 60/40, you know what I

22    mean?

23    Q.    He's been bad more than 50 percent, his feeling

24    throughout the day; correct?

25    A.    As far as I can observe.  I'm not him.  I'm not

1    in his body.  I don't know what he feels.  That's what I

2    observe.

3        Q.   In the last two weeks, let's focus on that,

4    have you gone with your grandfather on the good days to

5    any establishments?

6        A.   You said in the last two weeks?

7        Q.   Yeah, just in the last two weeks.

8        A.   About two weeks ago, I think, we went -- it

9    could have been two or three weeks ago, we went and got

10   our hair cut and went and got ice cream.

11       Q.   Have you been to any restaurants in the last

12   two or three weeks?

13       A.   I honestly can't remember.

14       Q.   You remember a haircut and ice cream?  That

15   stands out?

16       A.   Yes.

17       Q.   Does anything else stand out?

18       A.   Not really.

19       Q.   Let's focus on 2014, when you did go out with

20   your grandfather in 2014, when your grandmother was

21   living at the house still, so in the early part of 2014,

22   would she come with you, or would she not come with you

23   and your grandfather?

24       A.   It all depends.  Sometimes she would, sometimes

25   she wouldn't.

1     A.    No.

2           MS. MOORE:  Objection; vague as to time.

3  BY MS. SANIEFAR:

4     Q.    In 2014, focusing just on restaurants, can you

5  give me an estimate of how many times you, Jason, and

6  your grandfather went to a restaurant?

7     A.    No, I don't know.

8     Q.    Do you think it was five times?

9     A.    I have no idea.

10    Q.    You can't say if it was less or more?

11    A.    It could have been one time or 15 times.

12    Q.    So one to 15 times?

13    A.    I don't know.  I'm just saying.

14    Q.    You mentioned you sometimes help your

15 grandfather.  You mentioned helping him with his

16 wheelchair, getting him to his door, opening doors for

17 him.  Do you ever assist him -- you also mentioned

18 navigating his wheelchair if he can't get around

19 something.  Do you ever help him -- strike that.

20          When you do go out with your grandfather, do

21 you sometimes sign his receipts for him?

22    A.    Yes.

23    Q.    Can you describe when you would do that?

24    A.    When I would do it, if the counter is, like,

25 too high or something, he can't reach it, or if it's too

1    wide and the cashier can't even, like, hand him the

2    receipt.  He can't even reach it, you know what I mean?

3         Q.    During the time it's a paper receipt and the

4    cashier wants to hand it over to him or you, have you

5    ever taken the receipt and given it to your grandfather

6    to sign?

7         A.    What do you mean?

8         Q.    So you mention sometimes you sign for him

9    because the counter is so wide; correct, that she can't

10   even reach over to give it to him, so she may give it to

11   you, the cashier.  Do you, typically, in that case, sign

12   for him, or do you give the receipt to your grandfather

13   and say, "Here you go, sign it"?

14        A.    If he can't reach up to the counter to sign it,

15   I'll sign it for him.  If it's too difficult for him to

16   do it or too high or whatever, I sign it for him.

17        Q.    How often does that happen when you go out with

18   him?

19        A.    That probably happens more often than it

20   should.  I don't know about an exact number.

21        Q.    Can you give me an estimate?

22        A.    Maybe 50 or 60 percent of the places we go.

23        Q.    You sign for him?

24        A.    Yes.

25        Q.    Do you ever sign for him, other than that

1  scenario you mentioned; for example, do you ever sign

2  for him when they bring the bill to your table?

3      A.   No.  If he can do it himself, I don't do it.

4      Q.   You cannot recall a time that you could have

5  signed, but instead, you signed for him anyway?

6      A.   Not that I can remember, anyway.

7      Q.   Has your grandfather ever given you his credit

8  card?

9      A.   What do you mean, has he given me his credit

10  card?

11      Q.   Has he handed his credit card over to you for

12  use?

13      A.   For use, if we're in the store and he can't

14  reach it to swipe or give to the cashier, he hands it to

15  me to hand to them.

16      Q.   Has he ever given you his credit card to use by

17  yourself?

18      A.   By myself?  No.  You have to have an ID to use

19  a credit card.

20      Q.   So you have never purchased an item, in a

21  store, for yourself, using your grandfather's credit

22  card; is that correct?

23      A.   No, I never have.  He's purchased items for me

24  with his credit card before.

25      Q.   He's been in there; correct?

1    A.    Yeah, because they live by Fig Garden.  My

2  little brother had a baseball game at a park in Fig

3  Garden.  So I stopped by there on my way.

4    Q.    They lived in that house ever since moving from

5  Fresno to Madera?

6    A.    Yes.

7    Q.    When you were in Madera, when you mentioned you

8  went to an ice cream place, you mentioned you stopped

9  and got gas or maybe drinks.  At any of those

10 establishments that you visited in Madera, did your

11 grandpa experience any difficulties because of his

12 disabilities?

13   A.    I can remember, yeah.  It happens a lot.

14   Q.    Did you say you can't remember?

15   A.    I say I remember him having difficulties.  I

16 just don't remember exactly what it was at each place.

17   Q.    Okay.  So nothing in particular about Madera

18 stands out to you?

19   A.    I just remember when we were getting ice cream,

20 he couldn't reach his cone.  I think the counter was

21 high.

22   Q.    This was Frosty Queen, and you said it was by

23 the freeway.  Is that 99?

24   A.    The 99 or 41 or something.  It's one of them.

25 I don't know.  I'm not too familiar with the freeways.

1  facility?

2      A.    No.

3      Q.    So when you went and sat down, did you assist

4  your grandfather with accommodating him at a table?

5      A.    I believe I pulled a chair away from the table

6  for him to get into it, but that could have happened or

7  couldn't have happened.  I don't know.

8      Q.    And when you were at the table, did you

9  instantly order food?

10     A.    I'm sure we ordered drinks first.

11     Q.    And then you ordered food?

12     A.    I believe so.

13     Q.    The food came, I'm assuming.  You ate, I'm

14  assuming; correct?

15         During the time you ordered, to the end of your

16  meal, was there any difficulties that your grandfather

17  experienced that you recall?

18     A.    Yeah.

19     Q.    Go ahead.

20     A.    He got trapped in the bathroom there.

21     Q.    When did that happen?

22     A.    I think it might have been after we ordered our

23  food.

24     Q.    But before you ate?

25     A.    Yes.

1      Q.    Okay.

2      A.    I believe so.

3      Q.    So after you ordered, from that time, getting

4  away from the table and going to the restroom, did he go

5  by himself, or did he go with somebody to the restroom?

6      A.    I believe me and my little brother got up

7  first.  This is as far as I can remember.  Me and my

8  little brother got up first, went to go wash our hands

9  before we ate, and then after we left, my grandfather

10 went in to go use the restroom and wash his hands, too.

11         After me and my little brother left and my

12 grandfather had went in to go do that, he called for me

13 to go in there.  He couldn't get his wheelchair into the

14 stall and get on the toilet and have his wheelchair in

15 the stall.

16     Q.    Okay.

17     A.    So he had to call me in there to watch his

18 wheelchair for him.

19     Q.    Okay.  So when he went to the restroom, he went

20 alone; correct?

21     A.    I believe so.  I'm not too sure.

22     Q.    You and Jason -- was it Jason?

23     A.    Yes.

24     Q.    You and Jason had already come back from the

25 restroom when your grandfather then went to the

1  restroom?

2      A.    That's what I believe happened.

3      Q.    And then you mentioned he required assistance.

4      A.    Uh-huh, yes.

5      Q.    Describe that.

6      A.    Like I said, he couldn't get his wheelchair

7  into the stall and get on the toilet.  The stall was too

8  small for him to fit his wheelchair in there and still

9  have room for him to get up and get on the toilet.  He

10  needed help getting out of the chair and on to the

11  toilet.  I don't believe there was handrails for him to

12  grab on to.

13      Q.    How did you become aware this was happening to

14  your grandfather?

15      A.    Because he called my name out, across the

16  restaurant.

17      Q.    So he was in the restroom, you were in the

18  dining area; is that correct?

19      A.    Yes.

20      Q.    You mentioned you believe you were sitting

21  somewhere in the middle of the dining area?

22      A.    Yes.

23      Q.    Then you heard your grandfather?

24      A.    Yes.

25      Q.    What did you hear?

1     A.   I heard my name.

2     Q.   Anything else, you just heard "Ronny"?

3     A.   I believe that's what he said.

4     Q.   And you heard him from the restroom?

5     A.   Yes.  I'm sure he opened up the door, and he

6 yelled my name.

7          After he had gotten back in his wheelchair and

8 washed his hands, I left back out of the restroom and

9 went back to sit at the table.  By the time I sat back

10 down, I heard my name again.  He had to yell across the

11 restaurant again because there was two doors to get into

12 the restroom.

13          There was a first door that leads into -- I

14 think it's a little box room.  There's another door to

15 get into the actual restroom itself.  He got trapped in

16 between the doors trying to get out.  When they went in,

17 they opened inwards so they can go right through.  The

18 way when he was coming out, he got trapped in there so

19 he yelled for me and my little brother.

20          My little brother went over there and held the

21 door open.  I had to get behind him somehow.  I don't

22 remember how I did it, and lift his wheelchair up.

23     Q.   Okay.

24     A.   Kind of get him out of there.

25     Q.   So going in, he got stuck inside where the

1 stall is; correct, when he first went in?

2     A.    I don't think he got stuck going in.

3     Q.    You mentioned that he --

4     A.    He couldn't get his wheelchair into the stall.

5     Q.    Okay.  But going in, he didn't have a problem

6 with any other entrance door?  It was the stall door

7 that prevented him from --

8     A.    I believe that's what it was.  That's what I

9 can remember.

10     Q.    And then getting out, he had difficulty with

11 the actual door to the restroom; is that correct?

12     A.    Getting out?

13     Q.    Yeah.

14     A.    Yeah.  No, I don't think it was the restroom

15 door.  I think it was the one before you get into the

16 actual restroom.

17     Q.    So let's go back to the beginning to where you

18 think -- in the beginning where he yells at Ronny.  Did

19 you clearly hear him, or was it loud enough where you

20 clearly hear his name?

21     A.    My grandfather is kind of loud when he talks.

22 He's loud.

23     Q.    Did anybody else hear him?

24     A.    I'm sure anybody in the restaurant heard him.

25 I'm sure the cooks in the back did.

1    A.    Not that I can remember.

2    Q.    Do you believe there were other customers?

3    A.    I believe there was.

4    Q.    When your grandfather yelled, you don't

5  remember any recognition by any of the other customers?

6    A.    No, not that I can remember.

7    Q.    Okay.  So your grandfather goes through the

8  double doors, and when he realizes he can't get into the

9  stall, he yells for you, he yells, "Ronny"; correct?

10  Did he yell once or twice?

11    A.    He could have yelled from one to five times,

12  but I heard him the first time.

13    Q.    Did the other members of your family, which

14  would be your --

15    A.    Grandmother and brother.

16    Q.    Did they also hear it?

17    A.    I'm sure they did.  We're all sitting at the

18  same table.  He's not quiet.

19    Q.    So you got up with Jason?

20    A.    That was the second time, not the first time.

21    Q.    So you got up by yourself, and you went into

22  the bathroom?

23    A.    And I had to help him out of his wheelchair on,

24  to the toilet, and then watch his wheelchair outside of

25  the stall.

1    Q.    And then what happened after that?

2    A.    After that, then after he was done and I helped

3  him back into his wheelchair, he was washing his hands,

4  and I left outside of the restroom.

5    Q.    So you left while he was washing his hands?

6    A.    Yes.

7    Q.    Did he experience any other difficulties that

8  you witnessed?

9    A.    Not that I know of, besides getting stuck on

10  his way out.

11    Q.    Let's talk about that.  At some point, you had

12  gone back into the dining room; correct?

13    A.    Yes.

14    Q.    And you hear your name again; is that right?

15    A.    Yes.

16    Q.    And just your name?

17    A.    As far as I could remember, yeah.

18    Q.    How many times do you think he called out?

19    A.    Maybe once or twice.

20    Q.    And so you go back, this time, with Jason?

21    A.    Yes.

22    Q.    And when you are about to enter the restroom

23  area, what do you see?

24    A.    Well, as soon as I open up the first door, my

25  grandpa is, like, sitting there, caught between the

1  bathroom door and the first door.

2      Q.   Can you explain that?  I'm not visualizing.

3      A.   I can't really even explain it.  It was weird.

4  I don't know what happened.

5      Q.   So his wheelchair was no longer in the

6  restroom?  It was in the -- it was between the two

7  doors; is that right?

8      A.   Yes.  That's what I can remember, yeah.

9      Q.   And where was he stuck?

10      A.   In between the doors.

11      Q.   Okay.  So was the door -- I'm assuming there's

12  a door in front of him and a door behind him; is that

13  right?

14      A.   Yes.

15      Q.   Was the door behind him closed?

16      A.   I can't remember whether or not it was, like,

17  closed or not.

18      Q.   So which door was he stuck in, the first or the

19  second?

20      A.   I think what it was, is that he had gone

21  through the bathroom door.  He was headed to the first

22  door, and the bathroom door had shut behind him.  He

23  couldn't open the first door because it opened inwards.

24  That's what I think.  I don't really know.

25      Q.   When you say "stuck," correct me if I'm wrong,

1   he was stuck in the area?  Was his wheelchair actually

2   stuck on something, onto something?

3       A.   I don't believe it was onto something.  I

4   believe there was nowhere for him to go.

5       Q.   Okay.

6       A.   It was almost like a track.

7       Q.   Is it fair to say his wheelchair was not stuck

8   on a frame of a door?

9       A.   I don't know for sure.

10      Q.   Well, did you see it being stuck on the frame

11  of a door?

12      A.   I don't remember.

13      Q.   You mentioned that you believe the back door

14  was closed.

15      A.   I believe so.

16      Q.   And he was stuck in that spatial area, and he

17  had no way of opening the next door; is that correct?

18      A.   I think so.

19      Q.   Okay.  So you and Jason get up.  Describe the

20  process.  You get up and start walking towards the

21  bathroom door.  What happens next?

22      A.   Jason held the door open, and I tried to move

23  his wheelchair out of there.

24      Q.   How did you and Jason get inside?

25      A.   I think I climbed over him.  I literally had to

1  climb over my grandfather to get behind him because I

2  believe the doorway wasn't wide enough for him to have

3  his wheelchair right there and for me to walk right by

4  him.

5      Q.   So you were able to open the door, step inside

6  to some extent, and then, literally, climb over him?

7      A.   I believe so.

8      Q.   And where was Jason?

9      A.   He was holding the door open.

10     Q.   And how far was he opening the door, Jason?

11     A.   I don't know.

12     Q.   So after you climb over your grandfather, then

13 what?

14     A.   Then I help him, like, pick up the back of his

15 wheelchair and move it so he can get out of the

16 restroom, not the restroom, but the little space.

17     Q.   What do you mean by "pick up his wheelchair"?

18     A.   Pick up the actual back of the chair and pivot

19 it.

20     Q.   Was he still inside the chair then?

21     A.   Yes.

22     Q.   And you pivoted, and Jason is still holding the

23 door open?

24     A.   That's what I believe happened, yes.

25     Q.   And then your grandfather was able, after that,

1    to get up, or did you still have to assist him?

2        A.    No, I assisted him.

3        Q.    How?

4        A.    Because I was pushing his chair out of there.

5    After he got it completely out of there, he wheeled

6    himself.

7        Q.    So then all three of you, you, Jason, and your

8    grandfather, returned to the table again?

9        A.    Uh-huh.

10       Q.    And then what happens?

11       A.    Then we waited for our food and ate.

12       Q.    Was your grandfather upset?

13       A.    I would be upset.  Wouldn't you be upset if

14   that happened to you?

15       Q.    What did he say?

16       A.    He didn't say anything.  You could just tell by

17   the look on his face.

18       Q.    Did you complain to anyone, any member of your

19   family?

20       A.    No.

21       Q.    Nobody complained?

22       A.    No.

23       Q.    Why is that?

24       A.    Because don't you think that's embarrassing

25   enough to have to yell out in a restaurant because you

1  food and didn't like it.

2      Q.   Who suggested you go to Zlfred's?

3      A.   One of my grandparents.  Like I said, I don't

4  make the decisions.

5      Q.   Do you typically have what you describe as

6  Armenian food?

7      A.   I have had it before, yeah.  Shish kabob and

8  stuff.  I believe that's Armenian, too; right?

9      Q.   No problems that you recall during the meal,

10 after the bathroom, and during the meal process?

11     A.   I remember my grandfather couldn't scoot up to

12 the table, and he started spilling food on himself.

13     Q.   Tell me about that.

14     A.   There's legs under the table, like this one

15 right here.  It would be sticking out too far, and he

16 couldn't scoot his wheelchair up to it.  He would be

17 sitting way back, like, over here, instead of being able

18 to scoot up to the table and eat over the table.

19     Q.   Did you request a different table so it would

20 accommodate him?

21     A.   It was all they had.  They had, like, another

22 table or something, but the rest were booths.  My

23 grandpa can't sit at a booth.

24     Q.   Did you request anything, any assistance?

25     A.   We just used the tables that they had.

1      Q.    And you didn't complain about it?

2      A.    No.

3      Q.    How far away was your grandfather during the

4  meal?

5      A.    I don't know.  Probably, about, like this.

6      Q.    How many inches would you say that is from the

7  table?

8      A.    Maybe three quarters of a foot, a foot.

9      Q.    And he was still able, though, to feed himself,

10  or did anyone have to assist him?

11      A.    He was able to feed himself.  I mean, he's not

12  going to let anybody else feed him.

13      Q.    But you mentioned he spilled food and water?

14      A.    No, just food.

15      Q.    Just food.  Okay.

16            Did it stain his clothes?

17      A.    I'm sure it did.

18      Q.    Still, at that point, no complaints were made

19  to anyone?

20      A.    Not that I know of.

21      Q.    Was he able to finish his meal?

22      A.    I don't remember.

23      Q.    Would it be safe to say your family didn't get

24  up and leave as a result of not being able to be

25  comfortable at the table?

1    A.   My grandpa is not going to have us all get up

2  and leave because of problems that he's having.

3    Q.   Okay.  So then at some point, the meal is

4  finished, and do you know if anything else was ordered

5  after the meal?

6    A.   Not that I can remember.

7    Q.   Okay.  And how did you request -- did your

8  family request a bill, or was it just brought to your

9  table?  Explain the process of exiting.

10    A.   I don't remember that.

11    Q.   Okay.  So after the meal, when your family got

12  up to leave, any issues from getting up from the table

13  to back to the car?

14    A.   Yeah.  I remember the way that they had the

15  ramp, my grandpa couldn't even, like -- the way the

16  disabled parking was, the handicap parking, the ramp,

17  like, went right into the car pretty much.  So the

18  sidewalk is going this way, and the ramp drops down

19  right here.  The stall, the parking stall was right

20  here.

21    Q.   So how was your grandfather able to get to the

22  car?

23    A.   He had to barely squeeze through, and he was

24  barely able to make it down the ramp and get through the

25  side of the car and the curb.

1    Q.   Did you assist -- did anybody assist him?

2    A.   I believe I helped him turn it.

3    Q.   Okay.  Your family gets into the car, and you

4    leave?

5    A.   Yeah.

6    Q.   Anything -- any other issues that your

7    grandfather experienced on that visit that I have not

8    covered with you?

9    A.   Can you repeat that?

10   Q.   Were there any other issues that your

11   grandfather experienced on that visit that we have not

12   discussed here?

13   A.   Not that I can remember, personally.

14   Q.   Okay.  How often does your grandfather --

15   strike that.

16        Has your grandfather ever been stuck before, in

17   a public facility?

18   A.   I believe so.

19   Q.   Okay.  Were you present at any of those times?

20   A.   I honestly don't remember too much.  I believe

21   he's been stuck, but I don't know when or where.

22   Q.   To the best of your recollection, if you had

23   been there when he was stuck, do you recall the

24   circumstances?

25   A.   No.

1    A.   No.

2         MS. SANIEFAR:  Why don't we take a break?  I

3    want to make sure I'm not missing anything.  Maybe a

4    five- to ten-minute break.

5                   (Recess taken.)

6         MS. SANIEFAR:  We're back on the record.

7    BY MS. SANIEFAR:

8    Q.   I just have a few more topics.

9         You mentioned that you believe the restrooms

10   inside of Zlfred's lacked grab bars; is that correct?

11   A.   I believe so.

12   Q.   What makes it stand out that you -- strike

13   that.

14        How is it that you remember that, that it

15   lacked grab bars?

16   A.   I don't believe my grandfather would have asked

17   me to help him get out of his chair and on the toilet if

18   there was grab bars.  I don't see why I would need to

19   assist him.

20   Q.   I thought he couldn't even get into the stall.

21   A.   No, his chair.

22   Q.   Okay.

23   A.   His chair couldn't fit into the stall with him

24   trying to get up and get on the toilet.

25   Q.   I think I'm unclear for that.  I'm glad you're

1   clarifying.  His chair could not go through the stall

2   door.  Did he attempt to stand up and still get in?

3       A.    After I was helping him, to make sure he was

4   stable, because he does fall a lot.

5       Q.    When he yelled for you, he was still inside of

6   his chair; correct?

7       A.    Yes.

8       Q.    And then you assisted him up?

9       A.    Uh-huh.

10      Q.    So that he wouldn't fall?

11      A.    Yes.

12      Q.    And then go ahead and tell me the rest from

13   that point.

14      A.    I picked him up -- I didn't pick him up, but I

15   assisted him in standing up, keeping him stable, making

16   his way down to the toilet.  I stood outside of the

17   stall and watched his chair.

18      Q.    And you had to assist him again to get up and

19   back into the chair?

20      A.    Yes.  By that time, he was washing his hands,

21   and I left the restroom.

22      Q.    Did he have any difficulties washing his hands,

23   that you witnessed?

24      A.    No.  I wasn't there long enough to see any of

25   that.

1    Q.   Has your grandfather ever, to your knowledge,
2  burned his legs as a result of it touching pipes
3  underneath a sink?
4    A.   I have heard him tell me that before, yes.
5    Q.   Have you ever seen it happen?
6    A.   No, not with my eyes.
7    Q.   What has he told you about it?
8    A.   He told me that the pipes underneath the sink
9  were hot, and his leg touched it.
10   Q.   How many times has that happened to him, that
11 you are aware of?
12   A.   I have no idea how many times.
13   Q.   What brought up the conversation where he would
14 tell you that?
15   A.   He came out of the restroom and told me.
16   Q.   Oh, at Zlfred's?
17   A.   Not at Zlfred's.  I don't remember where we
18 were when that happened.
19   Q.   He would have told you right after it happened;
20 correct?
21   A.   I don't know.  I don't know if he's going to
22 tell me every time.
23   Q.   Going inside of Zlfred's, so after you help
24 assist him with his wheelchair, was there any problems
25 with the ramp itself?

# Exhibit 126

Tanya E. Moore, SBN 206683
Zachary M. Best, SBN 166035
MOORE LAW FIRM, P.C.
332 North Second Street
San Jose, California 95112
Telephone: (408) 298-2000
Facsimile: (408) 298-6046
Email: service@moorelawfirm.com

Attorneys for Plaintiff,
Ronald Moore

MOJI SANEIFAR SBN 233330
SANIEFAR LAW
533 Airport Boulevard, Suite 400
Burlingame, CA 94010
Tel: (650) 401-2222
Fax: (650) 373-2002
Email: moji@saniefarlaw.com

Attorneys for Defendants,
Fatemah Saniefar dba Zlfred's; Gholamreza Saniefar
dba Zlfred's; Zlfred's, Inc., a California corporation; and
Alireza Saniefar, Trustee of the Bost Trust

## THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RONALD MOORE, | Case No.: 1:14-cv-01067-SKO |
| Plaintiff, | **JOINT STATEMENT OF STIPULATED FACTS IN SUPPORT OF THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT** |
| vs. | |
| FATEMAH SANIEFAR dba ZLFRED'S, et al. | Date: January 11, 2017 |
| Defendants. | Time: 9:30 a.m. |
| | Courtroom: 7 |
| | Magistrate Judge Sheila K. Oberto |

All of the parties, through their counsel, stipulate to the following facts in support of their respective cross-motions for summary judgment, or alternatively, summary adjudication:

1.      On April 14, 2014, and continuing to this day, the land and buildings located at 4030 N. Blackstone Ave., Fresno, CA ("Subject Property"), were owned in trust, by the Bost Trust.

2.      On April 14, 2014, the restaurant known as "Zlfred's" ("Restaurant") was owned by Defendant Zlfred's, Inc.

3.      On or about February 1, 2015, the facility formerly known as Zlfred's located at 4030 N. Blackstone Ave., Fresno, CA, was leased to Ali Abubaker, who opened a new restaurant named "Yem Kabob".

4.      Attached as Exhibit A hereto, are photographs taken by Plaintiff's expert, Michael Bluhm, regarding the Subject Property. The photographs of the accessible parking space on the left side of the page are accurate depictions of the of the accessible parking space, access aisle and ramp that were public accommodations in connection with the Restaurant on April 14, 2014. The "restaurant portion" (defined only as the main dining area, which does NOT include the areas known as the bar, banquet and patio) of the Restaurant was also a public accommodation on that date, and continues as such through today.

5.      On April 14, 2014, the door pressure of the front entrance to the Restaurant exceeded five pounds pressure to open.

6.      On April 14, 2014, the threshold at the front entrance to the Restaurant exceeded ½ inch tall.

7.      On April 14, 2014, the interior dimensions of the designated men's restroom stall were less than 60 inches x 59 inches.

8.      On April 14, 2014, the grab bars in the designated accessible stall in the men's restroom were not 36 inches long, minimum, at the rear grab bar, and 42 inches long, minimum, at the side grab bar.

9.      On April 14, 2014, the sink counter in the men's restroom had knee clearance less than 29 inches under the front of the sink counter.

Joint Statement of Stipulated Facts in Support of the Parties' Cross Motions for Summary Judgment

10.     On April 14, 2014, the clear width of the doorway to the men's restroom was less than 32 inches wide, measured from the face of the opened door to the opposite stop.

11.     As of November 23, 2016, the following barriers alleged in Plaintiff's Second Amended Complaint are compliant with applicable federal and state accessibility guidelines: Subparagraphs 11a), 11b), 11c), 11d), 11e), 11f), 11g), and 11i) and Subparagraphs 12a), 12b), 12c), 12d), 12e), 12f), 12g), 12h), 12i), 12j), 12k), 12l), 12m), 12n), 12o), 12p), 12q), 12v), 12x), 12y), 12z), 12aa), 12dd), 12ee), 12ff), 12gg), 12hh), and 12ii).

12.     As of November 23, 2016, the following barriers alleged in Plaintiff's Second Amended Complaint no longer exist at the site formerly known as Zlfred's: Subparagraphs 12u), 12bb) and 12cc).

13.     The following barriers alleged in Plaintiff's Second Amended Complaint are not applicable to Plaintiff's causes of action for alleged violations of disability access laws because of Defendants' contention that they are not public accommodations:  Subparagraphs 12r), 12s), and 12t).


IT IS SO STIPULATED.


//
//
//
//
//
//
//
//
//
//

1    Dated: November 22, 2016               MOORE LAW FIRM, P.C.

2
                                           */s/ Zachary Best*
3                                          Zachary Best
                                           Attorneys for Plaintiff,
4                                          Ronald Moore

5

6
7    Dated: November 22, 2016               SANIEFAR LAW

8
9                                          */s/ Moji Saniefar*
                                           Moji Saniefar
10                                         Attorneys for Defendants,
                                           Fatemah Saniefar dba Zlfred's; Gholamreza
11                                         Saniefar dba Zlfred's; Zlfred's, Inc., a California
                                           corporation; and Alireza Saniefar, Trustee of the
12                                         Bost Trust

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# Exhibit 127

# CERTIFIED ACCESS SPECIALIST (CASp)

REPORT OF SPECIFIC EXTERIOR & INTERIOR

ACCESSIBILITY BARRIERS

LOCATED AT:

## ZLFRED'S RESTAURANT

## 4030 N BLACKSTONE AVENUE
## FRESNO, CA 93726

INSPECTION DATE

DECEMBER 2, 2014



4539 N BRAWLEY AVE SUITE 101
FRESNO, CA
559.276.7711
Mike@CASpInspected.com



CASpInspected.com

# ZLFRED'S RESTAURANT – 4030 N BLACKSTONE AVENUE, FRESNO, CA 93726

- Accessibility Conditions were surveyed and the Report written based on 2013 California Building Code (CBC), 1991 ADAAG and 2010 ADA Accessibility Standards.

- Certified Access Specialist (CASp) Survey and Report of the: Exterior and Interior Accessibility Conditions not meeting Construction-Related Accessibility Standards, as pertaining to individuals with mobility impairments, serving Zlfred's Restaurant located at 4030 N Blackstone Avenue in Fresno California.

- The Restaurant is a property and business offering public accommodations as defined by Title III of the ADA.

- CASp Inspector: Michael Bluhm CASp #223  (559) 994.0419 Mike@caspinspected.com

- It is the opinion of the CASp that the inspected exterior and interior areas of the property need modification to meet construction-related accessibility standards.

- This report is <u>not</u> a complete or official CASp Inspection Report. Accessibility barriers noted in this report are related specifically to those affecting individuals with mobility impairments. Correcting and maintaining only the barriers noted in this report will <u>not</u> assure that all the exterior and/or interior conditions are accessible to all individuals with disabilities.

EX. 127-3

MLF0039123

# ZLFRED'S RESTAURANT – 4030 N BLACKSTONE AVENUE, FRESNO, CA 93726



1. There is no accessible route of travel from the City sidewalks to the entry walkways, which does not meet the requirements of 206.2.1 of the 2010 ADA, 11B-206.2.1 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.3.2 of the 1991 ADAAG.

ACCESSIBLE ROUTE OF TRAVEL FROM THE PUBLIC
RIGHT-OF-WAY TO ON-SITE ENTRY WALKWAYS

MLF0039124



ENTRY/EXIT WALKWAYS

2. The entry/exit walkways have cross slopes that exceed 1:48 (2.08%) (CBC & 2010 ADA) or 1:50 (2.0%) (1991 ADAAG), which do not meet the requirements of 206.2.2, 402.2 & 403.3 of the 2010 ADA, 11B-206.2.2, 402.2 & 403.3 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.3.2 & 4.3.7 of the 1991 ADAAG.



ENTRY/EXIT WALKWAY

3. The route along the west entry/exit walkway has a change in level that exceeds ¼" vertical and an expansion joint opening in the ground surface that exceeds ½", which does not meet the requirements of 302.3, 303 & 403.4 of the 2010 ADA, 11B-302.3, 303 & 403.4 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.3.8, 4.5.2 & 4.5.4 of the 1991 ADAAG.

EX. 127-6

MLF0039126



4. The route of travel from the designated accessible parking stall to the entry walkway has a slope that exceeds 1:12 (8.33%) and does not meet the requirements of a curb ramp, which does not meet the requirements of 206.2.2, 406 & 303.4 of the 2010 ADA, 11B-206.2.2, 406 & 303.4 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.3.7, 4.3.8 & 4.7 of the 1991 ADAAG.

ROUTE OF TRAVEL FROM THE DESIGNATED ACCESSIBLE PARKING STALL TO THE ENTRY WALKWAY

EX. 127-7

**MLF0039127**



OFF-STREET PARKING SIGNS

5. Off-street parking signs are not provided at all entry points to off-street parking or adjacent to and visible from each parking space as required by 11B-502 of the CBC (California Building Code) California Code of Regulations Title 24 and VC Section 22511.8 of the California Vehicle Code.

MLF0039128

# ZLFRED'S RESTAURANT – 4030 N BLACKSTONE AVENUE, FRESNO, CA 93726



6. Based on the number of parking stalls provided on-site, (3) designated accessible parking stalls are required, but only (1) is provided. Additionally there is no designated "van accessible" parking stall serving the Zlfred's property, which does not meet the requirements of 208.2, 208.2.4 & 208.3.1 of the 2010 ADA, 11B-208.2, 208.2.4 & 208.3.1 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.6.1 & 4.6.2 of the 1991 ADAAG.

7. The designated accessible parking stall and access aisle have portions which are cracked/uneven and the stall and access aisle are not marked properly, which does not meet the requirements of 502.3.3, 502.4 & 502.6 of the 2010 ADA and 11B-502.3.3, 502.4 & 502.6 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.6.3 of the 1991 ADAAG.

8. The designated accessible parking stall sign does not include the "Minimum Fine $250" and "Van Accessible" language, as required by 11B-502.6 & 502.6.2 of the CBC (California Building Code) California Code of Regulations Title 24.



DESIGNATED ACCESSIBLE PARKING STALL

EX. 127-9

MLF0039129



DOOR BOTTOM SURFACES

9. The entry doors do not have 10" smooth, uninterrupted bottom portions on the push sides of the doors and have surface mounted slide bolts obstructing the bottom portions of the doors, which does not meet the requirements of 404.2.10 of the 2010 ADA, 11B-404.2.10 of the CBC (California Building Code) California Code of Regulations Title 24.



DOOR OPERATING REQUIREMENTS

10. The north entry door requires more than 5 lbs. of pressure to operate and is not adjusted to the required closing period, which does not meet the requirements of 404.2.8 & 404.2.9 of the 2010 ADA, 11B-404.2.8 & 404.2.9 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.13.10 & 4.13.11 of the 1991 ADAAG.



ENTRY/EXIT DOOR THRESHOLD

11. The primary entry/exit doors have a threshold with a vertical change in level that exceeds ¼" and is greater than ½" in height, which does not meet the requirements of 303 & 404.2.5 of the 2010 ADA, 11B-303 & 404.2.5 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.5.2 & 4.13.8 of the 1991 ADAAG.

12.2.14

EX. 127-11

MLF0039131



12. The north entry/exit door does not have the required maneuvering clearances provided at the exterior (pull) side of the door, which does not meet the requirements of 404.2.4 of the 2010 ADA, 11B-404.2.4 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.13.6 of the 1991 ADAAG.

NORTH ENTRY/EXIT DOOR

# ZLFRED'S RESTAURANT – 4030 N BLACKSTONE AVENUE, FRESNO, CA 93726



WAITING AREA

13. The bench seating waiting area does not have a minimum 30"x48" clear floor space located clear of the route of travel for individuals in wheelchairs, which does not meet the requirements of 305 and 903 of the 2010 ADA and 11B-305 and 903 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.2.4 & 4.32.2 of the 1991 ADAAG.

MLF0039133



14. The transaction counter does not have an accessible lower portion provided and the tooth pick dispenser and mints located on the counter are positioned beyond the reach requirements, which do not meet the requirements of 308 and 904.4 of the 2010 ADA and 11B-308 and 904.4 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.2.5, 4.2.6 & 7.2 of the 1991 ADAAG.

TRANSACTION COUNTER

MLF0039134

15. Accessible dining tables are not provided within the main dining area and are not provided at each type of seating offered, which does not meet the requirements of 226, 902 & 306 of the 2010 ADA, 11B-226, 902 & 306 of the CBC (California Building Code) California Code of Regulations Title 24 and 5.1-5.4 of the 1991 ADAAG.





DINING TABLE SEATING





DINING TABLE SEATING

MLF0039136

16. Exterior patio tables do not have the required knee clearances, which does not meet the requirements of 226, 902 & 306 of the 2010 ADA, 11B-226, 902 & 306 of the CBC (California Building Code) California Code of Regulations Title 24 and 5.1-5.4 of the 1991 ADAAG.



PATIO DINING TABLES

## ZLFRED'S RESTAURANT – 4030 N BLACKSTONE AVENUE, FRESNO, CA 93726



17. The bar counter exceeding 34" in height does not have a portion which is 60" minimum in length with the top at 28" minimum and 34" max above the finished floor with knee and toe clearances, which does not meet the requirements of 226, 902 & 306 of the 2010 ADA, 11B-226, 902 & 306 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.1.3(18) & 5.2 of the 1991 ADAAG.

BAR COUNTER SEATING

MLF0039138

# ZLFRED'S RESTAURANT – 4030 N BLACKSTONE AVENUE, FRESNO, CA 93726



18. Routes within the north dining area do not have 36" minimum clear widths, which does not meet the requirements of 206.2.5 & 403.5.1 of the 2010 ADA, 11B-206.2.5 & 403.5.1 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.3.3 & 5.3 of the 1991 ADAAG.

INTERIOR ROUTE OF TRAVEL THROUGH THE NORTH DINING AREA

MLF0039139



BAR/NORTH DINING AREA RAISED PLATFORM

19. The raised platform within the bar/north dining area is not accessible by way of platform lift or ramp, which does not meet the requirements of 206.2.5 & 206.2.6 of the 2010 ADA, 11B-206.2.5 & 206.2.6 of the CBC (California Building Code) California Code of Regulations Title 24 and 5.7 of the 1991 ADAAG.

20. The floor mats throughout the facility, which are not secured to the walking surfaces, create tripping hazards and are not in compliance with 302.2 of the 2010 ADA and 11B-302.2 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.5.3 of the 1991 ADAAG.



FLOOR MATS

# ZLFRED'S RESTAURANT – 4030 N BLACKSTONE AVENUE, FRESNO, CA 93726



21. The cased openings and doors to the Men's and Women's restrooms do not have the required 32" minimum clear opening width, which do not meet the requirements of 404.2.3 of the 2010 ADA, 11B-404.2.3 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.13.5 of the 1991 ADAAG.



PASSAGEWAYS & DOORS TO MEN'S & WOMEN'S RESTROOMS

EX. 127-22

12.2.14

MLF0039142



MEN'S & WOMEN'S RESTROOM DOOR SIGNS

22. The Men's & Women's restaurant restroom door signs are not an equilateral triangle (Men's) and circle (Women's), which does not meet the requirements of 11B-703.7.2.6.1 & 703.7.2.6.2 of the CBC (California Building Code) California Code of Regulations Title 24.



WOMEN'S RESTROOM DOOR MANEUVERING CLEARANCES

23. The Women's restroom door does not have the required maneuvering clearances provided at the interior (pull) side of the door, which does not meet the requirements of 404.2.4 of the 2010 ADA, 11B-404.2.4 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.13.6 of the 1991 ADAAG.

MLF0039143



24. The Men's restroom lavatory is not located with the required knee clearance and has exposed water supply pipes that are not insulated or otherwise configured to protect against contact, which does not meet the requirements of 606 of the 2010 ADA and 11B-606 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.19 & 4.24.6 of the 1991 ADAAG.

MEN'S RESTROOM LAVATORY

MLF0039144



25. The Men's restroom urinals are installed with the rim higher than 17" above the finished floor and the flush controls located higher than 44" above the finished floor, which does not meet the requirements of 605.2 & 605.4 of the 2010 ADA, 11B-605.2 & 605.4 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.18.2 & 4.18.4 of the 1991 ADAAG.

MEN'S RESTROOM URINAL

# ZLFRED'S RESTAURANT – 4030 N BLACKSTONE AVENUE, FRESNO, CA 93726



26. The Men's restroom designated accessible water closet compartment door is not self-closing, does not have door pulls on both sides of the door, the compartment does not have the minimum clearances or maneuvering spaces within the compartment, the grab bars are not located properly, the coat hook is located higher than 48" above the finished floor and the toilet paper dispenser is not located properly, which do not meet the requirements of 308, 404, 603.4, 604.5, 604.7 & 604.8.1 of the 2010 ADA, 11B-308, 404, 603.4, 604.5, 604.7 & 604.8.1 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.2.5, 4.2.6, 4.13, 4.16.4, 4.17.3 & 4.17.5 of the 1991 ADAAG.



MEN'S RESTROOM DESIGNATED ACCESSIBLE
WATER CLOSET COMPARTMENT

MLF0039146



27. The Men's restroom mirror, paper towel and soap dispensers are located higher than 40" above the finished floor to the bottom edge of the reflecting surface of the mirror and operable parts of the dispensers, which does not meet the requirements of 603.3 of the 2010 ADA, 11B-603.3 & 603.5 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.19.6 of the 1991 ADAAG.

MEN'S RESTROOM ACCESSORIES

EX. 127-27

MLF0039147



28. The Women's restroom lavatory is not located with the required knee clearance and has exposed water supply pipes that are not insulated or otherwise configured to protect against contact, which does not meet the requirements of 606 of the 2010 ADA and 11B-606 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.19 & 4.24.6 of the 1991 ADAAG.



WOMEN'S RESTROOM LAVATORY

MLF0039148



WOMEN'S RESTROOM DESIGNATED ACCESSIBLE WATER CLOSET COMPARTMENT

29. The Women's restroom designated accessible water closet compartment door is not 32" minimum in clear width, is not self-closing, does not have a door pull on the inside of the door, the compartment does not have the minimum clearances or maneuvering spaces within the compartment, the grab bars are not located properly, the coat hook is located higher than 48" above the finished floor and the toilet paper dispenser is not located properly, which do not meet the requirements of 308, 404, 603.4, 604.5, 604.7 & 604.8.1 of the 2010 ADA, 11B-308, 404, 603.4, 604.5, 604.7 & 604.8.1 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.2.5, 4.2.6, 4.13, 4.16.4, 4.17.3 & 4.17.5 of the 1991 ADAAG.



MLF0039149



30. The Women's restroom mirror and paper towel dispensers are located higher than 40" above the finished floor to the bottom edge of the reflecting surface of the mirror and operable parts of the dispensers, which does not meet the requirements of 603.3 of the 2010 ADA, 11B-603.3 & 603.5 of the CBC (California Building Code) California Code of Regulations Title 24 and 4.19.6 of the 1991 ADAAG.

WOMEN'S RESTROOM ACCESSORIES