# Exhibit 128

1   MOJI SANIEFAR (SBN 233330)
    SANIEFAR LAW
2   1220 Howard Ave., Suite 200
    Burlingame, CA  94010
3   Tel: (650) 581-0025
    Email: moji@saniefarlaw.com
4
    Attorneys for Defendants
5

6

7                    UNITED STATES DISTRICT COURT

8                   EASTERN DISTRICT OF CALIFORNIA

9                          FRESNO DIVISION

10

11
    RONALD MOORE,                        Case No.: 1:14-cv-01067-SKO
12
          Plaintiff,
13
    vs.                                  **DEFENDANTS' MEMORANDUM OF**
14                                       **POINTS AND AUTHORITIES IN**
                                         **SUPPORT OF MOTION FOR**
15  FATEMEH SANIEFAR dba ZLFRED'S;       **SUMMARY JUDGMENT, OR**
    GHOLAMREZA SANIEFAR dba ZLFRED'S;    **ALTERNATIVELY SUMMARY**
    ZLFRED'S, INC. a California Corporation;  **ADJUDICATION**
16  ALIREZA SANIEFAR, Trustee of the BOST
    TRUST,                               Fed. R. Civ. P. 56
17
          Defendants.                    Hearing Date: January 11, 2017
18                                       Hearing Time: 9:30 a.m.
                                         Room: 7, 6th Floor
19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION ...............................................................................................1

II.   RELEVANT FACTUAL BACKGROUND ......................................................1

    A. **Plaintiff's Barrier Allegations** ..............................................................1

III.  STANDARD OF LAW .......................................................................................2

IV.   ARGUMENT ......................................................................................................3

    A. **This Court Has Lost Subject Matter Jurisdiction Because There is Currently No Violation of the ADA at the Premises** ......................3

        1. **Plaintiff's Only Remaining Allegations Regarding the Width and Clearances of the Men's Bathroom Doorway Has Been Remedied and is Currently Compliant With State and Federal Disability Access Laws** ..............................................................4

    B. **The Court Should Decline to Exercise Supplemental Jurisdiction** ............5

        1. **Dismissal of Plaintiff's ADA Claim For Injunctive Relief Warrants Dismissal of His State-Law Claims For Damages** ..................................6

        2. **Plaintiff's Claims For Damages Under the Unruh Act Raise Novel and Complex Issues of State Law)** ..........................................................8

        3. **Plaintiff's Claims For Damages Substantially Predominate Over His            Claims For Injunctive Relief** ................................9

V.    CONCLUSION ................................................................................................11

# TABLE OF AUTHORITIES

**Cases**

*Acri v. Varian Assoc's, Inc.,* 114 F.3d 999 (9th Cir. 1996) ................................................ 6

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986) ......................................................... 2

*Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343 (1988) ……………………………….....6

*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986) ...................................................................... 2

*Chapman v. Starbucks Corp.,* 2011 U.S. Dist. LEXIS 3570 (E.D. Cal. Jan. 6, 2011) ........ 3

*Clark v. City of Lakewood,* 259 F.3d 996 (9th Cir. 2001) ..................................................... 3

*Duarte v. M & L Bros. Pharmacy Inc.,* 2014 U.S. Dist. LEXIS 156061
   (C.D. Cal. Nov. 4, 2014) ..................................................................................................... 7

*Freeman v. Arpaio,* 125 F.3d 732 (9th Cir. 1997) ................................................................ 2

*Gasper v. Marie Callender Pie Shops,* 2006 U.S. Dist. LEXIS 96929 (C.D. Cal. 2006) ... 3

*Gray v. Cnty. of Kern,* 2015 U.S. Dist. LEXIS 156107 (E.D. Cal. Nov. 17, 2015) ............ 7

*Grutman v. The Regents of the University of California,* 807 F.Supp.2d 861
   (N.D. Cal. 2011) .................................................................................................................. 9

*Gunther v. Lin,* 144 Cal.App.4th 223  (2006) ...................................................................... 9

*Harris v. Costco Wholesale Corp.,* 389 F. Supp. 2d 1244 (S.D. Cal. 2005) ....................... 6

*Harris v. Stonecrest Care Auto Ctr., LLC,* 472 F.Supp.2d 1208, 1220 (S.D. Cal. 2007)…6

*Herman Family Revocable Trust v. Teddy Bear,* 254 F.3d 802 (9th Cir. 2001) ............. 7,8

*Hubbard v. 7-Eleven, Inc.,* 433 F. Supp. 2d 1134 (S.D. Cal. 2006) ........................... 3, 4, 7

*Indep. Living Res. v. Or. Arena Corp.,* 982 F.Supp. 698 (D. Or. 1997) ............................. 4

*Jankey v. Beach Hut,* 2005 U.S. Dist. LEXIS 45235 (C.D. Cal. Dec. 7, 2005) ............... 11

*Kemper v. Sacramento Radiology Medical Group,* 2007 U.S. Dist. LEXIS 66380
   (E.D. Cal. Aug. 28, 2007) ................................................................................................... 8

*Kohler v. Bed Bath & Beyond of California, LLC,* 2012 U.S. Dist. LEXIS 103068
   (C.D. Cal. July 23, 2012) .................................................................................................... 7

*Kohler v. Southland Foods, Inc.,* 459 Fed. Appx. 617 (9th Cir. Cal. 2011) ....................... 7

*Langer v. Kacha,* 2016 U.S. Dist. LEXIS 17205 (S.D. Cal. Feb. 10, 2016) ................... 7,8

*Love v. Dhillon*, 2016 U.S. Dist. LEXIS 92898 (C.D. Cal. June 30, 2016) .......................7

*Love v. Khalid Azzam*, 2015 U.S. Dist. LEXIS 159592 (C.D. Cal. Nov. 24, 2015).………6

*Love v. Melham Zouher Ayoub*, 2016 U.S. Dist. LEXIS 93082
   (C.D. Cal. June 30, 2016) ...........................................................................................7

*Love v. Ocampo*, 2015 U.S. Dist. LEXIS 148442 (C.D. Cal. Oct. 29, 2015) ...................6

*Martinez v. Longs Drug Stores Corp.*, 281 Fed. Appx. 712 (9th Cir. Cal. 2008) ..............4

*Medical Society of New Jersey v. Herr*, 191 F.Supp.2d 574 (D.N.J. 2002) ......................3

*Molski v. EOS Estate Winery,* 2005 U.S. Dist. LEXIS 39936
   (C.D. Cal. July 14, 2005)....................................................................................10, 11

*Molski v. Hitching Post I Rest., Inc.,* 2005 U.S. Dist. LEXIS 39959
   (C.D. Cal. May 24, 2005) ........................................................................................11

*Molski v. M.J. Cable, Inc.*, 481 F.3d 724 (9th Cir. Cal. 2007) ...........................................3

*Molski v. Mandarin Touch Rest.,* 347 F.Supp.2d 860 (C.D. Cal. 2004).......................9

*Morton Intern, Inc. v. Cardinal Chemical Co.*, 967 F.2d 1571 (Fed. Cir. 1992)...............3

*Munson v. Del Taco, Inc.*, 46 Cal. 4th 661 (Cal. 2009).....................................................9

*Nissan Fire & Marine Ins. Co., v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000)...................2

*Oliver v. KFC Corp.*, 2008 U.S. Dist. LEXIS 53576 (S.D. Cal. July 14, 2008)................4

*Oliver v. Ralphs Grocery Co.*, 654 F.3d 903 (9th Cir. Cal. 2011) ..............................3, 7, 8

*Pappion v. R-Ranch Prop. Owners Ass'n*, 110 F.Supp.3d 1017 (E.D. Cal. 2015).............6

*Parr v. L&L Drive-Inn Restaurant*, 96 F.Supp.2d 1065 (D. Haw. 2000) ......................3, 4

*Paulick v. Starwood Hotels & Resorts Worldwide, Inc.*, 2012 U.S. Dist. LEXIS 101332
   (N.D. Cal. July 20, 2012) ...........................................................................................7

*Pickern v. Best Western Timber Cove Lodge Marina Resort*, 194 F. Supp. 2d 1128
   (E.D. Cal. 2002)......................................................................................................4, 6

*Pinnock v. Safino Designs, Inc.*, 2007 U.S. Dist. LEXIS 63374
   (S.D. Cal. Aug. 28, 2007) .........................................................................................10

*Renne v. Geary*, 501 U.S. 312 (1991).................................................................................3

*Rodriguez v. Ralphs Grocery Company,* 323 Fed. Appx. 617 (9th Cir. Cal. 2009) ...........7

*Schutza v. McDonald's Corp.*, 133 F. Supp. 3d 1241 (S.D. Cal. 2015) ...........................10

*Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008)................................................................2

*Singletary v. The Brick Oven Rest.,* 406 F.Supp.2d 1120 (S.D. Cal.   2005)....................11

*Stevey v. 7-Eleven, Inc.*, 2009 U.S. Dist. LEXIS 53801 (E.D. Cal. Jun. 25, 2009)............3

*T. W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626 (9th Cir. 1987) .......2

*Wentzka v. Gellman*, 991 F.2d 423 (7th Cir. 1993)…………………………………………6

*Wilson v. Costco Wholesale Corporation,* 426 F.Supp.2d 1115 (S.D. Cal. 2006)………6

*Wilson v. PFS, LLC*, 2007 U.S. Dist. LEXIS 61754 (S.D. Cal. Aug. 22, 2007)................4

*Wyatt v. Rug Emporium*, 2016 U.S. Dist. LEXIS 68197 (E.D. Cal. May 24, 2016)...........6

**Statutes**

28 U.S.C. § 1367(c) ...............................................................................................5, 6

28 U.S.C. § 1367(c)(3) ...........................................................................................6, 8

Fed. R. Civ. P. 12(h)(3) ...............................................................................................2

Fed. R. Civ. P. 56(c)…………………………………………………………………2

**Other**

Americans with Disabilities Act Accessibility Guidelines (ADAAG) 404.2.3 .................5

California Building Code 11B-404.2.3 ...........................................................................5

## I.     INTRODUCTION

This action stems from Plaintiff's alleged visit to the site formerly known as Zlfred's restaurant located at 4030 N. Blackstone Avenue in Fresno, California (the "Premises") on April 14, 2014.  Plaintiff alleges discrimination pursuant to the Americans with Disabilities Act, Title III ("ADA") and related state law claims.  As explained in more detail below, all of Plaintiff's claims for injunctive relief under the ADA fail because they are moot.  Therefore, summary judgment is appropriate since there are currently no barriers under the ADA (or California disability access laws) at the Premises.

Because Plaintiff's claims under the ADA are moot, he no longer has standing to pursue his ADA claims.  Without the ability to plead facts to support standing, the Court should dismiss Plaintiff's ADA claims with prejudice and decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

## II.    RELEVANT FACTUAL BACKGROUND

### A.     **Plaintiff's Barrier Allegations**.

Plaintiff alleges that he encountered several barriers during his April 14, 2014 visit to Zlfred's.  [Statement of Undisputed Material Facts ("SUMF") 1] (Second Amended Complaint "(SAC)", ¶ 11a) to 11i)).  Plaintiff also alleges that several barriers existed at Zlfred's even though he did not personally encounter them.  [SUMF 2] (SAC, ¶ 12a) to 12ii)).  Of the barriers alleged in the SAC, Plaintiff has stipulated that as of the date of this filing:

a)  the following alleged barriers are compliant with state and federal disability access laws: SAC subparagraphs 11a), 11b), 11c), 11d), 11e), 11f), 11g), 11i), 12a), 12b), 12c), 12d), 12e), 12f), 12g), 12h), 12i), 12j), 12k), 12l), 12m), 12n), 12o), 12p), 12q), 12v), 12x), 12y), 12z), 12aa), 12dd), 12ee), 12ff), 12gg), 12hh), and 12ii).  [Joint Statement of Stipulated Facts ("JSSF" ¶ 11)];

b)  the following alleged barriers no longer exist at the site formerly known as Zlfred's: SAC subparagraphs 12u), 12bb) and 12cc) [JSSF, ¶ 12]; and

1     c)   the following alleged barriers are not applicable to Plaintiff's causes of action for alleged

2      violations of disability access laws because they are not public accommodations:  SAC

3      subparagraphs 12r), 12s), and 12t).  [JSSF, ¶ 13].

4     Taking into account the above factual stipulations, the only remaining barrier at issue in

5   this case are contained in subparagraphs 11h) and 12w) of the SAC regarding the width of the

6   men's bathroom entryway door.  [SUMF 3] [JSSF ¶¶ 11-13].

7   **III.   STANDARD OF LAW**

8     When a court learns that it has lost subject matter jurisdiction at any time, it must dismiss

9   the action.  *See* Fed. R. Civ. P. 12(h)(3).  Federal Rule of Civil Procedure 56 empowers a court to

10  enter summary judgment on factually unsupported claims or defenses.  *See Celotex Corp. v.*

11  *Catrett*, 477 U.S. 317, 325, 327 (1986).  Summary judgment is appropriate "if the pleadings,

12  depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,

13  show that there is no genuine issue as to any material fact and that the moving party is entitled to

14  judgment as a matter of law."   Fed. R. Civ. P. 56(c).  A fact is material when, under the

15  substantive governing law, it affects the outcome of the case.  *See Anderson v. Liberty Lobby, Inc.*,

16  477 U.S. 242, 248 (1986); *Freeman v. Arpaio*, 125 F.3d 732, 735 (9th Cir. 1997) overruled on

17  other grounds in *Shakur v. Schriro*, 514 F.3d 878, 884-85 (9th Cir. 2008).

18    The party moving for summary judgment bears the initial burden of establishing the

19  absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving party does not

20  have the burden of proof at trial, it may carry its initial burden by "produc[ing] evidence negating

21  an essential element of the nonmoving party's case, or, after suitable discovery, the moving party

22  may show that the nonmoving party does not have enough evidence of an essential element of its

23  claim or defense to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins.*

24  *Co., v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000).

25    A "genuine issue" of material fact arises if "the evidence is such that a reasonable jury

26  could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  "Disputes over

27  irrelevant or unnecessary facts will not preclude a grant of summary judgment."  *T. W. Elec. Serv.,*

28  *Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).

IV.     **ARGUMENT**

> A.  <u>**This Court Has Lost Subject Matter Jurisdiction Because There is Currently No Violation of the ADA at the Premises.**</u>

A private plaintiff can only obtain injunctive relief (i.e. removal of the barrier) under Title III of the ADA, and may not obtain monetary damages.  *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 905 (9th Cir. Cal. 2011); *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. Cal. 2007).  As such, "a defendant's voluntary removal of alleged barriers prior to trial can have the effect of mooting [an] ADA claim."  *Oliver*, 654 F.3d at 905; *see also Chapman v. Starbucks Corp.*, 2011 U.S. Dist. LEXIS 3570, *11 (E.D. Cal. Jan. 6, 2011); *Stevey v. 7-Eleven, Inc.*, 2009 U.S. Dist. LEXIS 53801, *33-*34 (E.D. Cal. Jun. 25, 2009); *Hubbard v. 7-Eleven, Inc.*, 433 F. Supp. 2d 1134, 1145 (S.D. Cal. 2006).  "Mootness is a jurisdictional defect that can be raised at any time by the parties or the court *sua sponte*."  *Parr v. L&L Drive-Inn Restaurant*, 96 F.Supp.2d 1065, 1087 (D. Haw. 2000).

A case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome."  *Clark v. City of Lakewood*, 259 F.3d 996, 1011 (9th Cir. 2001).  "Past exposure to illegal conduct does not in itself show a present case or controversy…if unaccompanied by any continuing, present adverse effects."  *Renne v. Geary*, 501 U.S. 312, 320-321 (1991).  "This requisite ensures that the courts are able to grant effective relief, rather than rendering advisory opinions."  *Medical Society of New Jersey v. Herr*, 191 F.Supp.2d 574, 581 (D.N.J. 2002).  "If an issue is moot in [the] sense" that it "no longer presents an actual case or controversy," then a court has no discretion but must dismiss for lack of jurisdiction."  *Morton Intern, Inc. v. Cardinal Chemical Co.*, 967 F.2d 1571, 1574 (Fed. Cir. 1992).

It is axiomatic that a defendant's remedial efforts will render a plaintiff's ADA claims for injunctive relief moot:

> "The only remedy available for a violation of the Americans with Disabilities Act under a private right of action is injunctive relief.  Accordingly, if no ADA violations exist at the time the court is asked to provide injunctive relief, the ADA claim is moot because there is no basis for relief and there is nothing for the court to order the facility to change."

1  *Gasper v. Marie Callender Pie Shops*, 2006 U.S. Dist. LEXIS 96929, *4 (C.D. Cal. 2006).

2  It is also well established that when a plaintiff's ADA claim is moot, courts need not

3  determine whether any violations previously existed. As put by the court in *Oliver v. KFC Corp.*,

4  2008 U.S. Dist. LEXIS 53576 (S.D. Cal. July 14, 2008):

5  "Because the ADA only offers injunctive relief, an ADA claim is moot once the
defendant has remedied the alleged architectural barrier. *Hubbard v. 7-Eleven,*

6  *Inc.*, 433 F.Supp.2d 1134, 1145 (S.D. Cal. 2006); *Parr v. L&L Drive-Inn*
*Restaurant*, 96 F.Supp.2d 1065, 1087 (D. Haw. 2000); *Indep. Living Res. v. Or.*

7  *Arena Corp.*, 982 F.Supp. 698, 771 (D. Or. 1997). Therefore, for purposes of
adjudicating the pending [cross] motions [for summary judgment] concerning

8  plaintiff's ADA claim, the Court need not address any architectural barriers that
[defendant] has already remedied."

9

10  *Id.* at *3.

11  For these reasons, courts routinely dismiss ADA claims as moot when defendants modify

12  allegedly noncompliant items. *See, e.g., Martinez v. Longs Drug Stores Corp.*, 281 Fed. Appx.

13  712 (9th Cir. Cal. 2008) (upholding district court's dismissal of ADA claims as moot because

14  defendant had remedied all alleged barriers); *Pickern v. Best Western Timber Cove Lodge Marina*

15  *Resort*, 194 F.Supp.2d 1128, 1130 (E.D. Cal. 2002) ("Plaintiff concedes, as she must, that

16  defendant's latest remedial efforts have rendered her ADA claim for injunctive relief moot");

17  *Wilson v. PFS, LLC*, 2007 U.S. Dist. LEXIS 61754 (S.D. Cal. Aug. 22, 2007) (holding that

18  McDonald's modifications to its restaurants rendered the plaintiff's ADA claims moot).

19  As explained below, all of Plaintiff's claims for injunctive relief are moot because all alleged

20  barriers meet current construction standards under the ADA and California law (even though they

21  are not required to since the subject property is an existing facility).

22  **1.  Plaintiff's Only Remaining Allegations Regarding the Width and Clearances of
the Men's Bathroom Doorway Has Been Remedied and is Currently Compliant**

23  **With State and Federal Disability Access Laws**.

24  Plaintiff has stipulated that, as of the date of this filing, the only alleged barrier that remains at issue

25  in this action is the men's bathroom door entryway as contained in Paragraph 11h) and Paragraph 12w) of

26  the SAC. [JSSF, ¶¶ 11-13]; [SUMF 4, 5]; (SAC, ¶¶ 11h) and 12w)). All other barriers alleged in the SAC

27  are either: (i) compliant with state and federal disability access laws [JSSF, ¶ 11]; (ii) no longer in

28  existence [JSSF, ¶ 12]; or (iii) not public accommodations [JSSF, ¶ 13]. This leaves the only remaining

barrier at dispute in this case Plaintiff's allegations in his SAC that "[t]he men's restroom doorway lacked proper maneuvering clearances on the inside of the restroom" [SUMF 4] (SAC, ¶ 11h)) and "[t]he passageway and doorway leading to the men's restroom lack proper clear width" [SUMF 5] (SAC, ¶ 12w)).  Based on Plaintiff's ADA expert, Michael Bluhm, the remaining issue with the men's restroom is the following:

> 22.  During the 12.2.14 inspection as well as the 7.20.16 reinspection, it was observed that the cased opening and door to the Men's restroom do not have the required 32" minimum clear opening widths.

> [SUMF 6]; Declaration of Moji Saniefar ("Saniefar Decl.") ¶ 4, Ex. A, Bluhm Report, at 34.

Under the current construction standards of the ADA and California law, an entrance door must be 32 inches wide minimum.  (2010 ADAAG § 404.2.3; 2013 CBC § 11B-404.2.3).

> ADAAG 404.2.3 Clear Width.  Door openings shall provide a clear width of 32 inches (815 mm) minimum. Clear openings of doorways with swinging doors shall be measured between the face of the door and the stop, with the door open 90 degrees.

> CBC 11B-404.2.3 Clear Width. Door openings shall provide a clear width of 32 inches (813 mm) minimum. Clear openings of doorways with swinging doors shall be measured between the face of the door and the stop, with the door open 90 degrees.

Here, the width of the men's restroom entryway door and cased opening has been remedied and is at least 32 inches wide.  [SUMF 7] (Bray Decl. ¶¶ 6-7; Exhibit A to Bray Decl.).  Thus, this claim is moot.

## B. The Court Should Decline to Exercise Supplemental Jurisdiction.

As there is no longer any federal claim at issue in this litigation, under 28 U.S.C. § 1367(c), the Courts may properly exercise its discretion to decline supplemental jurisdiction if _any_ of four statutory grounds exist:

> (1) the claim raises a novel or complex issue of state law,

> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

> (3) the district court has dismissed all claims over which it has original jurisdiction,  or

> (4) in exceptional circumstances, there are other compelling reasons  for declining  jurisdiction.

> 28  U.S.C. § 1367(c).

1   As explained below, statutory grounds based on 28 U.S.C. § 1367(c) exist in this case

2   compelling the Court to decline supplemental jurisdiction.

3   **1. Dismissal of Plaintiff's ADA Claim For Injunctive Relief Warrants Dismissal of His State-Law Claims For Damages**.

4

5   As the Supreme Court has instructed, once federal claims are dismissed, courts should

6   decline supplemental jurisdiction over related state-law claims:

7   [I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine

8   judicial economy, convenience, fairness, and comity will point toward declining to exercise jurisdiction over the remaining state-law claims.

9   *Carnegie*-Mellon *Univ. v. Cohill*, 484 U.S. 343, 350, n. 7 (1988) superseded by statute on other grounds; *see, e.g.*, *Wentzka v. Gellman*, 991 F.2d 423. 425

10  (7th Cir. 1993) ("[W]e said quite clearly that, where a federal claim drops out before trial, a district court should not retain the state law claims absent

11  extraordinary circumstances."); *Acri v. Varian Assoc's, Inc.*, 114 F.3d 999, 1001 (9th Cir. 1996) ("The Supreme Court has stated, and we have often

12  repeated, that 'in the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point toward declining to exercise jurisdiction over the remaining state-law claims'").

13

14  In ADA cases, district courts properly and routinely decline supplemental jurisdiction over

15  related state-law access claims once the ADA cause of action has been dismissed on

16  summary judgment.  *See, e.g.*, *Wilson v. Costco Wholesale Corporation*, 426 F.Supp.2d 1115,

17  1124 (S.D. Cal. 2006) ("Because the Court has dismissed all claims over which it has original

18  jurisdiction in this matter, the Court will decline to exercise supplemental jurisdiction over

19  Plaintiffs' remaining state law claims"); *Harris v. Stonecrest Care Auto Ctr., LLC*, 472

20  F.Supp.2d 1208, 1220 (S.D. Cal. 2007) (same); *Love v. Khalid Azzam*, 2015 U.S. Dist. LEXIS

21  159592, at *13 (C.D. Cal. Nov. 24, 2015) ("Having found that Plaintiff's ADA claim is moot, and

22  in the absence of any other basis for federal jurisdiction, the Court declines to exercise

23  supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(c)(3)");

24  *Wyatt v. Rug Emporium*, 2016 U.S. Dist. LEXIS 68197 (E.D. Cal. May 24, 2016) (same);

25  *Pappion v. R-Ranch Prop. Owners Ass'n*, 110 F.Supp.3d 1017, 1026 (E.D. Cal. 2015)

26  (same); *Harris v. Costco Wholesale Corp.*, 389 F. Supp. 2d 1244 (S.D. Cal. 2005) (same);

27  *Pickern v. Best Western Timber Cove Lodge Marina Resort*, 194 F. Supp. 2d 1128 (E.D. Cal.

28  2002) (same); *Love v. Ocampo*, 2015 U.S. Dist. LEXIS 148442 (C.D. Cal. Oct. 29, 2015) (same);

1  *Paulick v. Starwood Hotels & Resorts Worldwide, Inc.*, 2012 U.S. Dist. LEXIS 101332, at *15

2  (N.D. Cal. July 20, 2012) (same); *Hubbard v. 7-Eleven, Inc.,* 433 F. Supp. 2d 1134, 1150

3  (S.D.Cal.2006) (same); *Gray v. Cnty. of Kern*, 2015 U.S. Dist. LEXIS 156107 (E.D. Cal. Nov. 17,

4  2015) (same); *Love v. Dhillon*, 2016 U.S. Dist. LEXIS 92898 (C.D. Cal. June 30, 2016) (same);

5  *Love v. Melham Zouher Ayoub*, 2016 U.S. Dist. LEXIS 93082 (C.D. Cal. June 30, 2016)(same);

6  *Langer v. Kacha*, 2016 U.S. Dist. LEXIS 17205 (S.D. Cal. Feb. 10, 2016) (same); *Duarte v. M &*

7  *L Bros. Pharmacy Inc.*, 2014 U.S. Dist. LEXIS 156061, at *3 (C.D. Cal. Nov. 4,

8  2014) (same); *Kohler v. Bed Bath & Beyond of California, LLC*, 2012 U.S. Dist. LEXIS 103068,

9  at *9 (C.D. Cal. July 23, 2012) (declining to exercise supplemental jurisdiction over state law

10  claims after granting the defendant's motion for summary judgment on all of the plaintiff's ADA

11  claims, because "to adjudicate the remaining state claims would require knowledge of the

12  California Building Code, the California Health & Safety Code, and other state laws and

13  regulations. A state court would be a better venue for these issues.").

14       Indeed, the Ninth Circuit has confirmed that district courts should decline supplemental

15  jurisdiction over a plaintiff's state-law access claims once his ADA claim is deemed moot.  For

16  instance, in *Rodriguez v. Ralphs Grocery Company,* 323 Fed. Appx. 617 (9th Cir. Cal. 2009), the

17  Ninth Circuit, citing *Herman Family Revocable Trust v. Teddy Bear,* 254 F.3d 802 (9th Cir.

18  2001), stated that "if the federal claim is dismissed for lack of subject matter jurisdiction, a

19  district court has no discretion to retain the supplemental claims for adjudication, and must

20  dismiss the state law claims without prejudice." *Id.* at 2.  *See also Kohler v. Southland Foods,*

21  *Inc.*, 459 Fed. Appx. 617, 619 (9th Cir. Cal. 2011) ("Given the absence of any available relief

22  under federal law, the district court did not abuse its discretion in declining to exercise

23  supplemental jurisdiction over Kohler's state-law claims.").

24       In *Oliver v. Ralphs Grocery Company*, 654 F.3d 903 (9th Cir. 2011), the Ninth Circuit

25  rejected the plaintiff's claim that it was error for the district court to decline supplemental

26  jurisdiction over his state-law access claims once it determined that his ADA claims were moot:

27       We finally turn to [Plaintiff's] argument that the district court erred in
         declining to exercise supplemental jurisdiction over his state law claims. By
28       granting summary judgment to Ralphs and Cypress Creek on [Plaintiff']s

1  ADA claim, the district court, properly disposed of all claims over which it
2  had original jurisdiction.  Because the balance of the factors of judicial
   economy, convenience, fairness, and comity did not tip in favor of
3  retaining the state law claims after the dismissal of the ADA claim, *San-ford
   v. MemberWorks, Inc.,* 625  F.3d 550, 561  (9th Cir. 2010) ...the district court
4  did not abuse its discretion in dismissing [Plaintiff]'s state law claims without
   prejudice."

5  *Id.* at 911.

6     The reasoning behind these cases is that dismissing the state-law claims promotes the

7  values of comity and fairness.  *See, e.g., Kemper v.  Sacramento Radiology Medical Group*, 2007

8  U.S. Dist. LEXIS 66380, *6 (E.D. Cal. Aug. 28, 2007) ("The *Gibbs* values of comity and fairness

9  do not weigh in favor of the federal court deciding Plaintiffs' state disability and damage

10 claims.  Accordingly, the court declines to continue exercising  supplemental jurisdiction

11 over  Plaintiffs' remaining state law claims and therefore these  are dismissed  under 28 U.S.C.

12 §1367(c)(3)"); *Oliver v. Ralphs Grocery Company,* 654 F.3d at 911 (same).

13    Since the Court must dismiss Plaintiff's federal claims as moot, then it must also dismiss the

14 pendent California state-law claims.  "[D]istrict courts may decline to exercise supplemental

15 jurisdiction over a [ ] claim if . . . the district court has dismissed all claims over which it has

16 original jurisdiction."  (28 U.S.C. § 1367(c)(3)).  District courts only have discretion "[i]f the

17 district court dismissed all federal claims on the merits."  *Herman Family Revocable Trust v.*

18 *Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001).  If, however, the district court "dismisses [all

19 federal claims] for lack of subject matter jurisdiction, it has no discretion and must dismiss all

20 [state law] claims."  *Id.*

21    In this case, because the Court must dismiss Plaintiff's ADA claim for lack of subject

22 matter jurisdiction because the federal claims are moot, it does not have discretion to exercise

23 supplemental jurisdiction over the state-law claims.  *See id.*; *Langer v. Kacha*, 2016 U.S. Dist.

24 LEXIS 17205 (S.D. Cal. Feb. 10, 2016).

25    **2.  Plaintiff's Claims For Damages Under the Unruh Act Raise Novel and
        Complex Issues of State Law**.
26

27    Courts have recognized that claims under the Unruh Act raise novel  and complex

28 issues of state law, providing another basis to decline supplemental jurisdiction.  For example, in

*Grutman v. The Regents of the University of California,* 807 F.Supp.2d 861 (N.D. Cal. 2011), the court explained that the way in which damages are calculated presents novel and complex issues of state law:

> Here, the Court declines to exercise supplemental jurisdiction because Plaintiffs claim raises novel and difficult questions of state law, the resolution of which will have signification implications for enforcement of the [California Unruh Civil Rights Act]. In particular, the results of this and similar litigation will be dramatically different depending on whose interpretation of Section 52(a) the Court adopts...neither the case law nor the legislative history offered by Defendant as to the 2008 amendment require that the Court find that a plaintiff who encounters architectural barriers on a daily basis in her residence should be treated differently from plaintiffs who encounter architectural barriers, over a series of visits, to other types of business establishments ... under these circumstances, the Court concludes that this is a matter of state law that is better left to the California courts to decide."

> *Id.* at 870.

In the present case, because Plaintiff's remaining claims are under state law, including a claim under the Unruh Civil Rights Act, the question of whether Plaintiff is entitled to any damages is better left to the California state court.

### 3.   Plaintiff's Claims For Damages Substantially Predominate Over His Claims For Injunctive Relief.

Likewise, courts have recognized that a plaintiff's state-law claims for monetary damages substantially predominate over his claim for injunctive relief under the ADA, providing yet another ground for declining supplemental jurisdiction. "State law claims have become the tails that wag the dog of federal ADA litigation." *Gunther v. Lin,* 144 Cal.App.4th 223, 256 (2006) overruled on other grounds in *Munson v. Del Taco, Inc.,* 46 Cal. 4th 661 (Cal. 2009). "[E]nterprising plaintiffs (and their attorneys) have found a way to circumvent the will of Congress by seeking money damages while retaining federal jurisdiction." *Molski v. Mandarin Touch Rest.,* 347 F.Supp.2d 860, 862-63 (C.D. Cal. 2004). As explained by one district court:

> "While Plaintiff has pleaded a federal claim as a jurisdictional hook to maintain the action in federal court the case centers on Plaintiff's claim for damages which are recoverable only under the state law claims … Even

though Plaintiffs have submitted a notice of voluntary limitation of damages, seeking only an award of $4,000 to Molski and $1,000 to [co- plaintiff that is an association], it is still clear that the claim for damages is the predominant focus of this lawsuit. Further, since the state law claims provide for injunctive relief, the federal claim adds nothing to the lawsuit that could not be obtained in Superior Court. Accordingly, Plaintiffs' state law claims substantially predominate over the federal ADA claim.

*Molski v. EOS Estate Winery,* 2005 U.S. Dist. LEXIS 39936, *4 (C.D. Cal. July 14, 2005)

Recent courts have also declined to exercise supplemental jurisdiction in disability access litigation cases based on review of the remedies available to a plaintiff in state court.

In this case, Plaintiff asserts three state-law claims (Unruh Civil Rights Act, CDPA, and negligence) and one federal claim (ADA).

The Court finds that Plaintiff's three state-law claims substantially predominate over Plaintiff's ADA claim. First, California has its own set of public accommodation accessibility standards that can provide the basis for liability for disability discrimination in addition to ADA standards. *See Moeller v. Taco Bell Corp.*, No. C02-05849, 2008 U.S. Dist. LEXIS 60714, 2007 WL 2301778, at *6 (N.D. Cal. Aug. 8, 2007) ("A violation of a California Standard constitutes a violation of both the CDPA and the Unruh Act.").

Finally, Plaintiff's state-law claims provide more expansive remedies than Plaintiff's ADA claim, and Plaintiff is pursuing those remedies. Plaintiff seeks damages, which are unavailable under the ADA, but are available under the Unruh Civil Rights Act and CDPA. *Compare Wander*, 304 F.3d at 858 (noting that damages are not available under Title III of the ADA) *with* Cal. Civ. Code §§ 52(a), 54.3(a) (authorizing damages under the Unruh Civil Rights act and CDPA, respectively). Plaintiff also seeks attorneys' fees. The Unruh Civil Rights Act and CDPA contain mandatory fee-shifting provisions, while the [**13] ADA's attorneys' fees provision is discretionary. *Compare* Cal. Civ. Code §§KL: 52(a), 54.3(a) (providing mandatory fee-shifting to a prevailing plaintiff under the Unruh Civil Rights Act and CDPA, respectively) *with* 42 U.S.C. § 12205 (providing for discretionary fee-shifting to the "prevailing party").

*Schutza v. McDonald's Corp.*, 133 F. Supp. 3d 1241, at *12-13 (S.D. Cal. 2015).

For these reasons, courts routinely decline to exercise supplemental jurisdiction. *See, e.g., Pinnock v. Safino Designs, Inc.*, 2007 U.S. Dist. LEXIS 63374, *4 (S.D. Cal. Aug. 28, 2007) ("Given the disparity in terms of comprehensiveness of the remedy sought, state law claims

1  substantially predominate over the ADA for purposes of  28  U.S.C. § 1367(c)(2)"); *Molski v.*

2  *EOS  Estate Winery,* 2005 U.S. Dist. LEXIS 39936, at *4; *Jankey v. Beach Hut*, 2005 U.S. Dist.

3  LEXIS 45235, at *5 (C.D. Cal. Dec. 7, 2005); *Molski v. Hitching Post I Rest., Inc.,* 2005 U.S.

4  Dist. LEXIS 39959, at *4 (C.D. Cal. May 24, 2005); *Singletary v. The Brick Oven Rest.,* 406

5  F.Supp.2d 1120, 1130-31 (S.D. Cal.   2005).

6      Because Defendants remedied each of the ADA barriers alleged in the Complaint, the Court

7  must find Plaintiff's ADA claims moot. Therefore, the Court must grant Defendants' motion for

8  summary judgment as to the ADA claim, and dismiss the claims with prejudice.

9  **V.      CONCLUSION**

10      For the foregoing reasons, Defendants respectfully request that the Court grant Defendants'

11  motion for summary judgment and that the Court decline to exercise supplemental jurisdiction

12  over Plaintiff's state law claims.

13

14                                         Respectfully submitted,

15  DATED:  November 23, 2016              SANIEFAR LAW

16                                         /s/ Moji Saniefar

17                                         MOJI SANIEFAR
18                                         Attorneys for Defendants

19

20

21

22

23

24

25

26

27

28

# Exhibit 129

1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8

9 | RONALD MOORE,

Case No.  1:14-cv-01067-SKO

10 |        Plaintiff,

**ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DISMISSING PLAINTIFF'S
CLAIMS**

11

12 | v.

**(Doc. 90)**

13 | FATEMAH SANIEFAR, et al.,

14 |        Defendants.

15 | _____/

16
17
18
19

Before the Court is Defendants' Motion for Summary Judgment, or Alternatively Summary Adjudication ("Defendants' Motion").  (Doc. 90.)  For the reasons provided herein, the Court GRANTS Defendants' Motion, (*id.*), and DISMISSES all of Plaintiff's claims.

20

## I.      BACKGROUND

21

This action involves allegations that features of a restaurant owned or operated by Defendants (the "Building") violate certain provisions under the Americans with Disabilities Act (the "ADA") and California state law.  The Building is "located at 4030 N. Blackstone Ave., Fresno, CA" and is owned by "the Bost Trust" to "this day."  (Doc. 89, Ex. 2 ¶ 1.)  On April 14, 2014, the Building was occupied by a restaurant "known as 'Zlfred's.'"  (*Id.* ¶ 2.)  "On or about February 1, 2015," the Building "was leased to" an individual "who opened a new restaurant named 'Yem Kabob.'"  (*Id.* ¶ 3.)

22
23
24
25
26
27
28

1    Plaintiff asserts that he "suffers from hydrocephalus . . . , degenerative disc disease, and

2 chronic pain syndrome." (Doc. 89, Ex. 1 at 9.)  Plaintiff further asserts that, "[a]s a result of his

3 medical conditions, [he] is substantially limited in his ability to walk" and, as such, qualifies as

4 disabled under the ADA. (*Id.* at 10.)

5    Plaintiff filed the operative Complaint on June 4, 2015.  (Doc. 32.)  In the Complaint,

6 Plaintiff alleges that he "visited" the Building on April 14, 2014.  (*Id.* ¶ 11.)  Plaintiff alleges that,

7 during this visit, he encountered a series of structural and non-structural barriers.  (*Id.*; *see also id.*

8 (describing the barriers Plaintiff allegedly encountered during an April 14, 2014 visit to the

9 Building).)   Beyond these barriers that Plaintiff purportedly "personally encountered," Plaintiff

10 also alleges that he "is aware of" numerous additional "barriers which exist at the [Building] and

11 relate to his disabilities."   (*Id.* ¶ 12; *see also id.* (providing Plaintiff's description of these

12 additional alleged barriers).)

13    In Plaintiff's First Claim, Plaintiff alleges that Defendants violated the ADA by (1)

14 "denying Plaintiff 'full and equal enjoyment' and use of the goods, services, facilities, and

15 privileges and accommodations of the [Building]," (*id.* ¶ 22); (2) failing to remove the

16 architectural barriers at the Building, an existing facility, (*see id.* ¶¶ 23–27); (3) designing and

17 constructing the Building "in a manner that was not readily accessible to the physically disabled

18 public," (*id.* ¶ 30); (4) altering the Building "in a manner that violated the ADA on or before

19 Plaintiff's April 14, 2014 visit" without making "the [Building] readily accessible to the

20 physically disabled public," (*id.* ¶ 33); and (5) "failing to make reasonable modifications in

21 policies, practices, or procedures at the [Building] at or prior to Plaintiff's April 14, 2014 visit

22 . . . when these modifications were necessary to afford . . . these goods, services, facilities, or

23 accommodations to Plaintiff," (*id.* ¶ 36).  The Complaint also includes the following two claims

24 under California state law: (1) Second Claim—a claim that Defendants violated certain provisions

25 of the Unruh Act, including, in part, by acts and omissions that violated the ADA, (*see id.* ¶¶ 39–

26 46); and (2) Third Claim—a claim that Defendants violated provisions of the California Health

27 and Safety Code, (*see id.* ¶¶ 47–51).  Finally, the Complaint includes the following requests for

28 relief: (1) "[a]n injunction requiring that" Defendant Alireza Saniefar, trustee of the Bost Trust,

1  "make the [Building] fully accessible to Plaintiff under both state and federal accessibility

2  standards;" (2) "[d]eclaratory relief that Defendants violated the ADA at the time of Plaintiff's

3  April 14, 2014 visit to the [Building] for purposes of Unruh Act damages;" (3) "[s]tatutory

4  minimum damages of $4,000 under section 52(a) of the California Civil Code;" (4) "[a]ttorneys'

5  fees, litigation expense[s], and costs of suit," including "attorneys' fees under California Code of

6  Civil Procedure § 1021.5;" and (5) "[i]nterest at the legal rate from the date of the filing of this

7  action." (*Id.* at 12.)

8      "When Defendants were served with the Complaint, they hired a Certified Access

9  Specialist . . . to [r]eview the [Building]." (Doc. 101, Ex. 1 ¶ 30.) After receiving the assessment

10  from this Certified Access Specialist, "Defendant[s] hired a contractor to address all the issues

11  identified" in the Complaint. (*Id.* ¶ 31.) Defendants assert that these efforts promptly resulted in

12  the removal of the alleged barriers. (*See, e.g.*, Doc. 97 at 11 ("As soon as Defendants were made

13  aware of issues, they immediately fixed them to achieve compliance.").) The parties now

14  agree—solely for purposes of Defendants' Motion—that all of the alleged barriers have been

15  removed and the Building is now compliant with the ADA and California state law. (*See, e.g.*,

16  Doc. 90, Ex. 1 at 9 ("[A]ll alleged barriers meet current construction standards under the ADA and

17  California law . . . ."); Doc. 91 at 6 ("[F]or purposes of [Defendants' Motion] only, Plaintiff takes

18  Defendants at their word that they have brought all of the barriers listed in his [C]omplaint into

19  compliance with the codes."); Doc. 101, Ex. 1 ¶ 15 (providing Plaintiff's statement that it is

20  "[u]ndisputed for purposes" of Defendants' Motion that "[t]here are currently no barriers to

21  disability access at" the restaurant).) Defendant Alireza Saniefar, trustee of the Bost Trust, also

22  filed a declaration in which he states that he "fully intend[s] to make sure that the [Building]

23  remains compliant to the full extent of [his] control and legal ability." (Doc. 97, Ex. 3 ¶ 4; *cf.*

24  Doc. 101, Ex. 1 ¶ 32 (providing Plaintiff's assertion that the Bost Trust "has sought to abdicate

25  [his] legal responsibility to monitor compliance on [the] property to the tenant").)

26      Additionally, the Bost Trust "has entered into a 5-year agreement with a" Certified Access

27  Specialist "to check" the property quarterly for compliance. (Doc. 101, Ex. 1 ¶ 33; *see also* Doc.

28  97, Ex. 4 at 2 (constituting an agreement between "Bost Trust, c/o Ali Saniefar, Trustee" and the

3

1   Certified Access Specialist, Kelly Bray, in which Ms. Bray agrees to inspect the property located

2   at "4030 N. Blackstone[,] Fresno, [CA]" on a quarterly basis between March 2017 and December

3   2021 "to confirm that the condition of the property complies with the [ADA]").)  Defendants also

4   state that the Bost Trust "has notified the current tenant of the [Building] about what it must and

5   must not do to maintain compliance with disability access laws."  (Doc. 101, Ex. 1 ¶ 34; *see also*

6   Doc. 97, Ex. 6 at 2–5 (constituting a letter from Defendant Alireza Saniefar, "Trustee, Bost Trust"

7   to "Ammar" at Yem Kabob, 4030 North Blackstone Ave., Fresno, California 93726, in which

8   Defendant Alireza Saniefar states that "Yem Kabob owners, managers and employees need to

9   ensure that" the items listed in an attached list "stay in their current compliant status"); *cf.* Doc.

10  101, Ex. 1 ¶ 34 (providing Plaintiff's assertion that "[t]here is no evidence that the [n]otice was

11  ever received by the [t]enant").)

12      Defendants filed Defendants' Motion on November 23, 2016.  (Doc. 90.)  Plaintiff filed his

13  opposition to Defendants' Motion on December 16, 2016, (Doc. 91), and Defendants filed their

14  reply in support of this motion on February 8, 2017,[1] (Doc. 102).  As such, Defendants' Motion is

15  fully briefed and ready for disposition.[2]

16              **II.    LEGAL STANDARD**

17      "Federal Rule of Civil Procedure 56 governs motions for summary judgment," *Smith v.*

18  *Union Pac. R.R. Co.*, No. 2:12–cv–00656–TLN–CKD, 2013 WL 5718874, at *2 (E.D. Cal. Oct.

19  16, 2013), and provides, in part, that "[t]he court shall grant summary judgment if the movant

20  shows that there is no genuine dispute as to any material fact and the movant is entitled to

21  judgment as a matter of law," Fed. R. Civ. P. 56(a).  In evaluating a motion for summary

22  judgment, the court "must draw all reasonable inferences supported by the evidence in favor of the

23  non-moving party and then decide whether any genuine issues of material fact exist."  *Guidroz-*

24  *Brault v. Mo. Pac. R.R. Co.*, 254 F.3d 825, 829 (9th Cir. 2001).  "A fact issue is genuine 'if the

25  evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Id.*

26

27  [1] By its order entered on December 28, 2016, the Court granted the parties' request for an extension for the briefing pertaining to Defendants' Motion and ordered that "Defendants shall file their reply brief in support of [Defendants' Motion] by February 8, 2017."  (Doc. 95.)

28  [2] By its order entered on February 13, 2017, the Court found that "Defendants' Motion [is] suitable for decision without oral argument."  (Doc. 104.)  The Court therefore vacated the hearing regarding Defendants' Motion.  (*Id.*)

4

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  "A material fact is one that may affect the outcome of the case under the applicable law."  *Cotta v. Cty. of Kings*, 79 F. Supp. 3d 1148, 1156 (E.D. Cal. 2015) (citing *Liberty Lobby, Inc.*, 477 U.S. at 248).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see, e.g.*, Fed. R. Civ. P. 56(c)(1)(A) (stating that a party seeking summary judgment must support their motion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials").  "The exact nature of this responsibility, however, varies depending on whether the issue on which summary judgment is sought is one in which the movant or the nonmoving party carries the ultimate burden of proof."  *Cotta*, 79 F. Supp. 3d at 1157 (citations omitted).  "Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun*, 509 F.3d at 984.  On the other hand, a moving party that does not carry "the ultimate burden of persuasion at trial" must "either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial."  *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000) (citations omitted).

"If a moving party fails to carry its initial burden of production, the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of persuasion at trial."  *Id.* at 1102–03 (citations omitted).  "In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything."  *Id.* at 1103 (citation omitted).

However, "[i]f the moving party meets its initial burden, the non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a

1    genuine issue for trial.'"  *Soremekun*, 509 F.3d at 984 (quoting *Liberty Lobby, Inc.*, 477 U.S. at

2    250).   Stated differently, "[i]n order to avoid summary judgment, a non-movant must show a

3    genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in

4    its favor."  *F.T.C. v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) (citing *Liberty Lobby, Inc.*, 477

5    U.S. at 257).  "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both

6    insufficient to withstand summary judgment." *Id.* (citing *Galen v. Cty. of L.A.*, 477 F.3d 652, 658

7    (9th Cir. 2007));  *see, e.g.*, *Soremekun*, 509 F.3d at 984 ("Conclusory, speculative testimony in

8    affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary

9    judgment." (citations omitted)); *F.T.C. v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1170 (9th

10   Cir. 1997) ("Once the [moving party] has made a prima facie case for summary judgment, the

11   [non-moving party] cannot rely on general denials; [they] must produce significant probative

12   evidence that demonstrates that there is a genuine issue of material fact for trial." (citing *Liberty

13   Lobby, Inc.*, 477 U.S. at 249–50)).

14        "In judging evidence at the summary judgment stage, the court does not make credibility

15   determinations or weigh conflicting evidence."  *Soremekun*, 509 F.3d at 984.  "That remains the

16   province of the jury or fact finder."  *Cotta*, 79 F. Supp. 3d at 1157 (citation omitted).  "Rather, [the

17   court] draws all inferences in the light most favorable to the nonmoving party."  *Soremekun*, 509

18   F.3d at 984 (citing *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31

19   (9th Cir. 1987)).  "The evidence presented by the parties must be admissible."  *Id.* (citing Fed. R.

20   Civ. P. 56(e)).

### III.    DISCUSSION

22        In Defendants' Motion, Defendants argue that they have remedied the alleged ADA

23   violations, thereby rendering Plaintiff's sole federal claim (the First Claim) moot.  (*See* Doc. 90,

24   Ex. 1 at 8–10.)  Defendants then argue that the Court should decline to exercise supplemental

25   jurisdiction over Plaintiff's remaining state law claims.  (*See id.* at 10–16.)  For the reasons that

26   follow, the Court agrees with Defendants' position.

27

28

**A.     Mootness Inquiry**

Defendants first argue that Plaintiff's sole federal claim—the First Claim, which includes allegations that Defendants violated certain provisions of the ADA—is now moot.  (*See id.* at 8–10.)  The Court finds that this argument has merit.

1.     Overview of the ADA

"The ADA was enacted 'to provide clear, strong, consistent, enforceable standards addressing discrimination against individuals with disabilities.'"  *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 944 (9th Cir. 2011) (quoting 42 U.S.C. § 12101(b)(2)).  "The concept of 'discrimination' under the ADA does not extend only to obvious exclusionary conduct—such as a sign stating that persons with disabilities are unwelcome or an obstacle course leading to a store's entrance."  *Id.* at 945.  "Rather, the ADA proscribes more subtle forms of discrimination—such as difficult-to-navigate restrooms and hard-to-open doors—that interfere with disabled individuals' 'full and equal enjoyment' of places of public accommodation."  *Id.* (quoting 42 U.S.C. § 12182(a)).

"Title III of the ADA prohibits discrimination on the basis of disability in the 'full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation' with a nexus in interstate commerce."  *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 904 (9th Cir. 2011) (quoting 42 U.S.C. §§ 2000a(b) & 12182(a)).  "The standard for discrimination depends on whether the public accommodation is an existing facility or a newly constructed facility."  *Dodson v. Joseph Esperanca, Jr., LLC*, No. 2:12–cv–02132–TLN–EFB, 2013 WL 6328274, at *2 (E.D. Cal. Dec. 4, 2013).  "In the context of existing facilities, discrimination includes 'a failure to remove architectural barriers . . . where such removal is readily achievable.'"  *Chapman*, 631 F.3d at 945 (alteration in original) (quoting 42 U.S.C. § 12182(b)(2)(A)(iv)).  "In the case of newly constructed facilities, compliance with the ADA's antidiscrimination mandate requires that facilities be 'readily accessible to and usable by individuals with disabilities.'"  *Id.* (quoting 42 U.S.C. § 12183(a)(1)).

"Congress charged the Attorney General with the task of promulgating regulations to enforce the ADA."  *Dodson*, 2013 WL 6328274, at *2 (citing 42 U.S.C. § 12186(b)).  *See*

1    *generally Miller v. Cal. Speedway Corp.*, 536 F.3d 1020, 1024–27 (9th Cir. 2008) (describing the

2    ADA's regulatory framework).   These regulations "provide[] the objective contours of the

3    standard that architectural features must not impede disabled individuals' full and equal enjoyment

4    of accommodations." *Chapman*, 631 F.3d at 945.  These regulations "are as precise as they are

5    thorough, and the difference between compliance and noncompliance with the standard of full and

6    equal enjoyment established by the ADA is often a matter of inches." *Id.* at 945–46 (citations

7    omitted).

8         "The enforcement provisions of the [ADA] provide that . . . . a person aggrieved by a

9    violation of the [ADA] may file a 'civil action for preventive relief, including an application for a

10    permanent or temporary injunction.'" *Antoninetti v. Chipotle Mexican Grill, Inc.*, 643 F.3d 1165,

11    1174 (9th Cir. 2010) (citations omitted) (quoting 42 U.S.C. § 2000a–3(a)).  In other words, the

12    ADA "permits private lawsuits against businesses that fail to accommodate individuals with

13    disabilities." *Johnson v. Wayside Prop., Inc.*, 41 F. Supp. 3d 973, 976 (E.D. Cal. 2014) (citing 42

14    U.S.C. § 12188(a)).  However, "[i]njunctive relief is the sole remedy available to private parties

15    under the [ADA]; it does not authorize a claim for money damages." *Antoninetti*, 643 F.3d at

16    1174 (citing *Wander v. Kaus*, 304 F.3d 856, 858 (9th Cir. 2002)).

17         2.   <u>Mootness Analysis</u>

18         The Court now turns to Defendants' mootness argument.  "It is a fundamental precept that

19    federal courts are courts of limited jurisdiction." *Owen Equip. & Erection Co. v. Kroger*, 437 U.S.

20    365, 374 (1978).  "The limits upon federal jurisdiction, whether imposed by the Constitution or by

21    Congress, must be neither disregarded nor evaded." *Id.*  "Article III of the United States

22    Constitution limits federal court jurisdiction to 'actual, ongoing cases or controversies.'" *Wolfson*

23    *v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010) (quoting *Lewis v. Cont'l Bank Corp.*, 494 U.S.

24    472, 477 (1990)).  "[A] federal court has neither the power to render advisory opinions nor to

25    decide questions that cannot affect the rights of litigants in the case before them." *Preiser v.*

26    *Newkirk*, 422 U.S. 395, 401 (1975) (citation omitted).  "Its judgments must resolve 'a real and

27    substantial controversy admitting of specific relief through a decree of a conclusive character, as

28

1    distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'"

2    *Id.* (quoting *North Carolina v. Rice*, 404 U.S. 244, 246 (1971)).

3        "To qualify as a case fit for federal-court adjudication, 'an actual controversy must be

4    extant at all stages of review, not merely at the time the complaint is filed.'"   *Arizonans for*

5    *Official English v. Arizona*, 520 U.S. 43, 67 (1997) (quoting *Preiser*, 422 U.S. at 401).   "If the

6    court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the

7    action."  Fed. R. Civ. P. 12(h)(3).  Further, "[a] federal court is presumed to lack jurisdiction in a

8    particular case unless the contrary affirmatively appears."   *Stock W., Inc. v. Confederated Tribes of*

9    *the Colville Reservation*, 873 F.2d 1221, 1225 (9th Cir. 1989) (citation omitted).

10       "If the controversy is moot, . . . the trial . . . court[] lack[s] subject matter jurisdiction and

11   the concomitant power to declare the law by deciding the claims on the merits."   *In re Burrell*, 415

12   F.3d 994, 998 (9th Cir. 2005) (citation omitted).   "[A] case is moot when the issues presented are

13   no longer 'live' or the parties lack a legally cognizable interest in the outcome."   *City of Erie v.*

14   *Pap's A.M.*, 529 U.S. 277, 287 (2000) (alteration in original) (quoting *Cty. of L.A. v. Davis*, 440

15   U.S. 625, 631 (1979)).   "Mootness can be characterized as the doctrine of standing set in a time

16   frame: The requisite personal interest that must exist at the commencement of the litigation

17   (standing) must continue throughout its existence (mootness)."   *Foster v. Carson*, 347 F.3d 742,

18   745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir.

19   1999)).

20       "The underlying concern" of the mootness doctrine "is that, when the challenged conduct

21   ceases such that there is no reasonable expectation that the wrong will be repeated, then it

22   becomes impossible for the court to grant any effectual relief whatever to the prevailing party."

23   *City of Erie*, 529 U.S. at 287 (citations omitted).   "In that case, any opinion as to the legality of the

24   challenged action would be advisory."   *Id.*

25       "[I]n deciding a mootness issue, the question is not whether the precise relief sought at the

26   time the application for an injunction was filed is still available."   *Or. Nat. Res. Council v. U.S.*

27   *Bureau of Land Mgmt.*, 470 F.3d 818, 820 (9th Cir. 2006) (alteration in original) (quoting *Nw.*

28   *Envtl. Def. Ctr. v. Gordon*, 849 F.2d 1241, 1244–45 (9th Cir. 1988)).   Rather, "[t]he basic question

9

1    in determining mootness is whether there is a *present* controversy as to which effective relief can

2    be granted." *Gordon*, 849 F.2d at 1244 (citation omitted).  In other words, "moot cases [are] those

3    which have lost their character as present, live controversies." *Id.* (citation omitted).  Thus, "[i]f

4    an event occurs" during the litigation "that prevents the court from granting effective relief, the

5    claim is moot and must be dismissed." *Am. Rivers v. Nat'l Marine Fisheries Serv.*, 126 F.3d 1118,

6    1123 (9th Cir. 1997) (citations omitted); *see, e.g.*, *Horizon Bank & Tr. Co. v. Massachusetts*, 391

7    F.3d 48, 53 (1st Cir. 2004) ("[A] case not moot at the outset can become moot because of a change

8    in the fact situation underlying the dispute, making relief now pointless." (citing *Weinstein v.*

9    *Bradford*, 423 U.S. 147, 148–49 (1975))); *S. Cal. All. of Publicly Owned Treatment Works v. EPA*,

10   No. 2:14–cv–01513–MCE–DAD, 2015 WL 2358620, at *2 (E.D. Cal. May 15, 2015) ("When a

11   case becomes moot, federal courts lose jurisdiction." (citing *Church of Scientology of Cal. v.*

12   *United States*, 506 U.S. 9, 12 (1992))).  In the context of ADA cases, "[b]ecause a private plaintiff

13   can sue only for injunctive relief (i.e., for removal of the barrier) under the ADA, a defendant's

14   voluntary removal of alleged barriers prior to trial can have the effect of mooting a plaintiff's

15   ADA claim." *Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 905 (9th Cir. 2011) (citations omitted).

16           Here, it is uncontested for purposes of Defendants' Motion that Defendants have

17   voluntarily remedied all alleged barriers.  (*See* Doc. 90, Ex. 1 at 9 ("[A]ll alleged barriers meet

18   current construction standards under the ADA and California law . . . ."); Doc. 91 at 6 ("[F]or

19   purposes of this motion only, Plaintiff takes Defendants at their word that they have brought all of

20   the barriers listed in [Plaintiff's Complaint] into compliance with the codes."); Doc. 101, Ex. 1 ¶

21   15 (providing Plaintiff's statement that it is "[u]ndisputed for purposes" of Defendants' Motion

22   that "[t]here are currently no barriers to disability access at" the Building).)   This voluntary

23   remediation of the alleged barriers indicates that Plaintiff's ADA claim is moot.  *See, e.g.*, *Corless*

24   *v. Cole*, Civ. No. 13–00700 ACK–BMK, 2014 WL 2892362, at *8 (D. Haw. June 25, 2014) ("In

25   the context of claims brought under the ADA, mootness is typically found in cases where the

26   defendants fix or remedy all non-compliant ADA barriers.").

27           Plaintiff nonetheless argues that his ADA claim is not moot due to the voluntary cessation

28   doctrine.  (*See* Doc. 91 at 7–12.)  The Court disagrees.

"Courts have long recognized a 'voluntary cessation exception' to mootness." *Moore v. Dollar Tree Stores Inc.*, 85 F. Supp. 3d 1176, 1187 (E.D. Cal. 2015) (quoting *Rosemere Neighborhood Ass'n v. EPA*, 581 F.3d 1169, 1173 (9th Cir. 2009)); *see, e.g. Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) ("It is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" (quoting *City of Mesquite v. Alladin's Castle, Inc.*, 455 U.S. 283, 289 (1982))); *Zaldivar v. City of San Diego*, CASE NO. 15CV67-GPC(RBB), 2016 WL 5118534, at *10 (S.D. Cal. Sept. 21, 2016) ("The voluntary cessation doctrine is an exception to the general rule that a case is mooted by the end of the offending behavior."). "Under this doctrine, when a defendant's voluntary cessation of a challenged activity is the basis for mootness, it becomes the defendant's burden to demonstrate that 'subsequent events made it absolutely clear that the alleged wrongful behavior could not reasonably be expected to recur.'" *Moore*, 85 F. Supp. 3d at 1187 (quoting *Friends of the Earth, Inc.*, 528 U.S. at 189; *cf. Barnes v. Healy*, 980 F.2d 572, 580 (9th Cir. 1992) ("Voluntary cessation of an illegal course of conduct does not render moot a challenge to that course of conduct unless (1) there is no reasonable expectation that the wrong will be repeated, and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." (citing *Davis*, 440 U.S. at 631)). "The 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Friends of the Earth, Inc.*, 528 U.S. at 189 (quoting *United States v. Concentrated Phosphate Exp. Ass'n*, 393 U.S. 199, 203 (1968)). "This is because 'otherwise they would simply be free to return to (their) old ways after the threat of a lawsuit had passed.'" *Moore*, 85 F. Supp. 3d at 1187 (quoting *Armster v. U.S. Dist. Court for Cent. Dist. of Cal.*, 806 F.2d 1347, 1359 (9th Cir. 1986)).

In the context of ADA claims, "[c]ourts have held that where structural modifications are made, then it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to occur in the future since structural modification undo the offending conduct." *Zaldivar*, 2016 WL 5118534, at *10 (collecting cases). When considering non-structural features, on the other hand, courts have found that "voluntary remediation of" these violations do "not moot an issue"

1   because the violations "could easily reoccur." *Id.* (citations omitted).  Nonetheless, "[i]n making a

2   determination about whether the facts indicate a danger of future violations . . . , [courts]

3   consider[] the bona fides of the expressed intent to comply, the effectiveness of the discontinuance

4   and, in some cases, the character of the past violations."  *Watanabe v. Home Depot USA, Inc.*, No.

5   CV025088RGKMCX, 2003 WL 24272650, at *4 (C.D. Cal. July 14, 2003) (citation omitted); *cf.*

6   *Langer v. G.W. Props., L.P.*, Case No. 15-cv-02443-BAS(BLM), 2016 WL 3419299, at *4 (S.D.

7   Cal. June 21, 2016) ("When determining whether behavior can reasonably be expected to recur,

8   courts consider various issues, such as the (a) motivation behind the conduct, (b) reasons for the

9   change in conduct, (c) volitional nature of the conduct, (d) length of time between the change in

10  conduct and the complaint, and (e) ownership status of the defendant in relation to the property."

11  (citations omitted)).

12      In this case, the pertinent considerations weigh in favor of finding that the

13  violations—even those pertaining to non-structural issues—are not reasonably likely to recur.

14  Defendants remedied the alleged violations immediately after the initiation of this action.  (*See,*

15  *e.g.*, Doc. 97 at 11 ("As soon as Defendants were made aware of issues, they immediately fixed

16  them to achieve compliance.").)  As such, it is uncontested for purposes of Defendants' Motion

17  that all of the purported violations have been brought into compliance with the ADA's

18  requirements.  (*See, e.g.*, Doc. 90, Ex. 1 at 9 ("[A]ll alleged barriers meet current construction

19  standards under the ADA and California law . . . ."); Doc. 91 at 6 ("[F]or purposes of [Defendants'

20  Motion] only, Plaintiff takes Defendants at their word that they have brought all of the barriers

21  listed in his [C]omplaint into compliance with the codes.").)

22      Additionally, it is uncontested that Defendants have taken substantial affirmative steps to

23  become compliant and prevent future violations.  Upon receiving the Complaint in this action,

24  Defendants hired an experienced Certified Access Specialist to review the site.  (*See* Doc. 101, Ex.

25  1 ¶ 30.)  After receiving the assessment from this specialist, Defendants then hired a contractor to

26  resolve the violations.  (*See id.* ¶ 32.)  Defendants also took steps to prevent future violations by

27  entering into a five-year contract with a Certified Access Specialist to assess the property on a

28  quarterly basis for compliance, (*see* Doc. 97, Ex. 3 ¶ 6; *see also id.*, Ex. 4 at 2 (constituting an

agreement between "Bost Trust, c/o Ali Saniefar, Trustee" and the Certified Access Specialist, Kelly Bray, in which Ms. Bray agrees to inspect the property on a quarterly basis between March 2017 and December 2021 "to confirm that the condition of the property complies with the [ADA]")), and issuing a notice to the tenants of the property regarding their obligation to ensure that the property remains in compliance between inspections, (*see id.*, Ex. 6).  These affirmative steps indicate that the violations are not reasonably likely to recur.  *See, e.g.*, *Turner v. Anand*, No. 14–cv–01147–BAS(PCL), 2015 WL 4474671, at *7 (S.D. Cal. July 21, 2015) (finding that the violations, including those pertaining to non-structural issues, could not "reasonably be expected to recur" and dismissing the plaintiff's ADA claim where the defendants "did not have a history of violating" the ADA and, following the initiation of the litigation, the defendants created a policy that "call[ed] for an annual inspection" for "compliance, and immediate notification should any defects be discovered between inspections").

Finally, there is no indication in the record that Defendants have any history of violations, or an intention to again violate the ADA.   Defendants contend—and Plaintiff does not dispute—that Defendants were not aware of the alleged violations prior to the initiation of this suit.  (*See, e.g.*, Doc. 102, Ex. 1 at 20.)  As such, Defendants do not have a history of evading or failing to remedy violations.  *Cf. Turner*, 2015 WL 4474671, at *7 (finding that the alleged "behavior" that violated the ADA could not reasonably be expected to recur where, in part, the defendants "did not initially have an access policy in place, and therefore did not have a history of violating that policy").  Further, Plaintiff has not directed the Court to any evidence in the record indicating an intent on the part of Defendants to again violate the ADA in the future.  (*Cf.* Doc. 97, Ex. 3 ¶ 4 (constituting the declaration of Alireza Saniefar, the trustee of the Bost Trust, in which he states that he "fully intend[s] to make sure that the [Building] remains compliant to the full extent of [his] control and legal ability").)  This absence of a pertinent history of violations—or any evidence of Defendants' intention to again violate the ADA—indicates that future violations are not reasonably likely to occur.  *Cf. Clavo v. Zarrabian*, No. SACV03864CJCRCX, 2004 WL 3709049, at *4 (C.D. Cal. May 17, 2004) (finding that the plaintiff's ADA claim was not moot where, in pertinent part, the defendants "had an entrenched policy of blocking access to" a

1    "wheelchair accessible gate and check-out aisle" and, "despite [the plaintiff's] complaint, [the

2    defendant] failed to change that policy until after th[e] case was filed"); *Watanabe*, 2003 WL

3    24272650, at *4 (finding that the plaintiff's ADA claim was not moot where, in relevant part,

4    there was "no evidence" (1) "of any expressed intent of [the defendant] to comply with ADA

5    requirements," or (2) "that [the defendant] . . . made any changes with respect to the[] policies or

6    procedures that would prevent" future ADA violations).

7         Based on this record, the Court finds that Defendants have met their heavy burden by

8    showing that it is absolutely clear that the alleged wrongful behavior—*i.e.*, the alleged

9    barriers—cannot reasonably be expected to recur.   Consequently, the voluntary cessation

10   exception to the mootness doctrine is inapplicable here and Plaintiff's ADA claim is moot.  *Cf.*

11   *Moore v. Dollar Tree Stores Inc.*, 85 F. Supp. 3d 1176, 1187 (E.D. Cal. 2015) ("[W]hen a

12   defendant's voluntary cessation of a challenged activity is the basis for mootness, it becomes the

13   defendant's burden to demonstrate that 'subsequent events made it absolutely clear that the alleged

14   wrongful behavior could not reasonably be expected to recur.'" (quoting *Friends of the Earth, Inc.*

15   *v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000))).   As this claim is moot, the Court

16   lacks subject-matter jurisdiction over Plaintiff's ADA claim.  *See, e.g.*, *In re Burrell*, 415 F.3d

17   994, 998 (9th Cir. 2005) ("If the controversy is moot, . . . the trial . . . court[] lack[s] subject matter

18   jurisdiction and the concomitant power to declare the law by deciding the claims on the merits."

19   (citation omitted)).   The Court therefore finds that Plaintiff's ADA claim—the First Claim in the

20   Complaint—must be dismissed.  *See, e.g.*, *Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003)

21   ("If there is no longer a possibility that [a party] can obtain relief for his claim, that claim is moot

22   and must be dismissed for lack of jurisdiction." (quoting *Ruvalcaba v. City of L.A.*, 167 F.3d 514,

23   521 (9th Cir. 1999))).

24        For these reasons, the Court DISMISSES Plaintiff's First Claim, (*see* Doc. 32 ¶¶ 17–38),

25   WITH PREJUDICE.

26   **B.     Supplemental Jurisdiction**

27        Defendants also argue that, as Plaintiff's sole federal claim is properly dismissed, the Court

28   should decline to exercise supplemental jurisdiction over Plaintiff's state law claims.  (*See* Doc.

90, Ex. 1 at 10–16.)   The Court again agrees with Defendants' position and finds that it is inappropriate for the Court to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.[3]

---

[3] Defendants argue, in part, that the Court *must* dismiss Plaintiff's state law claims if it dismisses Plaintiff's sole federal claim for lack of subject-matter jurisdiction.  (Doc. 90, Ex. 1 at 13.)  The Court finds that this argument has merit.

"Pursuant to the supplemental jurisdiction statute, when a district court dismisses on the merits a federal claim over which it had original jurisdiction, it may then decline to exercise supplemental jurisdiction over the remaining state claims, subject to the factors set forth in [28 U.S.C. § 1367(c)(1)–(4)]."  *Herman Family Revocable Tr. v. Teddy Bear*, 254 F.3d 802, 806 (9th Cir. 2001) (citation omitted).  "The court may exercise that supplemental jurisdiction, however, only if it has the 'power to hear state law claims.'"  *Id.* (quoting *Kohler v. Inter–Tel Techs.*, 244 F.3d 1167, 1170 (9th Cir. 2001)).  On this point, "[a] dismissal on the merits is different from a dismissal on jurisdictional grounds."  *Id.*  "If the district court dismisses all federal claims on the merits, it has discretion under § 1367(c) to adjudicate the remaining claims . . . ."  *Id.*  However, "if the court dismisses" all federal claims "for lack of subject matter jurisdiction, it has no discretion and must dismiss all claims."  *Id.*  "Dismissal on jurisdictional grounds means that the court was without original jurisdiction and had no authority to do anything other than to determine its jurisdiction."  *Id.*; *cf.* 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").

In this case, the Court held subject-matter jurisdiction over this case due solely to Plaintiff's ADA claim.  (*See, e.g.*, Doc. 32 ¶ 3.)  However, as discussed herein, the Court dismisses that claim for lack of subject-matter jurisdiction.  As such, the Court has no present subject-matter jurisdiction over this matter.  Absent subject-matter jurisdiction, the Court holds no discretion to consider Plaintiff's state law claims.  Instead, "there [is] nothing left to do but dismiss the case."  *Herman Family Revocable Tr.*, 254 F.3d at 807; *see, e.g.*, Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Plaintiff nonetheless argues that the Court retains discretion as to whether to exercise supplemental jurisdiction because the Court previously held subject-matter jurisdiction over the case.  (*See* Doc. 91 at 13–14.)  The Court disagrees.  As numerous courts in this Circuit have found, remedial measures instituted after the initiation of the litigation that render an ADA claim moot deprive the court of subject-matter jurisdiction, thereby precluding any discretion to retain the remaining state law claims.  *See, e.g.*, *Jinkins v. Irvine Props.*, Case No. 8:15-CV-00670-ODW-SS, 2016 WL 3344374, at *2 (C.D. Cal. June 8, 2016); *Langer v. Kacha*, Case No. 14-cv-2610-BAS(KSC), 2016 WL 524440, at *5 (S.D. Cal. Feb. 10, 2016); *Brooke v. Kalthia Grp. Hotels*, CASE NO. 15cv1873-GPC(KSC), 2015 WL 7302736, at *8–9 (S.D. Cal. Nov. 18, 2015); *see also Orozco v. Borenstein*, No. CV–11–2305–PHX–FJM, 2012 WL 3762408, at *5 (D. Ariz. Aug. 29, 2012) ("Because we have dismissed the federal claim as moot, we have no original jurisdiction upon which supplemental jurisdiction could attach.").  The Court agrees with these decisions and finds that, once the Court dismissed Plaintiff's ADA claim for lack of jurisdiction, it lost the sole source of subject-matter jurisdiction on which to hook Plaintiff's state law claims.  *Cf. Herman Family Revocable Tr.*, 254 F.3d at 805 (stating that the "plain language" of 28 U.S.C. § 1367(a) "makes clear that supplemental jurisdiction may only be invoked when the district court has a hook of original jurisdiction on which to hang it").  *See generally Foster v. Carson*, 347 F.3d 742, 745 (9th Cir. 2003) ("Mootness can be characterized as the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)." (quoting *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999))).  The only remaining course is to dismiss Plaintiff's remaining state law claims without prejudice.  *See, e.g.*, *Rodriguez v. Ralphs Grocery Co.*, 323 F. App'x 617, at *1 (9th Cir. 2009) ("[I]f the federal claim is dismissed for lack of subject matter jurisdiction, a district court has no discretion to retain supplemental claims for adjudication, and must dismiss the state law claims without prejudice . . . ." (citing *Herman Family Revocable Tr.*, 254 F.3d at 805–07)).

Nonetheless, the Court notes that there appears to be a conflict in the case law on this topic.  In particular, while not citing the Ninth Circuit's decision in *Herman Family Revocable Trust*, some courts in this Circuit address the discretionary analysis pursuant to 28 U.S.C. § 1367(c)(3) even after dismissing the plaintiff's sole federal claim—including claims under the ADA—as moot.  *See, e.g.*, *Pickern v. Best W. Timber Cove Lodge Marina Resort*, 194 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002).  The Court therefore finds that an alternative finding under Section 1367(c)(3) is warranted.

1    28 U.S.C. § 1367 "codifies and limits the doctrine of pendant claim jurisdiction." *Jeffrey*

2  *v. Home Depot U.S.A., Inc.*, 90 F. Supp. 2d 1066, 1070–71 (S.D. Cal. 2000) (citation omitted).

3  The decision of whether to retain "jurisdiction under § 1367(c) must be reached through a two-

4  step analysis": (1) "the [c]ourt must determine [whether] one of the 'factual predicates' of

5  § 1367(c)(1)–(3) exists;" and (2) "the [c]ourt must decide [whether] declining jurisdiction best

6  serves the values of economy, convenience, fairness, and comity established by" the Supreme

7  Court in *United Mine Workers of America v. Gibbs*, 383 U.S. 715 (1966). *Jeffrey*, 90 F. Supp. 2d

8  at 1071 (citation omitted).

9    Regarding the first inquiry—and as pertinent here—28 U.S.C. § 1367(c)(3) provides that

10  "[t]he district courts may decline to exercise supplemental jurisdiction over a claim . . . if . . . the

11  district court has dismissed all claims over which it has original jurisdiction."  The Supreme Court

12  noted that "[n]eedless decisions of state law should be avoided both as a matter of comity and to

13  promote justice between the parties, by procuring for them a surer-footed reading of applicable

14  law." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).  "[A] complaint making

15  an unfounded claim of federal right might nonetheless provide a federal court the opportunity to

16  determine an issue of state law."  *Trs. of Constr. Indus. & Laborers Health & Welfare Tr. v.*

17  *Desert Valley Landscape & Maint., Inc.*, 333 F.3d 923, 926 (9th Cir. 2003) (citation omitted).

18  "Section 1367(c)(3) reflects this concern by expressly enabling federal courts to avoid determining

19  an issue of state law when the federal claim, on which its jurisdiction rests, proves to be

20  unfounded." *Id.*

21    Here, the Court previously dismissed the sole claim over which it held original

22  jurisdiction—Plaintiff's ADA claim.  As such, the factual predicate under Section 1367(c)(3) is

23  satisfied.

24    As to the second inquiry, "[f]actors courts consider in deciding whether to dismiss

25  supplemental state claims include judicial economy, convenience, fairness, and comity." *Kolstad*

26  *v. Cty. of Amador*, Civ. No. 2:13–01279 WBS EFB, 2014 WL 556009, at \*4 (E.D. Cal. Feb. 12,

27  2014) (citing *Imagineering, Inc. v. Kiewit Pac. Co.*, 976 F.2d 1303, 1309 (9th Cir. 1992),

28  *abrogated on other grounds by Diaz v. Gates*, 420 F.3d 897, 900 (9th Cir. 2005)).  "[I]n the usual

1    case in which federal law claims are eliminated before trial, the balance of factors . . . will point

2    toward declining to exercise jurisdiction over the remaining state law claims." *Pickern v. Best W.*

3    *Timber Cove Lodge Marina Resort*, 194 F. Supp. 2d 1128, 1133 (E.D. Cal. 2002) (alterations in

4    original) (quoting *Reynolds v. Cty. of San Diego*, 84 F.3d 1162, 1171 (9th Cir. 1996), *overruled on*

5    *other grounds by Acri v. Varian Assocs., Inc.*, 114 F.3d 999, 1000 (9th Cir. 1997)).   Additionally,

6    "[s]ome circuits have held that a court may retain jurisdiction over state law claims if

7    extraordinary or unusual circumstances justify their retention."  *Id.* (citations omitted).

8            The Ninth Circuit "has advised that when all federal law claims are eliminated before trial,

9    the district court is 'duty-bound to take seriously' the responsibility to decline or retain jurisdiction

10   over any remaining state law claims."  *Int'l Longshore & Warehouse Union v. Port of Portland*,

11   844 F.3d 864, 865 n.1 (9th Cir. 2016) (quoting *Acri*, 114 F.3d at 1001).   "The decision whether to

12   continue to exercise supplemental jurisdiction over state law claims after all federal claims have

13   been dismissed lies within the district court's discretion."  *Foster v. Wilson*, 504 F.3d 1046, 1051

14   (9th Cir. 2007).

15           In this case, the interests of judicial economy and comity strongly weigh in favor of the

16   Court declining to exercise supplemental jurisdiction.  Plaintiff's sole federal claim has now been

17   dismissed on jurisdictional grounds and the Court has not yet ruled on the merits of Plaintiff's

18   state law claims.   Absent any remaining source of original jurisdiction for this Court, these

19   determinations are properly reserved to the state court.  *See, e.g.*, *Gibbs*, 383 U.S. at 726

20   ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a

21   jurisdictional sense, the state claims should be dismissed as well.").

22           The Court is cognizant of the present posture of this case and the efforts of the parties

23   during this litigation.   Nonetheless, the Court finds that any inconvenience to the parties is

24   outweighed by the interest in the state courts in disposing of Plaintiff's remaining state law claims

25   in this matter.  *See, e.g.*, *Pickern*, 194 F. Supp. 2d at 1133 (declining "to exercise supplemental

26   jurisdiction" over the plaintiff's remaining state law claims after dismissing the ADA claim at the

27   summary judgment stage, while also "recogniz[ing] that litigation of a new suit in state court may

28

17

create some inconvenience to [the] plaintiff").   As such, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining state law claims.

## IV.    CONCLUSION

For the reasons provided herein, the Court GRANTS Defendants' Motion.  (Doc. 90.)  The Court therefore DISMISSES Plaintiff's First Claim, (*see* Doc. 32 ¶¶ 17–38), WITH PREJUDICE. The Court further DISMISSES the remainder of the claims in this case—Plaintiff's Second and Third Claims, (*see id.* ¶¶ 39–51)—WITHOUT PREJUDICE.[4]  Plaintiff remains free to file his state law claims in state court.[5]

As the Court has dismissed all of the claims in this action, the Court DIRECTS the Clerk to close this case.

IT IS SO ORDERED.

Dated:   **March 28, 2017**                                   /s/ *Sheila K. Oberto*
                                                                   UNITED STATES MAGISTRATE JUDGE

---

[4] As the Court dismissed Plaintiff's sole federal claim for lack of subject-matter jurisdiction, it "must dismiss the state law claims *without prejudice*."  *Rodriguez v. Ralphs Grocery Co.*, 323 F. App'x 617, at *1 (9th Cir. 2009) (emphasis added) (citing *Herman Family Revocable Trust v. Teddy Bear*, 254 F.3d 802, 805–07 (9th Cir. 2001)).

[5] On November 23, 2016, Plaintiff filed a Motion for Summary Judgment or, in the Alternative, Summary Adjudication ("Plaintiff's Motion"), (Doc. 89), in which Plaintiff requests that "summary judgment be granted" on the merits "in [Plaintiff's] favor against Defendants," (*id.*, Ex. 1 at 27).  As the Court grants Defendants' Motion, (Doc. 90), and dismisses this matter, it does not reach Plaintiff's Motion.

EX. 129-19

# Exhibit 130

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

FRESNO DIVISION

_____

FATEMEH SANIEFAR,                )
                                 )
          Plaintiff,             )
                                 )
     vs.                         )  Case No.
                                 )  1:17-cv-00823-LJO-BAM
                                 )
RONALD D. MOORE, TANYA E. MOORE, )
KENNETH RANDOLPH MOORE, MAREJKA  )
SACKS, ELMER LEROY FALK,         )
ZACHARY M. BEST, MOORE LAW FIRM, )
a California Professional        )
Corporation, MISSION LAW FIRM,   )
a California Professional        )
Corporation, GEOSHUA LEVINSON,   )
RICK D. MOORE, WEST COAST CASP   )
AND ADA SERVICES, a California   )
Corporation, RONNY LORETO, and   )
DOES 1 THROUGH 100, inclusive,   )
                                 )
          Defendants.            )
_____)

DEPOSITION OF JASON LORETO

Tuesday, August 27, 2019

Fresno, California

Reported by:  Adrienne R. Cluff, CSR No. 13812

---

APPEARANCES

For Plaintiff:          Saniefar Law
                        By MS. MOJI SANIEFAR
                        Attorney at Law
                        7469 Mission Street, 2nd Floor
                        Daly City, California 94014
                        (650) 581-0025
                        moji@saniefarlaw.com

(Via Telephone)         Sheppard, Mullin, Richter
                        & Hampton, LLP
                        By MS. HAYLEY S. GRUNVALD
                        Attorney at Law
                        12275 El Camino Real, Suite 200
                        San Diego, California 92130
                        (858) 720-8900
                        hgrunvald@sheppardmullin.com

For Defendants:         Gordon & Rees, LLP
                        By MR. DAVID L. JONES
                        Attorney at Law
                        633 West Fifth Street, 52nd Floor
                        Los Angeles, California 90071
                        (213) 576-5000
                        djones@gordonrees.com

For Third-Party         Gratch Law Group
Witness Jason Loreto:   By MR. JOSHUA A. GRATCH
                        Attorney at law
                        951 Mariners Island Boulevard
                        Suite 300
                        San Mateo, California 94404
                        (650) 558-8729
                        jag@gratchlawgroup.com

---

I N D E X

EXAMINATION BY                                    PAGE

MS. SANIEFAR                                        5

EXHIBIT INDEX

Plaintiff's Exhibits                             PAGE

Exhibit 1  -  Copy of Subpoena, 2 pages;
                 Schedule A, 4 pages               28

Exhibit 2  -  Copy of Third Party Jason Loreto's
                 Objections to Subpoena, 9 pages   35

Exhibit 3  -  Copy of Second Amended Complaint
                 in re: Moore vs. Saniefar, 14 pages  89

Exhibit 4  -  Copy of Public Accommodation
                 Visit Questionnaire, Lucky Gas &
                 Liquor, 3 pages; Bates MLF0051822
                 through MLF0051824                110

Exhibit 5  -  Copy of Public Accommodation
                 Visit Questionnaire, Bulldog
                 Liquor, 2 pages; copy of
                 two receipts, 2 pages;
                 Bates MLF0051762 - MLF0051765     118
                 (continued)

EXHIBIT INDEX (CONTINUED)

Plaintiff's Exhibits                             PAGE

Exhibit 6  -  Copy of photo from Facebook post,
                 1 page                            129

QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER:

                                    Page 12,  Line 5

                                    Page 61,  Line 24

                                    Page 62,  Line 6

37

```
 1   know -- I'm assuming you don't know that?
 2      A.   No.
 3      Q.   Okay.  The one or two that you mentioned,
 4   which ones are they, if you know?
 5      A.   There was a corner store he was having trouble
 6   with, getting through the aisles.  And he cut open his
 7   hand, like, going through with his wheelchair, because
 8   the racks were too close together.
 9           And, then, I believe one was -- I don't
10   remember, like, what kind of store it was; but he was
11   having trouble in the bathroom, because they didn't
12   have, like, the rails in there for him to get up.  And
13   he had my brother go in and help him.
14      Q.   Can we go to the corner store; do you know
15   which store that was?
16      A.   No.
17      Q.   And were you there with him, or did you hear
18   about it?
19      A.   I was there with him.
20      Q.   Okay.  How long ago was that?
21      A.   I want to say about six to seven years, maybe.
22      Q.   Okay.  So you were probably 12?
23      A.   Yeah.
24      Q.   Okay.  And who was there on that visit?
25      A.   I believe, my brother, Ronny.
```

38

```
 1      Q.   So it was your grandfather, you, and Ronny?
 2      A.   Yeah.  But I don't know if he did file
 3   complaints about that or anything.  I just remember
 4   those instances.
 5      Q.   Okay.  So you mentioned he had problems
 6   getting through the aisles, correct?
 7      A.   Yeah.
 8      Q.   And maybe I'm misunderstanding -- and that led
 9   to him cutting his hand?
10      A.   Yeah.  Because the racks, they were, like,
11   really close together.  Like, I could barely squeeze
12   through them, walking.  And he cut his hand when he was
13   trying to wheel through.
14      Q.   Was it a serious cut?
15           MR. GRATCH:  Objection.  Vague and ambiguous.
16   BY MS. SANIEFAR:
17      Q.   In your opinion, was it a serious cut?
18      A.   I don't remember.
19      Q.   Okay.  Did he go to the hospital?
20      A.   I don't remember.
21      Q.   Okay.  Did he complain to anyone at the store
22   when that happened?
23      A.   The store clerk.  But he's, kind of, out
24   there, I guess.  He was, kind of, yelling.  And, then,
25   we didn't buy anything.  We just left.
```

39

```
 1      Q.   Okay.  Where is this corner store?
 2      A.   Not sure.
 3      Q.   Okay.  Was it in Clovis?
 4      A.   I believe Fresno.
 5      Q.   And is a corner store, like, an ampm mini
 6   mart?  What is a corner store?
 7      A.   Like, a gas-station-type thing.
 8      Q.   Okay.  Do you know if, in fact, it was a gas
 9   station, also?
10      A.   I don't remember.
11      Q.   Is there anything else you remember about the
12   store that could help me identify the store?
13      A.   No.
14      Q.   Okay.  Was it during the day?
15      A.   I believe it was at night.
16      Q.   It was nighttime; it was dark?
17      A.   Yeah.
18      Q.   Okay.  Do you know -- so you said your
19   grandfather left without buying anything, correct?
20      A.   Yeah.
21      Q.   Okay.  Okay.  Then you mentioned another time
22   where he had trouble in a bathroom?
23      A.   Yeah.
24      Q.   Okay.  Do you know where that was?
25      A.   No.
```

40

```
 1      Q.   Do you know if it was a restaurant or another
 2   store?
 3      A.   I believe it was a store.  I don't think it
 4   was a restaurant.
 5      Q.   Okay.  Do you remember, on that occasion, who
 6   was with him?
 7      A.   My brother, Ronny.  He was the one that helped
 8   him.
 9      Q.   Okay.  Anybody else, that you recall?
10      A.   No.
11      Q.   Okay.  Were you personally there?
12      A.   Yeah, I was, but I didn't go into the
13   restroom.  I just, kind of, went and walked around.
14      Q.   Okay.  Anything else about that incident that
15   stands out to you?
16      A.   No.
17      Q.   Okay.  And do you know if he had any other
18   troubles, other than the bathroom?
19           MR. GRATCH:  Object.  Vague and ambiguous.
20   BY MS. SANIEFAR:
21      Q.   Do you understand my question?
22      A.   You talking about at that place?
23      Q.   Yeah.
24      A.   No.
25      Q.   Do you know if he complained to anyone about
```

41

1  the bathroom?
2      A.   No.
3      Q.   Okay.  He did not, or you don't know if he
4  did?
5      A.   Not to my knowledge.  I can't remember.
6      Q.   Okay.  Was he angry about that incident?  Did
7  he express any anger to you?
8      A.   I don't believe so.  No.
9      Q.   Okay.  So when you said -- handrails, correct,
10  in the bathroom --
11      A.   Yeah.
12      Q.   -- that was the problem?  So --
13      A.   He just couldn't get off the toilet.  He was
14  more embarrassed about it than anything.
15      Q.   Okay.  Do you know around what time frame that
16  happened with the bathroom incident?
17      A.   Maybe five, six years ago.
18      Q.   So you were, roughly, 13?
19      A.   Yeah.
20      Q.   Does that sound right?
21      A.   Thirteen, fourteen.
22      Q.   So was Ronny in the bathroom with him when it
23  happened?
24      A.   No.  He called Ronny on his phone and told him
25  to come help him in the bathroom.

42

1      Q.   Okay.  And were you next to Ronny when the
2  call came through?
3      A.   We were just walking around the store.  And,
4  then, he was like, "Oh, I gotta go help Grandpa."  And
5  that was about it.
6      Q.   Okay.  And do you have any recollection where
7  this store was located?
8      A.   No.
9      Q.   Okay.  Do you believe it was Fresno?
10      A.   Yeah.
11      Q.   So it was local?
12      A.   Yeah.
13      Q.   Okay.  Do you have any recollection if
14  anything was actually purchased at the store?
15      A.   Yeah.  I believe we still purchased stuff;
16  because I think it was, like, really minor, kind of,
17  snack things.
18      Q.   Okay.  Anything else about that day that
19  stands out to you?
20      A.   No.
21      Q.   Okay.  Do you recall him complaining about any
22  other issues at that store, other than the bathroom?
23      A.   No.
24      Q.   Okay.  And do you know if a lawsuit was filed
25  against that store because of the bathroom?

43

1      A.   No.
2      Q.   Okay.  Has talking about these two stores
3  refreshed your recollection about other times that your
4  grandfather experienced any barriers when you were with
5  him?
6      A.   No.
7      Q.   Okay.  Did you review any documents in
8  preparation for today's deposition?
9      A.   What do you mean by "documents"?
10      Q.   Did you look at anything to prepare you for
11  today?
12      A.   No.
13      Q.   Okay.  Did you do any Internet searches to
14  prepare for today?
15      A.   No.
16      Q.   Okay.  Did you look at any pictures to prepare
17  for today?
18      A.   No.
19      Q.   Okay.
20      A.   Well, I mean, I looked up how long depositions
21  usually last.  But that was about it.  Just to see how
22  long this would take.
23      Q.   Okay.  I appreciate that clarification.
24           Did you tell any of your friends that you have
25  a deposition today?

44

1      A.   Yeah, but I didn't tell them what about.
2      Q.   Okay.  Did you tell any family members about
3  your deposition today?
4      A.   No.
5      Q.   Okay.  So when you received the Subpoena in
6  this matter, which was Exhibit 1 -- and you called your
7  grandfather, correct?
8      A.   Yeah.
9      Q.   How did you know to call him?  What made you
10  call him?
11      A.   I asked the PI guy what -- because he was
12  asking me -- like, trying to hand me the papers.  He was
13  like, "You Jason Loreto?"
14           And I was like, "What's this about?"
15           And, then, he was like, "It's about your
16  grandpa."
17           And that was about it.
18      Q.   Okay.  Have you gone by any other names or
19  just "Jason Loreto"?
20      A.   People call me "Jay," but that's about it.
21      Q.   And prior to living with your -- prior to
22  living with Sam on Hughes Street -- and you've lived
23  there, you indicated, for about two years?
24      A.   Yeah.
25      Q.   Where were you living prior to that?

61

```
 1     Q.   Okay.  Can you estimate how much text messages
 2  you would have from your grandfather?
 3     A.   I'd say about 50 to 100.
 4     Q.   Okay.  And how about the Facebook messages; do
 5  you have an idea, an estimate, of how many messages you
 6  have from your grandfather?
 7     A.   I'd say about 100 to 150, maybe.
 8     Q.   Okay.  And voicemails; can you estimate how
 9  many voicemails you have from your grandfather?
10     A.   I want to say five to seven.
11     Q.   Okay.  And as far as the 50 to 100 texts, did
12  you actually review each one?
13     A.   Yeah.  I went through and just read all of
14  them.  They --
15     Q.   Okay.
16     A.   It's just about how I'm doing and stuff like
17  that.
18     Q.   Okay.  And how about the 100 to 150 Facebook
19  messages; did you review each one?
20     A.   Yeah.
21     Q.   Okay.  And the voicemails; did you listen to
22  all five to seven?
23     A.   Yeah.
24   * Q    Okay.  Jason, do you know if Tanya Moore is
25  paying for your legal fees?
```

62

```
 1          MR. GRATCH:  I'm going to object based on
 2  privacy, confidentiality, relevance, attorney-client
 3  privilege.
 4          And instruct you not to answer.
 5  BY MS. SANIEFAR:
 6   * Q     Jason, do you know if Randy Moore is paying
 7  for your legal fees?
 8          MR. GRATCH:  Same objection.
 9          And same instruction.
10          MS. SANIEFAR:  Okay.  And just, again, for the
11  record, we will, more than likely, bring a Motion to
12  Compel, because we do believe that that's not a valid
13  objection.  There's clear Ninth Circuit law on that.
14  And if that requires having a second deposition, then
15  the judge will let us know, but I just wanted to make
16  the record clear about where we stand with that.
17          MR. GRATCH:  And, so that we're clear, I
18  assume you will, of course, first fulfill your
19  obligation to meet and confer regarding any further
20  testimony from Mr. Loreto.
21          MS. SANIEFAR:  Okay.  So the record is now
22  clear as to both of our positions.
23  BY MS. SANIEFAR:
24     Q.   Jason, let's go into -- I asked you about
25  playing football in high school.  Did you -- were you in
```

63

```
 1  any other kinds of activities or after-school clubs?
 2     A.   No.
 3     Q.   Okay.
 4     A.   Not in high school.
 5     Q.   Okay.  And any other sports, other than
 6  football, in high school?
 7     A.   No.
 8     Q.   Okay.  We talked about how often you speak or
 9  communicate with your grandfather.  When was the last
10  time you actually saw him, in person?
11     A.   I want to say about last November.
12     Q.   Okay.  November --
13     A.   It was Thanksgiving.
14     Q.   Okay.  And was that in Clovis?
15     A.   No.  We met at my aunt's house in Texas.
16     Q.   Oh, okay.  And that was November of 2018?
17     A.   Yeah.
18     Q.   Okay.  What about before that; do you recall
19  when the last time was you saw him before November 2018?
20     A.   No, I don't.
21     Q.   Okay.  Can you provide an estimate?  Are you
22  able to?
23     A.   I want to say, maybe, three, four months.
24     Q.   Prior to November 2018?
25     A.   Yeah.
```

64

```
 1     Q.   Do you know what occasion that was?
 2     A.   No.  There wasn't any special occasion.
 3     Q.   Was that in Texas, as well?
 4     A.   No, that was here.
 5     Q.   In Clovis?
 6     A.   Yeah.
 7     Q.   Okay.  Was it at somebody's house, or was it
 8  at a public place?
 9     A.   It was at my Uncle Rick's house.
10     Q.   Uncle Rick, being Ronald Moore's brother?
11     A.   Yeah.
12     Q.   Does he live on Blackstone Avenue?
13     A.   No.
14     Q.   Okay.  When you saw Ronald Moore in November
15  of 2018, in Texas, how did he appear to you, physically?
16          That's not a good question.
17     A.   Yeah.
18     Q.   When you saw him in November 2018, was he
19  using his wheelchair?
20     A.   That, and a cane, yes.  My aunt didn't
21  have -- she has, like, property.  And there's a bunch of
22  rocks everywhere, so he couldn't use a wheelchair as
23  much.  So he'd hold onto one of our shoulders and used
24  his cane.
25     Q.   Okay.  And your interaction with him, in
```

65

1 November of 2018, was just at your aunt's house,
2 correct?
3    A.  Yeah.
4    Q.  Okay.  Did he walk at all without his cane?
5    MR. GRATCH:  Objection.  Lacks foundation.
6 Speculation.
7 BY MS. SANIEFAR:
8    Q.  Did you see him walk without his cane in
9 November 2018?
10    A.  No.
11    Q.  How about at your Uncle Rick's house, which
12 you said was three to four months before November 2018;
13 did you see your grandfather use his cane at that time?
14    A.  He was sitting on the couch the whole time.
15    Q.  So you never saw him move at that time?
16    A.  No.
17    Q.  Did he have his wheelchair with him?  Do you
18 know?
19    A.  He always has it in his car.
20    Q.  Did you see his cane?
21    A.  Yeah.  He always has it sitting right next to
22 him.
23    Q.  How long have you known your grandfather to
24 use a wheelchair?
25    A.  Basically, as long as I can remember.

66

1    Q.  Okay.  How about a cane; how long have you
2 known him to use a cane?
3    A.  Basically, same time period.  He hurt his back
4 when I was younger.  So I think around when I was five
5 or something.  I think my mom said he broke it falling
6 off the roof or something.
7    Q.  Have you ever had a conversation with your
8 grandfather about what happened to his back?
9    A.  No.
10    Q.  Okay.  Have you ever had a conversation with
11 him about his use of a wheelchair?
12    A.  No.
13    Q.  Okay.  Has your grandfather ever indicated to
14 you that he has something called "hydrocephalus"?
15    A.  No.  I don't even know what that is.
16    Q.  Okay.  Has your grandfather ever complained
17 about his knees?
18    A.  All the time, yeah.
19    Q.  What's wrong with his knees, as far as you
20 know?
21    A.  He just always says, "They hurt," all the
22 time.
23    Q.  Okay.
24    A.  He doesn't really like to go into specifics or
25 tell me when he's hurting.

67

1    Q.  Has your grandfather ever complained about use
2 of his arms?
3    MR. JONES:  Object as vague.
4    THE WITNESS:  Not to my knowledge.
5 BY MS. SANIEFAR:
6    Q.  Okay.  The two times that you recalled being
7 with your grandfather was -- you mentioned a corner
8 store and, then, another store.  Do you remember we
9 talked about that?
10    A.  Yeah.
11    Q.  Okay.  Both times, was he using his
12 wheelchair --
13    A.  Yeah.
14    Q.  -- at both stores, throughout the whole visit
15 at the store?
16    MR. GRATCH:  Objection.  Lacks foundation.
17 Speculation.
18    MR. JONES:  I'll join.
19    THE WITNESS:  Yeah.
20 BY MS. SANIEFAR:
21    Q.  Okay.  Did he use his cane on either visit?
22    MR. GRATCH:  Same objections.
23    THE WITNESS:  To walk from his driver's seat
24 to where I brought the wheelchair out of his car.
25 //

68

1 BY MS. SANIEFAR:
2    Q.  When you were out with your grandfather --
3 let's focus on those two visits.  Would you or Ronny
4 usually take his wheelchair out of the back for him?
5    THE WITNESS:  Yeah.
6    MR. JONES:  Are you asking generally, or those
7 two visits?
8 BY MS. SANIEFAR:
9    Q.  Those two visits, specifically.
10    A.  We took it out both times, and put it back in.
11    Q.  Is he able to take it out himself?
12    MR. GRATCH:  Objection.  Lacks foundation.
13 Speculation.
14    MR. JONES:  Joined.
15    THE WITNESS:  He's tried a couple of times,
16 and he almost breaks it, like, every time.  But if he
17 really wants to, yeah.
18 BY MS. SANIEFAR:
19    Q.  Okay.  Have you seen him ever take his
20 wheelchair out by himself?
21    A.  No.
22    Q.  You've never seen that happen?
23    A.  No.
24    Q.  Okay.  Have you seen a video of him doing
25 that?

73

```
 1   BY MS. SANIEFAR:
 2        Q.   Has your grandfather, Ronald Moore, ever
 3   talked about a dispute between his siblings as to his
 4   father's passing and inheritance?
 5        A.   Not about the inheritance.  But I remember
 6   them fighting after he passed.  And that's all I know.
 7   I just, kind of, stayed out of family drama.
 8        Q.   Okay.
 9        A.   And I was young at that age, too.
10        Q.   Okay.  Do you have any knowledge whether Randy
11   Moore and Tanya Moore are married as of today?
12        A.   No.
13        Q.   Okay.  Do you know anything about Randy Moore
14   and Tanya Moore having divorced?
15        A.   No.
16        Q.   Okay.  Have you ever gone to a medical
17   appointment with your grandfather?
18        A.   I remember for his dentures.  I went with
19   that.  But, I don't believe, anything else.
20        Q.   Okay.  In your opinion, from interacting with
21   your grandfather since 2012 until the present, has his
22   disability, in your opinion -- I'm sorry -- strike that.
23        From 2012 to the present, from your
24   interactions with your grandfather, has his health, in
25   your opinion, deteriorated?
```

74

```
 1        MR. GRATCH:  Objection.  Vague and ambiguous.
 2   Relevance.  Lacks foundation.
 3        MR. JONES:  I'll join.
 4   BY MS. SANIEFAR:
 5        Q.   Go ahead.
 6        A.   Yeah.
 7        Q.   It has?
 8        A.   Yeah.  I'd say so.
 9        Q.   What have you noticed in his health that
10   causes you to believe it's gotten worse?
11        A.   He's got, like -- he has, like -- I believe
12   it's COPD or something, like, with his lungs.
13        Q.   Okay.
14        A.   And, then, he had, like, water in his brain or
15   something.  I don't remember when that time period was.
16        Q.   Okay.
17        A.   But he was, like, bedridden for, like,
18   eight months or something to a year.
19        Q.   Do you know when that was?
20        A.   No.
21        Q.   Anything else that stands out to you?
22        A.   No.
23        Q.   Okay.  Do you know, as far as his back pain,
24   if he complains more than before?
25        MR. GRATCH:  Objection.  Lacks foundation.
```

75

```
 1   Vague and ambiguous.  Speculation.
 2        THE WITNESS:  No.
 3   BY MS. SANIEFAR:
 4        Q.   No?  So when you saw him in November of 2018,
 5   did he complain more about his back than he had to you
 6   before?
 7        MR. GRATCH:  Same objections.
 8        MR. JONES:  Yeah.  I'll join.
 9        THE WITNESS:  No.  It's about the same.
10   BY MS. SANIEFAR:
11        Q.   Same?  Do you know if he's had recent back
12   surgery?
13        A.   No.
14        Q.   You don't know if he has?
15        A.   No.  I don't know.
16        Q.   Okay.  Is your grandfather an alcoholic?
17        MR. GRATCH:  Objection.  Relevance.  Lacks
18   foundation.  Speculation.
19        MR. JONES:  I'll join in that, as well.
20        THE WITNESS:  I don't know what clarifies as
21   an alcoholic.  He's been sober for, like, 15 to
22   20 years.  Something like that.
23   BY MS. SANIEFAR:
24        Q.   Okay.
25        A.   But he was, before, like, when he was younger.
```

76

```
 1   But that was before I was even born.  So...
 2        Q.   Okay.  So there's no reason to believe he has
 3   a drinking problem, currently?
 4        A.   No.
 5        Q.   Did he have a drinking problem in 2013?
 6        MR. GRATCH:  Objection.  Vague and ambiguous.
 7   Lacks foundation.
 8        MR. JONES:  I'll join.
 9        THE WITNESS:  No.
10   BY MS. SANIEFAR:
11        Q.   How about in 2014?
12        MR. GRATCH:  Same objections.
13        MR. JONES:  I'll add speculation.
14        THE WITNESS:  No.
15   BY MS. SANIEFAR:
16        Q.   Okay.  Is your grandfather addicted to any
17   other narcotics, that you're aware of?
18        MR. GRATCH:  Objection.  Vague and ambiguous.
19        MR. JONES:  And I'll join that.  Calls for
20   speculation.
21        THE WITNESS:  No.
22   BY MS. SANIEFAR:
23        Q.   Okay.
24        A.   Not to my knowledge.
25        Q.   How about in 2014, you're not aware of any
```

85

```
 1  store?
 2      A.   No.
 3      Q.   How about Ronny; has he ever asked you to do
 4  that?
 5      A.   Not to my knowledge.  Oh, if Ronny has asked
 6  me to do that?
 7      Q.   Yes.
 8      A.   I thought you were saying if he asked Ronny.
 9  No.  Ronny hasn't.
10      Q.   Okay.  Have you ever been to a store with your
11  grandfather, and he says, "You know what?  I'm going to
12  file a lawsuit against them for ADA violations"?  Has
13  that ever happened?
14      A.   No.
15      Q.   Has he ever said, "Hey, let's go out to 'X'
16  store, because I want to file a lawsuit against them"?
17  Has that ever happened?
18      A.   No.
19      Q.   Same question:  Has Ronny Loreto ever said
20  those things to you, "Hey, let's go; I wanna file a
21  lawsuit"?
22      A.   Okay.
23      Q.   Has Ronny Loreto ever, to your knowledge,
24  assisted your grandfather, in any way, regarding ADA
25  lawsuits?
```

86

```
 1      A.   Yeah, no, not to my knowledge.
 2      Q.   So Ronny Loreto has never told you anything
 3  about any ADA lawsuits?
 4      A.   No.
 5      Q.   Okay.  Do you know that Ronald -- I'm sorry.
 6  Strike that.
 7           Do you know that Ronny Loreto, your brother --
 8      A.   Yeah.
 9      Q.   -- provided deposition testimony in an ADA
10  matter in 2015?
11      A.   No.  I didn't know that.
12      Q.   Okay.  Do you know that Ronny Loreto provided
13  deposition testimony with respect to a lawsuit filed
14  against Zlfred's Restaurant?
15      MR. JONES:  I'm just going to object as to
16  vague and ambiguous what you mean by "provided."
17  BY MS. SANIEFAR:
18      Q.   Do you understand my question?
19      A.   Can you re-ask it?
20      Q.   Sure.  Did Ronny Loreto, your brother, ever
21  sit for, just like you are -- sit for a deposition
22  for -- related to a lawsuit brought by Ronald Moore
23  against Zlfred's?
24      MR. GRATCH:  Objection.  Lacks foundation.
25  Speculation.
```

87

```
 1           THE WITNESS:  No.
 2  BY MS. SANIEFAR:
 3      Q.   Okay.  Has your grandfather, Ronald Moore,
 4  ever told you about providing deposition testimony in a
 5  case filed against [sic] him against Zlfred's?
 6      MR. JONES:  Object.  It's vague and ambiguous.
 7           THE WITNESS:  No.
 8  BY MS. SANIEFAR:
 9      Q.   Okay.  When was the last time you recall
10  seeing your grandfather walk without a cane and without
11  his wheelchair?
12      A.   I couldn't tell you, honestly.
13      Q.   Okay.  Can you give me an estimate of -- so,
14  you just have no recollection; is that right?
15      A.   Yes, just no recollection.
16      Q.   Okay.  What about when -- when he was at home
17  at his own house, and you were there too, did you ever
18  witness him being able to maneuver around the house
19  without his wheelchair and without his cane?
20      MR. GRATCH:  Objection.  Vague and ambiguous.
21           THE WITNESS:  Does holding on to walls and
22  furniture and stuff count?
23  BY MS. SANIEFAR:
24      Q.   Right.  So you've seen that?
25      A.   Yeah, once or twice.
```

88

```
 1      Q.   So, in those instances, when he's not using
 2  the wheelchair, and he's not using his cane, you've seen
 3  him use the wall for assistance?
 4      A.   Yeah.
 5      Q.   Okay.  Any other examples of where he's been
 6  able to achieve mobility without his cane or the wall or
 7  a wheelchair?
 8      MR. GRATCH:  Objection.  Vague and ambiguous.
 9      MR. JONES:  I'll join.
10      MR. GRATCH:  Misstates his testimony.
11      MR. JONES:  I'll join in that.
12           THE WITNESS:  Yeah, no.
13  BY MS. SANIEFAR:
14      Q.   No?  Okay.  Does your grandfather smoke or
15  vape?
16      A.   Yeah.  I think that's why he got COPD.
17      Q.   Okay.
18      A.   But he -- I don't believe he does anymore,
19  after he heard that from the doctors.
20      Q.   Okay.  Okay.  So he did smoke or vape in
21  2014 --
22      MR. GRATCH:  Objection.  Speculation.  Lacks
23  foundation.
24  BY MS. SANIEFAR:
25      Q.   -- do you know that?
```

89

```
 1          MR. GRATCH:  I'm sorry.  I didn't mean to jump
 2  on your question.  Are you done?
 3          MS. SANIEFAR:  Yes.
 4          MR. GRATCH:  Objection.  Speculation.  Lacks
 5  foundation.
 6          MR. JONES:  I'll join.
 7          THE WITNESS:  Not to my knowledge.  I don't
 8  remember when he started vaping.
 9  BY MS. SANIEFAR:
10      Q.  But you've seen him vape?
11      A.  Yeah.
12      Q.  Do you remember what time frame you've seen
13  him vape?
14      A.  Just from -- only thing I can really remember
15  is from 2016 to 2018.
16      Q.  Okay.  Have you ever seen a Complaint filed by
17  Ronald Moore against Zlfred's Restaurant?
18      A.  No.
19          (Plaintiff's Exhibit 3 marked and
20          handed to the witness by Ms. Saniefar.)
21          MR. GRATCH:  Do you want him to read through
22  the whole thing or skim through it?
23  BY MS. SANIEFAR:
24      Q.  Feel free to skim through it.  I'm going to
25  focus on -- I'm pulling it up myself.  I'm just going to
```

90

```
 1  focus on a few pages.  But, certainly, you're free to
 2  skim through it, read through it.
 3          So I'm going to focus on -- so you can let me
 4  know whenever you're ready.
 5      A.  Oh, okay.  I think I'm ready.
 6      Q.  Okay.  So what I've handed you is a Complaint
 7  that was filed -- a Second Amended Complaint, that was
 8  filed June 4th, 2015.  Do you see the plaintiff there on
 9  the first page, to the middle of the -- on the left-hand
10  side?
11      A.  Number 11?
12      Q.  Number 11, correct.  It says "Ronald Moore,
13  Plaintiff."
14      A.  Yeah.
15      Q.  Okay.  And do you see -- if you go down,
16  between lines 14 and 15, there's a reference to
17  "Zlfred's, Inc."
18      A.  Yeah.
19      Q.  Okay.  Do you know what Zlfred's is?
20      A.  A restaurant, right?
21      Q.  Okay.  What do you know about it?  It's a
22  restaurant and -- do you know where it's at?
23      A.  No, I don't.
24      Q.  Okay.  Have you ever been to Zlfred's?
25      A.  I believe once, when I was younger.
```

91

```
 1      Q.  Okay.  How old do you think you were?
 2      A.  To be honest, I couldn't tell you.
 3      Q.  Okay.  Do you have any recollection of having
 4  visited Zlfred's?
 5      A.  Not besides going with my grandma and grandpa
 6  and my brother.
 7      Q.  Okay.
 8      A.  That's really the only thing I remember.
 9      Q.  Okay.  Do you know what food you ordered?
10      A.  No.
11      Q.  Okay.  Do you know what time of day you went?
12      A.  No.
13      Q.  So you have no recollection whether it was
14  breakfast? lunch? dinner?
15      A.  Well, actually, I think -- since my -- yeah.
16  My grandma was there.  So I'm pretty sure it was at
17  night.
18      Q.  Okay.  Have you ever seen this Complaint
19  before?
20      A.  No, I haven't.
21      Q.  I don't know if I asked.  If we go to page 3,
22  to the extent that you remember, do you remember how you
23  got to Zlfred's that night?
24      A.  Like, the mode of transportation?
25      Q.  Yes.
```

92

```
 1      A.  Car.
 2      Q.  Okay.  I'm sorry.  I think your testimony is
 3  that you recall one incident -- one time that you
 4  visited Zlfred's; is that correct?
 5      A.  Yeah.
 6      Q.  So you don't recall any other times that you
 7  would have potentially visited Zlfred's?
 8      A.  No.
 9          MR. GRATCH:  Objection.  Vague and ambiguous.
10  Asked and answered.
11  BY MS. SANIEFAR:
12      Q.  Is that right?
13      A.  Yeah.
14      Q.  I'm just focusing on that one time.  Do you
15  recall whether the mode of transportation was your
16  grandfather's car? your grandmother's car?  Do you have
17  any recollection of the vehicle?
18      A.  No.  I'd be guessing at that point.
19      Q.  Okay.  Do you have any recollection of your
20  grandfather using his wheelchair?
21      A.  Yeah, pretty sure.
22      Q.  Okay.  Do you have any recollection whether
23  your grandfather used a cane?
24      A.  I don't think so.  I mean, he usually has his
25  cane with him on his wheelchair.  But I don't think he
```

93

1  got up, from what I can remember.
2      Q.  Okay.  Do you have any recollection of any
3  difficulties that he had on the night that you remember
4  having gone to Zlfred's?
5      A.  No.
6          MR. GRATCH:  Objection.  Vague and ambiguous.
7  Calls for speculation.  Lacks foundation.
8          MR. JONES:  Joined.
9  BY MS. SANIEFAR:
10     Q.  Go ahead.
11     A.  No.  I don't remember.
12     Q.  Okay.  On the visit that you do remember to
13 Zlfred's, is there anything that stands out in your mind
14 that was traumatic for your grandfather?
15         MR. GRATCH:  Objection.  Vague and ambiguous.
16 Speculation.  Lacks foundation.
17         MR. JONES:  Joined.
18         THE WITNESS:  No.
19 BY MS. SANIEFAR:
20     Q.  Okay.  Do you recall your grandfather getting
21 stuck in the bathroom at Zlfred's?
22     A.  No.
23     Q.  Okay.  Do you recall your grandfather having
24 difficulty sitting at the table at Zlfred's?
25     A.  No.

94

1      Q.  Okay.  Do you recall your grandfather ever
2  complaining to you about that particular visit?
3      A.  No.  I don't really remember much from that
4  night.
5      Q.  Have you ever been out to a public facility
6  with your grandfather, where he had had to holler for
7  help because he was stuck in a bathroom?
8      A.  Not besides that one I said earlier.
9      Q.  When he called Ronny?
10     A.  Yeah.
11     Q.  That one?  Okay.  But other than using his
12 cellphone in that incident, you don't recall him ever
13 screaming or yelling for help?
14     A.  Yeah, no, not to my knowledge.
15     Q.  Okay.  So you don't have any recollection of
16 whether that may have happened at Zlfred's?
17     A.  No.
18     Q.  Okay.  Do you recall whether the server at
19 Zlfred's was male or female?
20     A.  No.
21     Q.  Okay.  Do you recall whether there was another
22 table at Zlfred's on the night that you went, where your
23 grandfather decided to pay the bill for that table?
24     A.  No.
25     Q.  And do you recall your grandfather ever

95

1  discussing Zlfred's with you, subsequent to your
2  recollection of the one time that you went there with
3  him?
4      A.  No.
5      Q.  Okay.  So, Jason, we talked earlier about
6  going out with your grandfather from time to time.
7      A.  Yeah.
8      Q.  And let's just focus on a year.  Let's focus
9  on 2014, if you can recall.  But when you would go out
10 with your grandfather in 2014, to public places,
11 restaurants, stores, corner stores, would he always go
12 with his wheelchair?
13     A.  Yeah.
14     Q.  Okay.  So do you recall -- and I'm focusing on
15 2014.  Do you recall a time where you did go out with
16 your grandfather to a place that's public, a public
17 accommodation, where he was not using his wheelchair?
18     A.  No.
19     Q.  Okay.  How about in -- is your answer the same
20 if we focus on 2015?
21     A.  Yeah, no, I don't remember any instances
22 without him -- with him without his wheelchair.
23     Q.  Okay.  And when he did have his wheelchair, he
24 still, also, carried his cane; is that correct?
25     A.  Yeah.  He, like, put it between his legs

96

1  between the foot stand.  And he had it, like, resting on
2  his lap, basically.
3      Q.  Okay.  And did you ever see him -- he drove a
4  Suburban, correct?
5      A.  Yeah.
6      Q.  Okay.  Did you witness him take out his
7  wheelchair from the back of his Suburban?
8      A.  I think once --
9      Q.  Okay.
10     A.  -- in the Suburban.
11     Q.  Okay.  Again, focusing on the Suburban, when
12 you would go out with him -- and I'm going to focus on
13 2014.  Did you ever -- strike that.
14         In 2014, did he have his Suburban?  Do you
15 know?
16     A.  I want to say "yes."  But I'm, honestly,
17 guessing.
18     Q.  Okay.  So, then, let's just focus on the
19 Suburban.  When he drove his Suburban, and you would go
20 out with him -- did that ever happen, where you would go
21 with him when he was driving the Suburban?
22     A.  Yeah.
23     Q.  And during those times, again, with the
24 Suburban, and you're going out with him, would you
25 typically take out his wheelchair from the back; or

97

1  would he take it out?
2      MR. GRATCH:  Objection.  Vague and ambiguous.
3  Lacks foundation.
4      THE WITNESS:  I would, whenever I was with
5  him.
6  BY MS. SANIEFAR:
7  Q.  Okay.  So when you were with him, you would
8  take out his wheelchair from the back when he drove the
9  Suburban?
10  A.  Yeah.  But if my older brother was with me, he
11  would get out and take it out.  But, other than that, it
12  was usually me.
13  Q.  Okay.
14      MS. GRUNVALD:  Moji, can we take a break?
15  This is Hayley.
16      MS. SANIEFAR:  Yeah.  Sure.
17      (Recess)
18  BY MS. SANIEFAR:
19  Q.  We're on the record.
20      MS. GRUNVALD:  And, Moji, I just wanted to be
21  heard on the record very quickly.
22      MS. SANIEFAR:  Okay.
23      MS. GRUNVALD:  We would like to get Judge
24  McAuliffe involved as it relates to the objection
25  related to Ms. Saniefar's question about who paid the

98

1  legal fees; and, secondarily, the objection based on
2  privacy and relevancy related to the Request for
3  Production that were attached to the Subpoena.  We've
4  contacted her chambers, and she is available, subject to
5  all the parties -- all counsel for the parties
6  stipulating to participate in that.
7      So, counsel for Mr. Loreto, is that something
8  that you will agree to participate in?
9      MR. GRATCH:  No.  I'd rather see whatever
10  authority your co-counsel mentioned, and just see the
11  arguments further before we raise the issue with the
12  judge.
13      MS. GRUNVALD:  I don't know if you're aware --
14  and, you know, David, you could, sort of, educate him
15  more.  But Judge McAuliffe does these informal calls
16  during depositions in order to avoid the need to file
17  Motions to Compel, which always include Requests for
18  Sanctions.  So the point is to avoid all of that and, at
19  least -- you know, she's not expecting -- my position
20  isn't that she's expecting that you're going to have a
21  string of cites.  But she's gonna, basically, tell you
22  what she thinks the Court's position is going to be on
23  it.  So I don't see any reasonable basis -- you know,
24  I'm not understanding how having her involved wouldn't
25  make sense.

99

1      MS. SANIEFAR:  So, Hayley, if I understand
2  correctly, Judge McAuliffe's procedures -- would she
3  just issue an advisory opinion; or would she decide it
4  here and now?
5      MS. GRUNVALD:  She would decide it here and
6  now.  She would get on the call.  She would confirm that
7  all parties stipulate to her adjudicating the issue on
8  the phone.  She'll hear oral arguments by counsel for
9  both parties on the phone.  And then she'll issue a
10  ruling.
11      MR. GRATCH:  I'm sorry.  She'll issue a
12  ruling?  She'll issue a discovery order?
13      MS. GRUNVALD:  Well, she issues a ruling on
14  the record, with my understanding, with her court
15  reporter.
16      MR. GRATCH:  Let's go off the record for a
17  moment, if I can talk with you, briefly.
18      MR. JONES:  Oh, sure.
19      (Recess)
20      MS. SANIEFAR:  Okay.  We're all back on the
21  record, Hayley.
22      MS. GRUNVALD:  Okay.  Great.
23      MR. GRATCH:  Counsel, I've certainly heard
24  your request.  At this point, I am not going to
25  stipulate to the call you requested.  I am happy, as

100

1  I've indicated before, and will repeat, to meet and
2  confer after we're done here today, take a look at your
3  arguments and any authority you have; and, if need be,
4  we'll compromise.  I just -- right now, that's the
5  position we're standing on for those objections.
6      MS. GRUNVALD:  Okay.  And I just want the
7  record to reflect that we have offered counsel for
8  Mr. Loreto the opportunity to engage in the Court's
9  informal-discovery-resolution process during the
10  deposition, which included contacting chambers; and them
11  expressing their availability, subject to all parties
12  stipulating; and that you are not agreeable to
13  stipulating, which will, indeed, require that we file a
14  Motion to Compel.  And we will be seeking sanctions,
15  particularly since we believe this is an issue that
16  could have been resolved very quickly by the magistrate.
17      Secondly, as it relates to case law, Hillside
18  Dairy, Inc. versus Kawamura, which is at
19  2004 Westlaw 373, 3409, which is within the Eastern
20  District of California, decided on July 6th, 2004,
21  specifically says as -- that we're entitled to, you
22  know, those portions as it relates to the fee
23  information in this instance.
24      Secondly, Federal Savings & Loan Insurance
25  Corporation versus Ferm, 909 F.2d 372, Ninth Circuit,

**105**

1  stranger a drink?
2      A.   I think he bought a homeless guy a soda one
3  time.
4      Q.   When was that?
5      A.   I couldn't tell you.
6      Q.   Okay.  Prior to the break, you mentioned that
7  there were instances, that you recalled, where you
8  provided receipts to your grandfather because he wanted
9  to keep a tally of costs; is that a correct
10  characterization?
11      A.   Yeah.
12      Q.   Okay.  Do you recall -- we talked about it a
13  little bit, but I just want to dig in a little deeper
14  with that.  Do you recall how many times that that
15  happened?
16      A.   No.  I actually can't.
17      Q.   Okay.  Do you think you can give me an
18  estimate, if you can?
19      A.   I mean, probably around, like, 20 to 30,
20  maybe.
21      Q.   Okay.  If we want to focus on the time period,
22  do you know if that ever happened in 2015?
23      A.   No.
24      Q.   Okay.  You do not believe it did, or you don't
25  recall?

**106**

1      A.   No.  I never gave him any receipts in 2015.
2      Q.   Okay.  I think we -- I wrote down that you
3  recall it happening between 2010 and 2012; is that
4  right?
5      MR. GRATCH:  Objection.  Misstates his
6  testimony.  I think he said 2010 -- I forget if he gave
7  years, 2010 or 2011, or age.
8  BY MS. SANIEFAR:
9      Q.   Okay.  Let's clear up the record, because
10  that's what I had down.  Perhaps it's wrong.  Do you
11  recall that happening in 2010?
12      A.   Yeah.
13      Q.   Okay.  How about in 2011?
14      A.   Yeah.
15      Q.   Okay.  How about in 2012?
16      A.   I believe so, a few times, but not as much as
17  prior years.
18      Q.   Did it ever happen in 2013?
19      A.   No.
20      Q.   Okay.  How about 2014?
21      A.   No.
22      Q.   Okay.  Do you remember the -- can you describe
23  for me the kinds of things you bought in those receipts?
24      A.   Soda, chips, candy, stuff like that --
25      Q.   Okay.

**107**

1      A.   -- because I would go with the neighbors or
2  with some of my friends and just go to the corner
3  stores.
4      Q.   Was it ever from a restaurant?
5      A.   No.
6      Q.   Okay.  Was it ever from a -- so, actually, we
7  asked this before.  "Corner store" -- can you define
8  what you mean when you say "corner store"?
9      A.   Like, a gas-station-type deal.
10      Q.   Okay.  Would it also include, like, a mini
11  mart without a gas station?
12      A.   That I got receipts from?
13      Q.   In your definition of "corner store."  I just
14  want to make sure we're talking about the same thing.
15      A.   Well, I, kinda -- I'd call those "liquor
16  stores."
17      Q.   All right.  So do you -- and thank you for
18  clarifying.  Do you ever recall getting receipts from
19  a liquor store and giving it to your grandfather?
20      A.   No.  It would mainly just be the corner store
21  that was down the street.
22      Q.   Okay.  Ever any other retail-type shops that
23  you received a receipt and handed over to your
24  grandfather?
25      A.   Not that I can remember, no.

**108**

1      Q.   Okay.  You also mentioned "water on the brain"
2  when you were talking about what you know about your
3  grandfather's health.  How did you hear about "water on
4  the brain"?  Who told you that?
5      A.   I think I heard my grandma and my mom talking.
6  And, then, I asked my mom about it later.
7      Q.   Okay.  Has your grandfather ever talked about
8  it?
9      A.   No.
10      Q.   Okay.  And do you know if the "water on the
11  brain," what that contributes to, in terms of any
12  physical ailments that your grandfather suffers from?
13      A.   Like, that he suffers from, like, currently?
14      Q.   Yeah.  That was a bad question.
15      Do you know what the symptoms of "water on the
16  brain" are for your grandfather?
17      A.   No.
18      Q.   Okay.
19      A.   I just remember him just laying in bed, and
20  that's all he would ever do.
21      Q.   And you believe that that was as a result of
22  the "water on the brain"?
23      A.   Yes.
24      Q.   Okay.  Has your grandfather ever passed out?
25      MR. GRATCH:  Objection.  Speculation.  Lacks

109

```
 1   foundation.
 2          MR. JONES:  Joined.
 3   BY MS. SANIEFAR:
 4       Q.   Have you ever seen your grandfather pass out?
 5       A.   Yeah.  A couple times.
 6       Q.   When?
 7       A.   I don't remember.
 8       Q.   Okay.  And do you know the reason for his
 9   having passed out?
10       A.   No.
11       Q.   Okay.  And when did these couple times -- when
12   did they occur?  Can you give me an estimate?
13       A.   I want to say around 2015.
14       Q.   Okay.  Both times around 2015?
15       A.   I remember at least one of them was in 2015.
16       Q.   Okay.  And where was it when it happened?
17       A.   It was -- he was in the house.  He was walking
18   without his cane.  And he got lightheaded and, like,
19   fell over.
20       Q.   Did he go to the hospital when it happened?
21       A.   I can't remember --
22       Q.   Okay.
23       A.   -- if he did or not.
24       Q.   Okay.  Do you know -- have you ever witnessed
25   any of your grandfather's medical conditions affect his
```

110

```
 1   handwriting?
 2       A.   No.  I don't think I've ever really seen
 3   anything written by him.
 4       Q.   Okay.  Has he ever sent you a birthday card
 5   that he signed?
 6       A.   No.  He usually just gives me money.
 7       Q.   Okay.  Has he ever -- so he's never written
 8   you a note where you would be able to recognize his
 9   handwriting?
10       A.   No.
11       Q.   Okay.
12          MS. SANIEFAR:  We're on Exhibit 4.
13          (Plaintiff's Exhibit 4 marked.)
14   BY MS. SANIEFAR:
15       Q.   Have you ever seen this document before?
16       A.   No.
17       Q.   No?  Is that your handwriting on the document?
18       A.   No.
19       Q.   Do you recognize that handwriting?
20       A.   No.
21       Q.   Okay.  Do you see on the top where it says
22   "What is the name of the facility?" and it says "Lucky
23   Gas & Liquor"?
24       A.   Yeah.
25       Q.   Okay.  I asked you about Lucky Gas & Liquor.
```

111

```
 1   Does this document refresh your recollection about
 2   whether you've ever been in a place called Lucky Gas &
 3   Liquor?
 4          MR. JONES:  Do you want him to read the whole
 5   thing?
 6          MS. SANIEFAR:  Yeah.  Feel free to read it.
 7          MR. GRATCH:  Take your time, take a look at
 8   it, read it; and, then, she'll ask -- the court reporter
 9   can read the question back.
10          THE WITNESS:  Okay.  So the question was if
11   this refreshes my memory about anything, right?
12   BY MS. SANIEFAR:
13       Q.   Right.  Have you ever -- do you believe you've
14   ever been to a place called Lucky Gas & Liquor in
15   Fresno?
16       A.   I don't remember, honestly.  But I think I
17   know who Jhonny is now.
18       Q.   Who's Jhonny?
19       A.   It's Sam's son.  He's not in our family,
20   but --
21       Q.   Oh, okay.  How old is Jhonny?
22       A.   I believe he just turned 24.
23       Q.   Okay.
24       A.   I'm not too sure.
25       Q.   Was it common for your grandfather to go out
```

112

```
 1   with you; your brother, Ronny; and Jhonny, in 2014?
 2          MR. GRATCH:  Objection.  Vague and ambiguous.
 3   Lacks foundation.
 4          MR. JONES:  Joined.
 5          THE WITNESS:  Every once in a while.  Not a
 6   lot.
 7   BY MS. SANIEFAR:
 8       Q.   Okay.  How many times do you recall, in 2014,
 9   having gone out with your grandfather and Jhonny?
10       A.   Not much.  I think, probably, like, 25 percent
11   of the time.
12       Q.   Okay.  So -- and is Jhonny your friend, or is
13   Jhonny Ronny's friend?
14       A.   Both.
15       Q.   Both?  Okay.  You said Jhonny is 24, correct?
16       A.   Yeah.
17       Q.   Okay.  Is Sam friends with your grandfather?
18       A.   They, kind of, just, like, kept to themselves.
19   They both were, kind of, like, hot-headed bikers back in
20   the day.  So they just, kind of, said their "hi's" and
21   "goodbyes" and stuff like that.
22       Q.   Okay.  Did you ever witness Jhonny assisting
23   your grandfather with his wheelchair, getting him into
24   his wheelchair?
25       A.   I don't remember "getting him into it."  I
```

113

1    remember him helping him get the wheelchair out and,
2    like, helping him fix it every once in a while, like, if
3    a wheel broke or something.
4        Q.   Okay.  So, just so I'm clear, if you, Ronny,
5    and Jhonny went out with your grandfather, did you,
6    on any of those occasions, witness Jhonny assist your
7    grandfather get -- to get into his wheelchair, or to get
8    out of his wheelchair?
9        A.   Not that I can remember.  No.
10       Q.   Okay.  And Jhonny knew how to fix wheelchairs?
11       A.   Yeah.
12       Q.   Okay.
13       A.   Like, he knew, like, just, kind of, the
14   basics.
15       Q.   Okay.  Sam is in a wheelchair, correct?
16       A.   Yeah.  He got -- he got blown up or something.
17   He's, like, a Marine vet.
18       Q.   Okay.  And Jhonny still lives where you're
19   living with Sam?
20       A.   Yeah.  He lives with us.
21       Q.   Okay.  Do you know if, in -- does this refresh
22   your recollection as to whether your grandfather was
23   driving a Suburban in May of 2014?
24       A.   I believe so, yeah.  I think he was -- he did
25   have a Suburban then.

114

1        Q.   Okay.
2        A.   But, then, I'm not a hundred percent sure on
3    that.
4        Q.   Okay.  If you go to page -- if you go to the
5    second page -- yeah, the second page of that exhibit
6    that you have in front of you, and you go to Number 27,
7    the question is, "Was the counter accessible?  If not,
8    describe."  And the handwriting states, "High and wide.
9    Grandson paid and signed receipt."
10            MR. GRATCH:  There's no question yet.
11            THE WITNESS:  Yeah, I know.
12   BY MS. SANIEFAR:
13       Q.   Do you recall whether you signed a receipt for
14   your grandfather at Lucky Gas & Liquor?
15       A.   No.
16       Q.   Okay.  Do you recall if Ronny signed a
17   receipt for your grandfather at Lucky Gas & Liquor?
18       A.   Same thing:  I don't remember.  I still don't
19   even remember the place.
20       Q.   Okay.  If you go to page 3 of that same
21   exhibit, there's a receipt.  And there's an address on
22   the receipt that looks like it says "347" -- I
23   can't read after that -- "Clovis Avenue."
24       A.   I think that's an "N."
25       Q.   Do you see --

115

1        A.   I think that's for, like, "North Clovis."
2        Q.   Is that close to the Hughes address?
3        A.   I couldn't tell you.  Wait.  I -- no.  I don't
4    know.
5        Q.   Okay.  Would this be an example, if you
6    recall, of a corner store?
7            MR. GRATCH:  Objection.  Speculation.  Lacks
8    foundation.
9            THE WITNESS:  If it was a gas station, then,
10   yeah.
11   BY MS. SANIEFAR:
12       Q.   Okay.
13       A.   I think it says he got gas.  Yeah.  "Pump
14   Number 3."
15       Q.   Right.
16            MR. GRATCH:  Are you done with that one?
17            MS. SANIEFAR:  Yes.
18   BY MS. SANIEFAR:
19       Q.   Did Jhonny ever go out with your grandfather
20   alone, that you recall, in 2014?
21       A.   No.
22       Q.   Okay.  Based on your recollection, would it
23   have been the case that Jhonny would have gone out with
24   your grandfather only if you and Ronny were also
25   attending?

116

1            MR. JONES:  Objection.  Calls for speculation.
2    Lacks foundation.
3            MR. GRATCH:  Joined.
4            THE WITNESS:  Yeah.  I couldn't answer that,
5    to be honest.
6    BY MS. SANIEFAR:
7        Q.   Okay.  Did you ever -- let's go to 2015.
8    In 2015, did you ever recall a time when your
9    grandfather went out with Jhonny alone?
10       A.   No.
11       Q.   Okay.  How about in 2014?
12       A.   No.
13       Q.   Okay.  Did your grandfather and Jhonny hang
14   out?
15            MR. GRATCH:  Objection.  Speculation.  Lacks
16   foundation.
17            MR. JONES:  And it's vague.
18            THE WITNESS:  From what I know, just whenever
19   Ronny was around, or me.
20   BY MS. SANIEFAR:
21       Q.   Okay.  Does Jhonny work, currently?
22            MR. GRATCH:  Objection.  Lacks foundation.
23   Speculation.
24            THE WITNESS:  No.
25   //

121

1  that I thought was printed.  Can we just go off for
2  five minutes, maybe ten?
3          MR. GRATCH:  Sure.
4              (Recess)
5  BY MS. SANIEFAR:
6      Q.  Jason, we talked about your relationship with
7  your grandfather; and, also, with your brother, Ronny;
8  and your mother.  In the last year, have you had any
9  fights with your grandfather?
10     A.  No.
11     Q.  Okay.  What about in 2018; any fights with
12 your grandfather?
13     A.  No.
14     Q.  Okay.  What about 2017?
15     A.  No.
16         MR. JONES:  I'm just going to object.  Vague
17 as to what you mean by "fights."
18 BY MS. SANIEFAR:
19     Q.  How about 2016; have you had any disputes or
20 fights with your grandfather?
21     A.  No.
22     Q.  Okay.  How about with Ronny, your brother;
23 have you had any disputes or fights with him in the last
24 two years?
25     A.  No.

122

1      Q.  Okay.  In the last five years?
2      A.  No.
3      Q.  Okay.  How about your mom; have you had any
4  fights or disputes with her in the last two years?
5      A.  That's the reason I moved out.  But, yeah.
6      Q.  Okay.
7      A.  When -- it was December of last year, I
8  believe.
9      Q.  Okay.
10     A.  Well, no.  It was when I turned 18.  It wasn't
11 the last one, but the one before that.
12     Q.  So December of 2017?
13     A.  Yeah.
14     Q.  What was that dispute about?
15         MR. GRATCH:  Objection.  Privacy.
16         MS. SANIEFAR:  Okay.  Thank you.
17 BY MS. SANIEFAR:
18     Q.  Go ahead.
19     A.  It was just some personal stuff.  She was just
20 always on my back and just, kind of, had, like -- had a
21 rope -- well, not a literal one -- but, like, a
22 rope-around-my-neck-type thing.
23     Q.  Okay.  And that caused you to move out,
24 correct?
25     A.  Yeah.

123

1      Q.  Okay.  What about with your grandmother, Lynn
2  Moore; have you had any disputes or fights with her in
3  the last five years?
4      A.  No.
5      Q.  Okay.  Is there a reason why you're not as
6  close to -- sorry.  Strike that.
7          Is there a reason why you're not talking to
8  your grandfather, Ronald Moore, more than you've
9  indicated?
10         MR. GRATCH:  Objection.  Vague.
11         THE WITNESS:  No.  No reason.
12 BY MS. SANIEFAR:
13     Q.  Okay.  So nothing in particular has, sort of,
14 affected your relationship with your grandfather?  No
15 particular incident?
16     A.  No.  Just -- I just don't really talk to any
17 of my family.
18     Q.  Okay.  Same question with Ronny; no particular
19 incident that has caused you to not speak to him?
20     A.  No.
21     Q.  Okay.  Do you know the two times -- I believe
22 you mentioned you've seen your grandfather pass out or
23 fall down --
24     A.  Yeah.
25     Q.  -- two times, correct?

124

1      A.  Yeah.
2      Q.  Okay.  And you mentioned one time it was at
3  the house; he got light-headed, correct?
4      A.  Yeah.
5      Q.  Okay.  Do you know what may have caused that?
6          MR. GRATCH:  Objection.  Asked and answered.
7          THE WITNESS:  No, I don't.
8  BY MS. SANIEFAR:
9      Q.  Okay.  Do you know if it had anything to do
10 with alcohol?
11     A.  No.  It wasn't that.
12     Q.  Okay.  Do you know if it had anything to do
13 with any sort of narcotics, whether prescribed or not
14 prescribed?
15     A.  Not to my knowledge, no.
16     Q.  Have you ever seen your grandfather pass out
17 for having used any kind of narcotics, whether
18 prescribed or not prescribed?
19     A.  Not to my knowledge, no.  I never asked if he
20 was ever on anything.
21     Q.  Have you ever seen your grandfather slur his
22 words?
23     A.  Yeah.  He, kind of, tends to just spit things
24 out real fast.  So he slurs his words a lot.
25     Q.  But do you have any reason to believe that's

125

1  as a result of taking any alcohol or drugs?
2       A.   No.
3       Q.   Okay.  You mentioned that your grandfather may
4  have met JR in AA; is that right?
5       A.   Yeah.
6       Q.   Okay.  Do you know how long your grandfather
7  has been in AA?
8       A.   About 15, 20 years, I guess, like I said
9  earlier.
10      Q.   Okay.  Do you remember -- no -- strike that.
11           Do you know anything about whether your
12  grandfather is on pain medication?
13      A.   No, not that I know of.
14      Q.   How about in 2012; do you know anything about
15  your grandfather's use of pain medication?
16      A.   No, especially around that time period, he
17  would keep that stuff away from me, if he did.
18      Q.   So instead of doing year by year -- from 2013
19  to 2016, do you know anything about your grandfather's
20  use of any pain medication?
21      A.   No.
22      Q.   Okay.  Do you know whether your grandfather
23  takes -- currently, is under the influence of any sort
24  of medical marijuana?
25      A.   Not to my knowledge, no.

126

1       Q.   Okay.  Have you ever known your grandfather or
2  been aware that he is taking medical marijuana?
3       A.   Yeah, a couple years back, I think, he told me
4  something about it.  Like, I overheard.  And, then, I
5  asked him.
6       Q.   Okay.  And what years would those be?
7       A.   I want to say 2017, maybe.
8       Q.   Okay.  So 2017, you heard about it?  Or
9  2017 --
10      A.   That's when I asked him about it.
11      Q.   That's when you asked him?
12      A.   Yeah.  I heard him talking to someone on the
13  phone; and, then, I asked him about it.
14      Q.   Okay.  And do you have any idea when he would
15  have been taking medicinal marijuana?
16           MR. GRATCH:  Objection.
17  BY MS. SANIEFAR:
18      Q.   I'm sorry.  Do you have any idea of when he
19  would be taking -- sorry -- strike that.
20           Do you know anything about your grandfather
21  being involved in a motorcycle accident?
22      A.   I believe I heard something about that, like,
23  briefly.  But I don't remember.
24      Q.   Okay.
25      A.   I think it happened, like, when I was younger

127

1  or before I was born or something.  I'm not sure about
2  it.
3       Q.   Okay.  But has anyone ever -- have you ever
4  overheard anyone talking about a motorcycle accident
5  causing any disability to your grandfather?
6       A.   No.  I haven't heard anything.
7       Q.   Okay.  Have you ever gone to Big 5 -- the
8  store Big 5, with your grandfather?
9            MR. GRATCH:  Objection.  Asked and answered.
10           MS. SANIEFAR:  Big 5?
11           MR. GRATCH:  I forget the list of names.  It
12  may have been, and it may not.
13           MS. SANIEFAR:  Just in case.  Just throw that
14  one in there.
15           MR. GRATCH:  It was a list of, like, whatever
16  it was, 12 or 15.
17           MR. JONES:  It was the second one on the list.
18           MR. GRATCH:  Go ahead.  You can answer.
19           THE WITNESS:  I think once or twice, to get me
20  football gear.
21  BY MS. SANIEFAR:
22      Q.   Okay.  Do you remember what years that may
23  have been, or year?
24      A.   When I was in middle school.
25           MR. GRATCH:  Sorry.  What you did say?

128

1            THE WITNESS:  I was trying to figure out when
2  middle school was.  So it was about six, seven years
3  ago.  So I think I was 12 or 13.
4  BY MS. SANIEFAR:
5       Q.   Okay.  So that would have been sometime around
6  2012, 2013?
7       A.   2013, 2014.
8       Q.   Okay.  And you think it would have been for
9  football gear?
10      A.   No.  I know it was for football gear.
11      Q.   You do know?
12      A.   Yeah.  Mouth guards, Under Armour shirts and
13  stuff, like, the Dri-FIT ones.
14      Q.   Do you know if -- sorry -- strike that.
15           Do you know -- is there only one Big 5 in
16  Fresno, if you know?
17      A.   There's only one I -- oh, no.  I think there's
18  at least two of them.
19      Q.   Okay.  So the couple times that you mentioned
20  the Big 5 store for football gear --
21      A.   Yeah.
22      Q.   -- do you know which location you went to?
23      A.   I'm not sure about that one.  But I don't
24  think it was the one that was by Sierra Vista, because I
25  think that's a newer one.

133

```
 1      Q.   Okay.  So you mentioned Wingstop.  And we've
 2   talked about Zlfred's.  Any other ones come to mind, now
 3   that we've talked about it a little bit?  Any other
 4   restaurants that you recall going to with your
 5   grandfather?
 6      A.   Hometown Buffet.
 7      Q.   When do you think that may have been?
 8      A.   Like, 2015, maybe.
 9      Q.   Okay.
10      A.   Well -- yeah.  I think so, yeah.
11      Q.   Okay.  Do you remember if anybody else was
12   with you when you went, in 2015, to Hometown Buffet?
13      A.   No.  It was just me and him.
14      Q.   Okay.  Any other restaurants that come to
15   mind?
16      A.   No.
17      Q.   Okay.  With respect to Zlfred's, you recall
18   going there once with your grandmother, grandfather, and
19   Ronny, correct?
20      A.   Yes.
21      Q.   Okay.  Why is it that you have a recollection
22   of Zlfred's, in particular?
23      A.   'Cause the name was weird.
24      Q.   Okay.  Any other reason why Zlfred's stands
25   out to you?
```

134

```
 1      A.   No.
 2      Q.   Okay.  And now that we've discussed -- sorry.
 3   Strike that.
 4           How about any other -- now, we're not going to
 5   talk about restaurants.
 6      A.   Okay.
 7      Q.   How about any other retail stores that you
 8   recall going to with your grandfather in 2014?  We've
 9   talked about Big 5.  So putting that aside, any other
10   retail stores that you recall going to with your
11   grandfather in 2014?
12      A.   Does Walmart count?
13      Q.   Yeah, sure.  So you remember Walmart?
14      A.   Well, I mean, I'd always go with him to get
15   dog food, because he couldn't lift it up.
16           MR. GRATCH:  Counsel, perhaps you can clarify.
17   What do you mean by "retail"?
18   BY MS. SANIEFAR:
19      Q.   Not a restaurant, not a corner store, not a
20   gas station.
21      A.   Okay.
22      Q.   Yeah.
23      A.   Yeah.  Just really there, or he got dog food
24   at Tractor Supply every once in a while.
25      Q.   And you would go with him?
```

135

```
 1      A.   Yeah.
 2           MR. JONES:  What was that?
 3           MR. GRATCH:  Tractor Supply.
 4   BY MS. SANIEFAR:
 5      Q.   And do you recall -- on your visit or visits
 6   to Walmart for dog food, do you recall whether anybody
 7   else would have gone with you and your grandfather?
 8           MR. GRATCH:  Objection.  Speculation.
 9           THE WITNESS:  No.
10   BY MS. SANIEFAR:
11      Q.   Okay.  Do you remember, on your visits to
12   Tractor Supply, if you went with anyone else in addition
13   to your grandfather?
14      A.   No.
15      Q.   Okay.  Any other retail stores that you can
16   think of?
17      A.   Not off the top of my head, no.
18      Q.   And I was focusing on -- I think I may have
19   focused on 2014.  But any other retail stores that you
20   remember going to with your grandfather in
21   any -- actually, in 2015?  Let's narrow it.
22      A.   Not really, no.
23      Q.   Okay.  2016?
24      A.   No.
25      Q.   Okay.  2013, you had the concussion.  So --
```

136

```
 1      A.   Yeah.  It's kind of foggy.
 2      Q.   So same response?
 3           MS. SANIEFAR:  I think those are all my
 4   questions at this point.  So if you guys have questions.
 5           MR. JONES:  Nope.  I don't have anything.  Do
 6   you want to go off the record and talk with the court
 7   reporter?
 8           MR. GRATCH:  I have no questions.
 9           MS. SANIEFAR:  One thing -- let's go off the
10   record.
11           (Recess)
12           MS. SANIEFAR:  Back on the record.  We have
13   agreed --
14           MR. JONES:  We're just going to go by Code.
15   I'll take the copies.
16           MR. GRATCH:  I don't need a copy at this time.
17           MR. JONES:  What's the normal package?
18           THE COURT REPORTER:  You get everything.
19           MR. JONES:  The works?
20           MR. GRATCH:  You get the mini.  You get the
21   full.
22           MS. SANIEFAR:  Yes.  And our order is the same
23   as yesterday.  Okay.
24           MR. JONES:  All right.
25           MS. GRUNVALD:  I have nothing further.
```

# Exhibit 131

1  MOJI SANIEFAR, Cal. Bar No. 233330
   SANIEFAR LAW
2  7469 Mission Street, 2nd Fl.
   Daly City, California 94014
3  Telephone: 650.581.0025
   moji@saniefarlaw.com
4
   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
5  ROBERT D. ROSE, Cal Bar No. 62559
   RAYMOND C. MARSHALL, Cal. Bar No. 83717
6  HAYLEY S. GRUNVALD, Cal. Bar No. 126791
   12275 El Camino Real, Suite 200
7  San Diego, CA 92130
   T: +1.858.720.8900
8  F: +1.858.509.3691
9  rrose@sheppardmullin.com
   rmarshall@sheppardmullin.com
10 hgrunvald@sheppardmullin.com
   Attorneys for Plaintiff
11 FATEMEH SANIEFAR

12              UNITED STATES DISTRICT COURT

13             EASTERN DISTRICT OF CALIFORNIA

14                    FRESNO DIVISION

15
   FATEMEH SANIEFAR,                    Case No. 1:17-cv-00823-LJO-BAM
16
            Plaintiff,                  Honorable Lawrence J. O'Neill
17                                      Honorable Barbara A. McAuliffe
        v.
18
   RONALD D. MOORE, TANYA E. MOORE,     PLAINTIFF FATEMEH SANIEFAR'S
19 KENNETH RANDOLPH MOORE,              OBJECTIONS AND FIRST
   MAREJKA SACKS, ELMER LEROY FALK,     SUPPLEMENTAL RESPONSES TO
20 ZACHARY M. BEST, MOORE LAW FIRM,     DEFENDANT MOORE LAW FIRM'S
   a California Professional Corporation, FIRST SET OF SPECIAL
21 MISSION LAW FIRM, a California        INTERROGATORIES
   Professional Corporation, GEOSHUA
22 LEVINSON, RICK D. MOORE, WEST        Action Filed:  June 20, 2017
   COAST CASP AND ADA SERVICES, a       Trial Date:    May 5, 2020
23 California Corporation, RONNY LORETO,
   and DOES 1 THROUGH 100, inclusive,
24
            Defendants.
25

26

27

28

| | |
|---|---|
| ASKING PARTY: | MOORE LAW FIRM |
| RESPONDING PARTY: | FATEMEH SANIEFAR |
| REQUEST NUMBER: | ONE |

**FATEMEH SANIEFAR'S FIRST SUPPLEMENTAL RESPONSES AND OBJECTIONS TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET ONE**

Plaintiff and Responding Party Fatemeh Saniefar, by and through her attorneys, and pursuant to the Federal Rules of Civil Procedure 33, Local Rules and Orders of this Court, provides this First Supplemental Responses and Objections to Defendant Moore Law Firm's First Set of Interrogatories, Set One as follows:

**PRELIMINARY STATEMENT**

1.      Responding Party's investigation and development of all facts and circumstances relating to this action is ongoing. Responding Party has made her best efforts to respond to these requests.  These responses and objections are made without prejudice to, and are not a waiver of, Responding Party's right to rely on other facts or documents at trial.  Responding Party reserves the right to update these responses by adding to, amending or modifying the responses as discovery ensues and additional facts become available to her.  Responding Party further reserves the right to correct any inadvertent errors or omissions in these responses as a result of continued discovery in this action.

2.      By making the accompanying responses and objections to Propounding Party's special interrogatories, Responding Party does not waive, and hereby expressly reserves, her rights to assert any and all objections as to the admissibility of such responses into evidence in this action, or in any other proceedings, on any and all grounds including, but not limited to, competency, relevancy, materiality, and privilege. Further, Responding Party makes the responses and objections herein without in any way implying that she considers the interrogatories, and responses to the interrogatories, to be relevant or material to the subject matter of this action.

3.      A response to an interrogatory shall not be deemed or construed that Responding Party performed any of the acts described in the interrogatory, in the definitions and/or in the instructions applicable to the interrogatory, or that Responding Party acquiesces in the

characterization of the conduct or activities contained in the interrogatory, or in the definitions and/or in the instructions applicable to the interrogatory.

4. Responding Party expressly reserves the right to supplement, clarify, revise, or correct any or all of the responses and objections herein, and to assert additional objections or privileges, in one or more subsequent supplemental response(s).

5. Responding Party further reserves the right to add additional facts to these disclosures because despite having served requests for production of documents on Defendants in October 2018, Defendants have not timely produced documents and, instead, have only recently (on August 12, 2019) produced voluminous responsive documents. This has caused a delay in Plaintiff's ability to identify additional and necessary witnesses. In fact, in email correspondence dated September 6, 2019, Defendants admitted that they had in their possession additional responsive documents which were not previously produced and that are directly relevant to these witness disclosures. Defendants have stated that these documents will not be produced until Friday, September 13, 2019. Following review of these as yet to be produced documents, Plaintiff may discover additional information which requires supplementation of the instant discovery responses

## GENERAL OBJECTIONS

1. Responding Party objects to each instruction, definition and interrogatory to the extent that it purports to impose any requirement or discovery obligation greater than or different from those under the Federal Rules of Civil Procedure and the applicable Rules and Orders of this Court.

2. Responding Party objects to each instruction, definition and interrogatory to the extent that it seeks information that is not in the possession, custody, or control of Responding Party.

3. Responding Party objects to each instruction, definition and interrogatory that seeks information without any reference to a particular time period, or that is not limited as to time or scope, or that seeks any information beyond the time period at issue in this action as this would

1   impose an overly broad and unduly burdensome obligation on Responding Party in responding to

2   the interrogatory.

3         4.     Responding Party objects to each instruction, definition and interrogatory that calls

4   for information that is irrelevant to the subject matter of this litigation or that is specifically

5   excluded by any of the rules contained in the Federal Rules of Evidence or purports to impose

6   obligations greater than those set forth in the Federal Rules of Civil Procedure.

7         5.     Responding Party objects to each instruction, definition and interrogatory that is

8   overly broad, unduly burdensome, or oppressive.

9         6.     Responding Party objects to each instruction, definition, and interrogatory to the

10   extent that it seeks information protected from disclosure by the attorney-client privilege, attorney

11   work product doctrine, or any other applicable privilege. Responding Party will not produce any

12   such information. Should any such disclosure by Responding Party occur, it is inadvertent and

13   shall not constitute a waiver of any privilege.

14         7.     Responding Party objects to each instruction, definition, and interrogatory as

15   overbroad and unduly burdensome to the extent it seeks information that is readily or more

16   accessible to Propounding Party from Propounding Party's own files or from documents or

17   information in Propounding Party's possession. Responding to such interrogatories would be

18   oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to

19   such interrogatories is substantially the same or less for Propounding Party as for Responding

20   Party.

21         8.     Responding Party objects to each instruction, definition and interrogatory that calls

22   for information that was provided to Responding Party by other entities or persons and that may

23   contain confidential, proprietary, trade secret or privacy information that is protected under State

24   and Federal law.

25         9.     To the extent any of Propounding Party's instructions, definitions or interrogatories

26   seeks answers that include expert material, Responding Party objects to any such interrogatory as

27   premature and expressly reserves the right to supplement, clarify, revise, or correct any or all

28   responses to such requests, and to assert additional objections or privileges, in one or more

-5-

subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court.

10. Responding Party objects to any instruction, definition and interrogatory to the extent that it calls for a legal opinion or conclusion.

11. Responding Party objects to any instruction, definition or interrogatory to the extent it is vague, ambiguous, or unintelligible or unlimited as to be an unwarranted annoyance and is oppressive and constitutes harassment.

12. Responding Party objects to each instruction, definition and interrogatory to the extent that it requests documents, the disclosure of which is prevented by order of a court, an adjudicative tribunal or an investigative or enforcement body.

13. Responding Party objects to each instruction, definition and interrogatory to the extent that it seeks information or responses that are not relevant to the subject matter of this litigation, nor likely to lead to the discovery of admissible evidence.

14. Responding Party objects to each interrogatory, definition or instruction to the extent it purports to interpret terms and the applicability of discovery requirements under Federal law. Responding Party reserves the right to object to such interpretation of terms and applicability of discovery requirements. Responding Party's responses herein shall not constitute a waiver of any objections she may have regarding her obligations under Federal law as to these interrogatories.

15. Responding Party objects to each interrogatory to the extent that it is compound and/or is comprised of subparts constituting more than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of interrogatories for Propounding Party in this case.

16. Responding Party objects to these interrogatories to the extent that such interrogatories, when properly counted, exceed the limit for interrogatories available to Propounding Party in this case.

17. Responding Party incorporates by reference every general objection set forth above into each specific response set forth below. A specific response may repeat a general objection for

-4-

emphasis or some other reason. The failure to include any general objection in any specific

response does not waive any general objection to that request. Moreover, Responding Party does

not waive her right to amend her responses and objections.

## OBJECTIONS TO DEFINITIONS

1.      Responding Party objects to the definition of "YOU" or "YOUR" as being broad

and unduly burdensome. Responding Party will only answer on her own behalf. Further,

Responding Party objects to this definition to the extent that it purports to impose obligations

greater than those set forth in the Federal Rules of Civil Procedure and the Federal Rules of

Evidence. Responding Party also objects to this definition to the extent that it calls for

information protected from disclosure by the attorney-client privilege, attorney work product

doctrine, or any other applicable privilege. Responding Party further objects to this definition to

the extent it asks for confidential or privileged information related to experts and expert material.

Responding Party objects to this definition to the extent that it calls for information that is

confidential, proprietary, trade secret or privacy information and that is protected under State and

Federal law. Responding Party also objects to this definition to the extent that it seeks information

without any reference to a particular time period and because it is not limited as to time or scope,

and because it seeks information that is not at issue in this action as this would impose an overly

broad and unduly burdensome obligation on Responding Party in responding to the interrogatory.

Responding Party further objects because this definition calls for information that is irrelevant to

this action and not reasonably calculated to lead to the discovery of admissible evidence.

2.      Responding Party objects to the definition of "DOCUMENTS" as being broad,

unduly burdensome and oppressive. Responding Party further objects because this definition is

vague, ambiguous, unintelligible, compound or unlimited as to be an unwarranted annoyance and

is oppressive and constitutes harassment. Responding Party also objects to this definition to the

extent that it purports to impose obligations greater than those set forth in the Federal Rules of

Civil Procedure and the Federal Rules of Evidence. Responding Party objects to this definition in

that it seeks information that is not limited in scope. Responding Party also objects to this

definition to the extent that it calls for information protected from disclosure by the attorney-client

-5-

privilege, attorney work product doctrine, or any other applicable privilege. Responding Party

further objects to the extent this definition calls for information that is irrelevant to this action and

not reasonably calculated to lead to the discovery of admissible evidence. Responding Party

objects to this definition because it purport to interpret the applicability of discovery requirements

under Federal law. Responding Party further objects to this definition to the extent that it seeks

information that includes expert material or communications as such requests are premature and

may be privileged and/or confidential. Responding Party also objects to this definition because it

includes information that may contain confidential, proprietary, or trade secret information or

privacy information that is protected under State and Federal law. Responding Party objects to

this definition because it seeks information that are readily or more accessible to Propounding

Party from Propounding Party's own files, from information in Propounding Party's possession,

from public sources or from other parties or third parties and producing such information would be

oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to

such requests is substantially the same or less for Propounding Party as for Responding Party.

3.     Responding Party objects to the definition of "IDENTIFY" as being broad, unduly

burdensome and oppressive. Responding Party objects to this definition to the extent it seeks

information that is not in the possession of Responding Party. Responding Party also objects to

this definition to the extent that it purports to impose obligations greater than those set forth in the

Federal Rules of Civil Procedure and the Federal Rules of Evidence. Responding Party further

objects to this definition because it purport to interpret the applicability of discovery requirements

under Federal law. Responding Party also objects to this definition to the extent that it calls for

information protected from disclosure by the attorney-client privilege, attorney work product

doctrine, or any other applicable privilege. Responding Party further objects to this definition to

the extent it asks for confidential or privileged information related to experts and expert materials.

Responding Party objects to this definition to the extent that it calls for information that is

confidential, proprietary, trade secret or privacy information and that is protected under State and

Federal law. Responding Party further objects because this definition calls for information that is

irrelevant to this action and not reasonably calculated to lead to the discovery of admissible

-6-

evidence. Responding Party also objects to this definition because it seeks information that is readily or more accessible to Propounding Party from Propounding Party's own files, from documents or information in Propounding Party's possession, from public sources or from other parties or third parties and producing such documents would be oppressive, unduly burdensome, and unnecessarily expensive, and the burden of responding to such requests is substantially the same or less for Propounding Party as for Responding Party.

7.     Responding Party objects to Instruction No. 10 as being broad, unduly burdensome and oppressive. Responding Party further objects to this definition to the extent that it calls for information that is irrelevant to this action and not reasonably calculated to lead to the discovery of admissible evidence. Responding Party also objects because this definition is vague, ambiguous, unintelligible, compound or unlimited as to be an unwarranted annoyance and is oppressive and constitutes harassment. Responding Party also objects to this definition to the extent that it purports to impose obligations greater than those set forth in the Federal Rules of Civil Procedure and the Federal Rules of Evidence. Responding Party further objects to this definition because it purport to interpret the applicability of discovery requirements under Federal law. Responding Party objects to this definition to the extent that it seeks information that includes expert material and communications as such requests are premature and may be privileged and/or confidential. Responding Party further objects to this definition because it includes information that may contain confidential, proprietary, or trade secret information or privacy information that is protected under State and Federal law. Responding Party also objects to this definition as it requires a determination as to its applicability based on legal opinion or conclusion. Responding Party objects to this definition to the extent that it encompasses information protected from disclosure by the attorney-client privilege, attorney work-product doctrine, or any other applicable privilege.

## INTERROGATORY NO. 2:

State any and all facts that support YOUR contention that "the lawsuits initiated by the criminal enterprise herein lack merit, are frivolous and vexatious because of false assertions regarding allegations of disabilities, visits to establishments, encounter of barriers, and intent to return" as stated in paragraph 22 of the COMPLAINT.

-7-

**RESPONSE TO INTERROGATORY NO. 2:**

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is compound and is comprised of subparts constituting more than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of interrogatories for Propounding Party in this case. Responding Party further objects to this interrogatory to the extent that it calls for a legal opinion or conclusion or seeks attorney-work product. To the extent that this interrogatory seeks answers that include expert material, Responding Party objects to any such request as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court. Subject to and without waiving said objections, Responding Party responds as follows.

Defendant Ronald Moore can walk and does not require the use of a wheelchair for mobility. Defendant Ronald Moore has offered false testimony regarding his alleged disability. Defendant Ronald Moore did not visit Zlfred's on April 14, 2014, and as such, did not encounter any barriers to suffer any injury. Discovery is ongoing, including the upcoming exchange of expert reports, and as new information is obtained, Responding Party will supplement her response.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is compound and is comprised of subparts constituting more than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of interrogatories for Propounding Party in this case. Responding Party further objects to this interrogatory to the extent that it calls for a legal opinion or conclusion or seeks attorney-work product. To the extent that this interrogatory seeks answers that include expert material, Responding Party objects to any such request as premature and expressly reserves the right to supplement,

-8-

clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court. Subject to and without waiving said objections, Responding Party responds as follows.

Plaintiff is informed and believes the following: Defendant Ronald Moore can walk and does not require the use of a wheelchair for mobility. Defendant Ronald Moore has offered false testimony regarding his alleged disability. Defendant Ronald Moore did not visit Zlfred's on April 14, 2014, and as such, did not encounter any barriers to suffer any injury.

Ronald Moore's alleged disability will be determined through use of experts, which disclosures are forthcoming and therefore, this request, as it relates to Ronald Moore's alleged disability, is untimely. Plaintiff intends to rely on Defendant Ronald Moore's medical records, video surveillance of Ronald Moore, prior declarations of Ronald Moore submitted in support of his disability access cases, and sworn deposition testimony of Ronald Moore to establish that he is not disabled as he has claimed and that he can walk and does not require the use of a wheelchair for mobility as he has alleged in numerous ADA complaints.

Plaintiff is further informed and believes that the following cases represent that Ronald Moore did not visit the stores or experience the barriers alleged in the complaints, and that he had no intent to return.

Moore v. A&A
Moore v. A&K Partnership
Moore v. AJCA 0929
Moore v. Albasha
Moore v. AMI
Moore v. Amroke
Moore v. Armey
Moore v. B&S Fresh Investments
Moore v. Banghu
Moore v. Beal Prop.
Moore v. Berry & Berry
Moore v. Bhourla
Moore v. Chaibi
Moore v. Chan's
Moore v. Chau

FATEMEH SANIEFAR'S OBJECTIONS AND FIRST SUPPLEMENTAL RESPONSES TO

Moore v. Cisneros

Moore v. Cloud

Moore v. CST California

Moore v. Daliwahl

Moore v. DeSantis

Moore v. Dhillon Bros.

Moore v. El Basha Grill & Smoke

Moore v. El Ranchito Bakery

Moore v. El Toro

Moore v. Elia

Moore v. Elite Vapor

Moore v. EZ N Quick

Moore v. Fajita Fiesta Mexican

Moore v. Fig Tree Liquor

Moore v. Gharibeh

Moore v. Ghuman

Moore v. Gong & Young

Moore v. Gongs Market of Sanger

Moore v. Gulamali

Moore v. Hadjis

Moore v. Hamid

Moore v. Hernandez

Moore v. Hiem

Moore v. Hinds

Moore v. Jiminez

Moore v. Jouda

Moore v. Karkashian

Moore v. Kaur

Moore v. Kijimi

Moore v. Ky

Moore v. La Hacienda

Moore v. La Princesa

Moore v. Las Islitas

Moore v. Leingang Enterprises

Moore v. Lembetecchio

Moore v. Lucido

Moore v. Madanat Invest

Moore v. Manjal

Moore v. Mann

Moore v. Monetary Mgmt

Moore v. Nagi

Moore v. Nimatex

Moore v. Papa Murphy

Moore v. Park

Moore v. Piccolo's Pizza

Moore v. Pondicherry

Moore v. Port of Subs

Moore v. Prolo Family

Moore v. QFS Inc.
Moore v. Refai
Moore v. Robles
Moore v. Rose and Ybarra Restaurants, Inc. et al
Moore v. Rowell Family
Moore v. Ruiz
Moore v. Sarantos
Moore v. Schiff
Moore v. Sekhon
Moore v. Simone
Moore v. Singh
Moore v. SNL Corp.
Moore v. Songhu
Moore v. Soto
Moore v. Stop N Shop
Moore v. Sunflower Clovis Investors
Moore v. Sunrise Square Shopping Center
Moore v. Talwandi
Moore v. The Pep Boys
Moore v. Times Square Holding
Moore v. Toledo
Moore v. Topoozian
Moore v. Torigian
Moore v. Trini's Oil
Moore v. Victoria Fresno Realty
Moore v. Villa Mart, Inc.
Moore v. Vituma
Moore v. Vohra
Moore v. Westfield Investments and Associates
Moore v. Wong
Moore v. Zamzami

        Discovery is ongoing, and as new information is obtained, Responding Party will supplement

her response. In fact, Plaintiff recently received a large production of documents on August 13,

2019 and has been informed that another production is forthcoming by or about September 13, 2019.

Depositions of key individuals are also scheduled in the future. Therefore, Plaintiff reserves her

right to amend these responses as new information becomes available to her.

**INTERROGATORY NO. 3:**

        IDENTIFY any and all PERSONS who may have knowledge of the facts supporting YOUR

contention that "the lawsuits initiated by the criminal enterprise herein lack merit, are frivolous

and vexatious because of false assertions regarding allegations of disabilities, visits to

establishments, encounter of barriers, and intent to return" as stated in paragraph 22 of the

-11-

FATEMEH SANIEFAR'S OBJECTIONS AND FIRST SUPPLEMENTAL RESPONSES TO

COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 3:**

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is compound and is comprised of subparts constituting more than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of interrogatories for Propounding Party in this case. Responding Party further objects to this interrogatory as overbroad and unduly burdensome to the extent it seeks information that is readily or more accessible to Propounding Party from Propounding Party's own files or from documents or information in Propounding Party's possession such that responding to such interrogatories is substantially the same or less for Propounding Party as for Responding Party. Responding Party also objects to this interrogatory to the extent that it calls for a legal opinion or conclusion or seeks attorney-work product. To the extent that this interrogatory seeks answers that include expert material, Responding Party objects to any such request as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court. Subject to and without waiving said objections, Responding Party responds as follows.

Individuals with knowledge of these facts include: ADA plaintiffs of Defendants Moore Law Firm and Mission Law Firm; ADA defendants and defendants' counsel that have been sued by Defendants Moore Law Firm and Mission Law Firm; Defendants in this action; and Defendant Ronald Moore's medical providers. Discovery is ongoing, including the upcoming exchange of expert reports, and as new information is obtained, Responding Party will supplement her response.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is compound and is comprised of subparts constituting more

than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of interrogatories for Propounding Party in this case. Responding Party further objects to this interrogatory as overbroad and unduly burdensome to the extent it seeks information that is readily or more accessible to Propounding Party from Propounding Party's own files or from documents or information in Propounding Party's possession such that responding to such interrogatories is substantially the same or less for Propounding Party as for Responding Party. Responding Party also objects to this interrogatory to the extent that it calls for a legal opinion or conclusion or seeks attorney-work product. To the extent that this interrogatory seeks answers that include expert material, Responding Party objects to any such request as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court. Subject to and without waiving said objections, Responding Party responds as follows.

Plaintiff is informed and believes that individuals with knowledge of these facts include: ADA plaintiffs of Defendants Moore Law Firm and Mission Law Firm; ADA defendants and defendants' counsel that have been sued by Defendants Moore Law Firm and Mission Law Firm; Defendants in this action; and Defendant Ronald Moore's medical providers. Discovery is ongoing, including the upcoming exchange of expert reports, and as new information is obtained, Responding Party will supplement her response.

Without yet the benefit of expert discovery, individuals with information regarding Ronald Moore's alleged disability at this time include:

| Ronald Moore c/o Gordon Rees | Lynn Moore (address known by Defendants) | Tanya Moore c/o Gordon Rees |
|---|---|---|
| Randy Moore c/o Gordon Rees | Ronny Loreto c/o Gordon Rees | Sudeshna Kundu 275 Herndon Ave. Clovis, CA 93612 (559) 324-6205 |
| Kurt Miller 1660 Herndon Ave. Clovis, CA 93720 (559) 431-8500 | Kevin Wingert 2131 Herndon Ave., Ste, 101 Clovis, CA 93711 (559) 297-3700 | |

-13-

Specifically, Plaintiff is further informed and believes that individuals with information regarding the Moore Law Firm's false claims about ADA plaintiffs' visits to establishments, encounter with barriers, or intent to return include the following:

| | | |
|---|---|---|
| Gary Agazarian<br>PO Box 926<br>Auberry, CA 93602<br>(559) 855-6358 | Ahmed Albasha<br>4206 North Blackstone Avenue<br>Fresno, CA 93726<br>(559) 222-3077 | Omar Albasha<br>4206 North Blackstone Av<br>Fresno, CA 93726<br>(559) 222-3077 |
| Ajmer Bains<br>4233 East Shields Avenue<br>Fresno, CA 93726<br>(559) 224-0989 | Balwant Bhaurla<br>5191 E. Belmont Ave.<br>Fresno, CA 93727<br>(559) 252-7949 | Navjeet Chahal<br>(559) 269-3225 |
| Hassan Chaibi<br>10015 S. Alta Avenue<br>Reedley, California<br>(559) 637-0066 | Baswhinder Dhaliwal<br>3348 E. Butler<br>Fresno, CA 93702<br>(559) 268-6556 | Paramjit Dhaliwal<br>310 West Shields Avenue<br>Fresno, CA 93722<br>(559) 271-8025 |
| Parminder Dhaliwal<br>310 West Shields Avenue<br>Fresno, CA 93722<br>(559) 271-8025 | Ravinder Dhaliwal<br>1999 Taft Highway<br>Bakersfield, CA 93313<br>(661) 827-0472 | Surinder Dhanda<br>488 West Shaw Avenue<br>Clovis, CA 93612<br>Phone: (559) 299-5868 |
| Lachman Dhillon<br>(559) 709-5813 | Kuljit Ghuman<br>2126 Taft Highway<br>Bakersfield, CA 93313<br>(661) 834-9113 | Ajit Gill<br>4206 White Ave.<br>Fresno, CA 93702<br>(559) 453-9082 |
| Dolores Gomez<br>423 East Court Avenue<br>Pixley, CA 93256<br>(559) 757-3456 | Everardo Gomez<br>423 East Court Avenue<br>Pixley, CA 93256<br>(559) 757-3456 | Serge Haitayan<br>5594 E. Belmont Ave.<br>Fresno, CA 93727<br>(559) 252-4441 |
| Feisal Hamid<br>815 West Manning Avenue<br>Reedley, CA 93654<br>(559) 638-9854 | Gurmeil Hans<br>(559) 779-6113 | Jose Jiminez<br>14575 E. Manning Avenue<br>Parlier, California 93648<br>(559) 646-1101 |
| Lee Ky<br>1145 11th St.<br>Reedley, CA 93654<br>(559) 638-3282 | Isidro Magallanes<br>3131 E. McKinley Ave.<br>Fresno, CA 93703<br>(559) 497-6919 | Javier Magallanes<br>3131 E. McKinley Ave.<br>Fresno, CA 93703<br>(559) 497-6919 |
| Twfiq Mohamed<br>3112 N. Gateway Drive<br>Madera, CA 93637<br>(559) 662-1099 | Rosalinda Moralez<br>2709 North Hughes Ave.<br>Clovis, CA 93705<br>(559) 233-7858 | Giana Neri<br>1578 W Floradora Ave<br>Fresno, CA 93722<br>(559) 233-4247 |

FATEMEH SANIEFAR'S OBJECTIONS AND FIRST SUPPLEMENTAL RESPONSES TO

EX. 131-16

| Margarita Higareda De Perez<br>4481 E. Tulare St., Ste. 101<br>Fresno, CA 93702<br>(559) 475-2164 | Jorge Rivera<br>417 West Shields Avenue<br>Fresno, CA 93705<br>(559) 226-0284 | Alexis Rodas<br>7014 N Maple Ave.<br>Fresno, CA 93720<br>(559) 322-6848 |
|---|---|---|
| Christina Rodriguez<br>(559) 475-0017 | Armando Sanchez<br>3243 East Belmont Ave.<br>Fresno, CA 93702<br>(559) 445-1592 | Gurmukh Sekhon<br>(559) 813-0583 |
| Amendeep Singh<br>10480 CA-41<br>Madera, CA 93636<br>(559) 439-1475 | Amir Siddiqi<br>1430 Granada Ave.<br>San Marino, CA 91108<br>(626) 639-3815 | Dilbag Singh<br>16540 Rd 26 # C<br>Madera, CA 93638<br>(559) 661-7370 |
| Inderjit Singh<br>1805 W Olive Ave<br>Fresno, CA 93728<br>(559) 681-1971 | Tarlochan Singh<br>(559) 458-5910 | Tarsem Singh<br>1805 W Olive Ave<br>Fresno, CA 93728<br>*(559) 681-1971* |
| Major Sumal<br>3093 E. McKinley Ave.<br>Fresno, CA 93703<br>(559) 412-4741 | Andre Torigian<br>(559) 281-8550 | Eskandar Zamzami<br>1408 N. Cedar Ave.<br>Fresno, CA 93703<br>*(559) 456-2527* |

Discovery is ongoing, and as new information is obtained, Responding Party will supplement her response. In fact, Plaintiff recently received a large production of documents on August 13, 2019 and has been informed that another production is forthcoming by or about September 13, 2019. Depositions of key individuals are also scheduled in the future. Therefore, Plaintiff reserves her right to amend these responses as new information becomes available to her.

**INTERROGATORY NO. 4:**

State any and all facts that support YOUR contention that "Directly as a result of the criminal enterprise, Defendants, and each of them, have caused damages to Plaintiff as stated in paragraph 23 of the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 4:**

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is vague, ambiguous, and unintelligible. Responding Party further objects to this interrogatory to the extent that it calls for a legal opinion or conclusion or seeks attorney-client communications or attorney-work product. To the extent that this interrogatory seeks answers that include expert material, Responding Party objects to any such request as

-15-

1   premature and expressly reserves the right to supplement, clarify, revise, or correct any or all
2   responses to such requests, and to assert additional objections or privileges, in one or more
3   subsequent supplemental response(s) in accordance with the time period for exchanging expert
4   reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court.
5   Subject to and without waiving said objections, Responding Party responds as follows.

6       Plaintiff has suffered damages, including, but not limited to, the following: litigation and
7   defense costs, including attorney's fees and costs, spent in defense of *Moore v. Saniefar, et al.* Case
8   Number 1:14-cv-01067-SKO filed in the Eastern District of California; litigation and defense costs,
9   including attorney's fees and costs, spent in defense of *Moore v. Saniefar, et al.* Case Number
10  17CECG01361 filed in California Superior Court; litigation and defense costs, including attorney's
11  fees and costs, spent in defense of *Moore v. Saniefar, et al.* Case Number F078085 filed in
12  California Court of Appeals; litigation costs, including attorney's fees and costs, spent in bringing
13  and prosecuting the pending RICO action, which fees are costs are still ongoing. Discovery is
14  ongoing, including the upcoming exchange of expert reports, and as new information is obtained,
15  Responding Party will supplement her response.

16  **FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

17      Responding Party incorporates the objections made above in the Preliminary Statement,
18  General Objections and Objections to Definition as though fully set forth herein. Responding Party
19  objects to this interrogatory because it is vague, ambiguous, and unintelligible. Responding Party
20  further objects to this interrogatory to the extent that it calls for a legal opinion or conclusion or
21  seeks attorney-client communications or attorney-work product. To the extent that this interrogatory
22  seeks answers that include expert material, Responding Party objects to any such request as
23  premature and expressly reserves the right to supplement, clarify, revise, or correct any or all
24  responses to such requests, and to assert additional objections or privileges, in one or more
25  subsequent supplemental response(s) in accordance with the time period for exchanging expert
26  reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court.
27  Subject to and without waiving said objections, Responding Party responds as follows.
28      Plaintiff has suffered damages, including, but not limited to, the following: litigation and

-16-

1 defense costs, including attorney's fees and costs, spent in defense of *Moore v. Saniefar, et al.* Case

2 Number 1:14-cv-01067-SKO filed in the Eastern District of California; litigation and defense costs,

3 including attorney's fees and costs, spent in defense of *Moore v. Saniefar, et al.* Case Number

4 17CECG01361 filed in California Superior Court; litigation and defense costs, including attorney's

5 fees and costs, spent in defense of *Moore v. Saniefar, et al.* Case Number F078085 filed in

6 California Court of Appeals; litigation costs, including attorney's fees and costs, spent in bringing

7 and prosecuting the pending RICO action, which fees are costs are still ongoing.

8      As a result of having to defend two prior fraudulent ADA lawsuits initiated by Ronald Moore

9 and prosecuted by the Moore Law Firm and Mission Law Firm against Plaintiff, Plaintiff has been

10 damaged in defending those claims. These damages include, but are not limited to: (1) attorney's

11 fees incurred to defend the two underlying lawsuits; (2) the costs of defending the two underlying

12 ADA lawsuits brought by Ronald Moore against Plaintiff including travel (airline and mileage),

13 court reporter fees, court filing fees, expert and fact witness fees, postage, research costs, and service

14 of process costs; and (3) the costs incurred related to the underlying federal ADA litigation

15 including, but not limited to, contractor and building costs and inspection fees. Discovery is

16 ongoing, including the upcoming exchange of expert reports, and as new information is obtained,

17 Responding Party will supplement her response.

18 **INTERROGATORY NO. 5:**

19      IDENTIFY any and all PERSONS who may have knowledge of the facts supporting

20 YOUR contention that "Directly as a result of the criminal enterprise, Defendants, and each of

21 them, have caused damages to Plaintiff' as stated in paragraph 23 of the COMPLAINT.

22 **RESPONSE TO INTERROGATORY NO. 5:**

23      Responding Party incorporates the objections made above in the Preliminary Statement,

24 General Objections and Objections to Definition as though fully set forth herein. Responding Party

25 objects to this interrogatory because it is vague, ambiguous, and unintelligible. Responding Party

26 further objects to this interrogatory to the extent that it seeks information protected from disclosure

27 by the attorney-client privilege or attorney work-product doctrine. Responding Party objects to this

28 interrogatory to the extent that it calls for a legal opinion or conclusion. To the extent that this

-17-

interrogatory seeks answers that include expert material, Responding Party objects to any such request as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court. Subject to and without waiving said objections, Responding Party responds as follows.

Plaintiff is willing to meet and confer with Propounding Party regarding this interrogatory.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is vague, ambiguous, and unintelligible. Responding Party further objects to this interrogatory to the extent that it seeks information protected from disclosure by the attorney-client privilege or attorney work-product doctrine. Responding Party objects to this interrogatory to the extent that it calls for a legal opinion or conclusion. To the extent that this interrogatory seeks answers that include expert material, Responding Party objects to any such request as premature and expressly reserves the right to supplement, clarify, revise, or correct any or all responses to such requests, and to assert additional objections or privileges, in one or more subsequent supplemental response(s) in accordance with the time period for exchanging expert reports set by the Federal Rules of Civil Procedure and the Local Rules and Orders of this Court. Subject to and without waiving said objections, Responding Party responds as follows.

Fatemeh Saniefar
c/o Saniefar Law

Reza Saniefar (deceased)
Deposition testimony regarding fees and costs incurred

Eric Bayless (contractor)
1449 W. Shaw Avenue
Fresno Ca. 93711
Office # (559)-349-2511

Kelly Bray (inspector)
6192 N. Fruit
Fresno, CA 93711

(559) 440-1800

Moji Saniefar
c/o Saniefar Law

Plaintiff has further provided all receipts to Plaintiff which contain additional names of vendors used in Plaintiff's defense of the underlying ADA litigation, therefore Defendants are already in possession of all persons and companies that have been paid in connection with defending the underlying ADA litigation filed by Defendants against Plaintiff Fatemeh Saniefar, and it would be burdensome for Plaintiff to list all those vendors here in response to this request.

**INTERROGATORY NO. 11:**

State any and all facts that support YOUR contention that "Defendants Randy Moore and Tanya Moore tell would-be ADA plaintiffs that investigators working for Defendants Moore Law Firm and Mission Law Firm will find violations at the business establishments to be sued and that Defendants Moore Law Firm and Mission Law Firm will supplement the complaint with these violations on behalf of the would-be plaintiff as stated in paragraph 40 of the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 11:**

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is compound and is comprised of subparts constituting more than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of interrogatories for Propounding Party in this case. Responding Party objects to this interrogatory to the extent it seeks attorney work product. Subject to and without waiving said objections, Responding Party responds as follows.

Defendants Geoshua Levinson, Rick Moore, Randy Moore, and Tanya Moore perform covert and undercover investigations prior to the filing of ADA lawsuits on behalf of Defendants Moore Law Firm and Mission Law Firm. Their findings are used to supplemental false allegations of encounter with barriers on behalf of ADA plaintiffs. Discovery is ongoing and as new information is obtained, Responding Party will supplement her response.

-19-

## SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is compound and is comprised of subparts constituting more than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of interrogatories for Propounding Party in this case. Responding Party objects to this interrogatory to the extent it seeks attorney work product. Subject to and without waiving said objections, Responding Party responds as follows.

Plaintiff is informed and believes the following: Defendants Geoshua Levinson, Rick Moore, Randy Moore, and Tanya Moore perform covert and undercover investigations prior to the filing of ADA lawsuits on behalf of Defendants Moore Law Firm and Mission Law Firm. Their findings are used to supplemental false allegations of encounter with barriers on behalf of ADA plaintiffs. Discovery is ongoing and as new information is obtained, Responding Party will supplement her response. The Moore Law Firm, through Randy Moore and Tanya Moore, recruited would-be ADA plaintiffs by the promise of enabling them the opportunity to make money by filing mass ADA lawsuits. Randy Moore and Tanya Moore provided finder's fees to ADA plaintiffs for each ADA lawsuit filed. The Moore Law Firm would routinely file ADA lawsuits without receipts from the actual ADA plaintiff for which an ADA complaint was filed. The Moore Law Firm would also supplement ADA complaints with false allegations of encounter with barriers that the ADA plaintiff did not actually encounter or experience. This information was obtained from covert inspections conducted by representatives of the Moore Law Firm and used for the purpose of supplementing allegations in ADA complaints to coerce settlements from ADA defendants.

## INTERROGATORY NO. 12:

IDENTIFY any and all PERSONS who may have knowledge of the facts supporting YOUR contention that "Defendants Randy Moore and Tanya Moore tell would-be ADA plaintiffs that investigators working for Defendants Moore Law Firm and Mission Law Firm will find violations at the business establishments to be sued and that Defendants Moore Law Firm and Mission Law Firm will supplement the complaint with these violations on behalf of

1 the would-be plaintiff as stated in paragraph 40 of the COMPLAINT.

2 **RESPONSE TO INTERROGATORY NO. 12:**

3       Responding Party incorporates the objections made above in the Preliminary Statement,

4 General Objections and Objections to Definition as though fully set forth herein. Responding Party

5 objects to this interrogatory because it is compound and is comprised of subparts constituting more

6 than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of

7 interrogatories for Propounding Party in this case. Responding Party further objects to this

8 interrogatory as overbroad and unduly burdensome to the extent it seeks information that is readily

9 or more accessible to Propounding Party from Propounding Party's own files or from documents or

10 information in Propounding Party's possession such that responding to such interrogatories is

11 substantially the same or less for Propounding Party as for Responding Party. Responding Party

12 objects to this interrogatory to the extent it seeks attorney work product. Subject to and without

13 waiving said objections, Responding Party responds as follows.

14       Individuals with knowledge of these facts include: Defendants in this matter and ADA

15 plaintiffs of Defendants Moore Law Firm and Mission Law Firm. Discovery is ongoing and as new

16 information is obtained, Responding Party will supplement her response.

17 **FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

18       Responding Party incorporates the objections made above in the Preliminary Statement,

19 General Objections and Objections to Definition as though fully set forth herein. Responding Party

20 objects to this interrogatory because it is compound and is comprised of subparts constituting more

21 than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of

22 interrogatories for Propounding Party in this case. Responding Party further objects to this

23 interrogatory as overbroad and unduly burdensome to the extent it seeks information that is readily

24 or more accessible to Propounding Party from Propounding Party's own files or from documents or

25 information in Propounding Party's possession such that responding to such interrogatories is

26 substantially the same or less for Propounding Party as for Responding Party. Responding Party

27 objects to this interrogatory to the extent it seeks attorney work product. Subject to and without

28 waiving said objections, Responding Party responds as follows.

-21-

Individuals with knowledge of these facts include: Defendants in this matter and ADA plaintiffs of Defendants Moore Law Firm and Mission Law Firm. Discovery is ongoing and as new information is obtained, Responding Party will supplement her response.

Specifically, Plaintiff is informed and believes that individuals with information include:

| Ronald Moore<br>c/o Gordon Rees | Tanya Moore<br>c/o Gordon Rees | Randy Moore<br>c/o Gordon Rees |
|---|---|---|
| Geoshua Levinson<br>c/o Gordon Rees | Rick Moore<br>c/o Gordon Rees | Marejka Sacks<br>c/o Gordon Rees |
| Natividad Gutierrez<br>(current contact information unknown) | Daniel Delgado<br>(current contact information unknown) | Jesus Sosa (deceased)<br>Testimony and declarations |
| John Morales<br>(current contact information unknown) | Peggy Goedde<br>ptgoedde@hotmail.com | Thomas Goedde<br>(current contact information unknown) |

**INTERROGATORY NO. 13:**

State any and all facts that support YOUR contention that "Defendants, including Defendants Randy Moore, Tanya Moore, Geoshua Levinson (of Defendant West Coast CASp), and/or Rick D. Moore (of Defendant West Coast CASp) visit the establishments to be sued prior to filing of a complaint to covertly gather information to be used in supplementing the ADA complaint (to be filed on behalf of a would-be ADA plaintiff) to include violations of the ADA that allegedly caused the would-be ADA plaintiff to suffer difficulty, discomfort, or embarrassment, even though such 'difficulty, discomfort, or embarrassment' never occurred and was never experienced by the named ADA plaintiff as stated in paragraph 41 of the COMPLAINT.

**RESPONSE TO INTERROGATORY NO. 13:**

Responding Party incorporates the objections made above in the Preliminary Statement, General Objections and Objections to Definition as though fully set forth herein. Responding Party objects to this interrogatory because it is compound and is comprised of subparts constituting more than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of interrogatories for Propounding Party in this case. Responding Party further objects to this interrogatory as overbroad and unduly burdensome to the extent it seeks information that is readily or more accessible to Propounding Party from Propounding Party's own files or from documents or

-22-

1 information in Propounding Party's possession such that responding to such interrogatories is
2 substantially the same or less for Propounding Party as for Responding Party. Responding Party
3 objects to this interrogatory to the extent it seeks attorney work product. Subject to and without
4 waiving said objections, Responding Party responds as follows.

5     Defendants Geoshua Levinson, Rick Moore, Randy Moore, and Tanya Moore perform covert
6 and undercover investigations prior to the filing of ADA lawsuits on behalf of Defendants Moore
7 Law Firm and Mission Law Firm. Their findings are used to supplemental false allegations of
8 encounter with barriers on behalf of ADA plaintiffs. Discovery is ongoing and as new information
9 is obtained, Responding Party will supplement her response.

10 **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

11     Responding Party incorporates the objections made above in the Preliminary Statement,
12 General Objections and Objections to Definition as though fully set forth herein. Responding Party
13 objects to this interrogatory because it is compound and is comprised of subparts constituting more
14 than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of
15 interrogatories for Propounding Party in this case. Responding Party further objects to this
16 interrogatory as overbroad and unduly burdensome to the extent it seeks information that is readily
17 or more accessible to Propounding Party from Propounding Party's own files or from documents or
18 information in Propounding Party's possession such that responding to such interrogatories is
19 substantially the same or less for Propounding Party as for Responding Party. Responding Party
20 objects to this interrogatory to the extent it seeks attorney work product. Subject to and without
21 waiving said objections, Responding Party responds as follows.

22     Plaintiff is informed and believes the following: Defendants Geoshua Levinson, Rick
23 Moore, Randy Moore, and Tanya Moore perform covert and undercover investigations prior to the
24 filing of ADA lawsuits on behalf of Defendants Moore Law Firm and Mission Law Firm. Their
25 findings are used to supplement false allegations of encounter with barriers on behalf of ADA
26 plaintiffs. The Moore Law Firm, through Randy Moore and Tanya Moore, recruited would-be ADA
27 plaintiffs by the promise of enabling them the opportunity to make money by filing mass ADA
28 lawsuits. Randy Moore and Tanya Moore provided finder's fees to ADA plaintiffs for each ADA

FATEMEH SANIEFAR'S OBJECTIONS AND FIRST SUPPLEMENTAL RESPONSES TO

| | |
|---|---|
| 1 | lawsuit filed. The Moore Law Firm would routinely file ADA lawsuits without receipts from the |
| 2 | actual ADA plaintiff for which an ADA complaint was filed. The Moore Law Firm would also |
| 3 | supplement ADA complaints with false allegations of encounter with barriers that the ADA plaintiff |
| 4 | did not actually encounter or experience. This information was obtained from covert inspections |
| 5 | conducted by representatives of the Moore Law Firm and used for the purpose of supplementing |
| 6 | allegations in ADA complaints to coerce settlements from ADA defendants. |
| 7 | Discovery is ongoing and as new information is obtained, Responding Party will supplement |
| 8 | her response. |
| 9 | **INTERROGATORY NO. 14:** |
| 10 | State any and all facts that support YOUR contention that "Defendants Tanya Moore, |
| 11 | Sacks and DOE Defendants have full knowledge that the allegations referring to the ADA |
| 12 | plaintiffs personally encountering barriers and experiencing 'difficulty, discomfort or |
| 13 | embarrassment' are false and that the ADA complaint includes allegations that have been |
| 14 | supplemented by information from representatives of Defendants Moore Law Firm and |
| 15 | Mission Law Firm from an undercover investigation, and not actually experienced by the |
| 16 | ADA plaintiff" as stated in paragraph 43 of the COMPLAINT. |
| 17 | **RESPONSE TO INTERROGATORY NO. 14:** |
| 18 | Responding Party incorporates the objections made above in the Preliminary Statement, |
| 19 | General Objections and Objections to Definition as though fully set forth herein. Responding Party |
| 20 | objects to this interrogatory because it is compound and is comprised of subparts constituting more |
| 21 | than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of |
| 22 | interrogatories for Propounding Party in this case. Responding Party further objects to this |
| 23 | interrogatory because it is vague, ambiguous, and unintelligible. Responding Party objects to this |
| 24 | interrogatory to the extent that it calls for a legal opinion or conclusion. Responding Party further |
| 25 | objects to this interrogatory as overbroad and unduly burdensome to the extent it seeks information |
| 26 | that is readily or more accessible to Propounding Party from Propounding Party's own files or from |
| 27 | documents or information in Propounding Party's possession such that responding to such |
| 28 | interrogatories is substantially the same or less for Propounding Party as for Responding Party. |

-24-

1  Responding Party objects to this interrogatory to the extent it seeks attorney work product. Subject
2  to and without waiving said objections, Responding Party responds as follows.

3        Defendants Geoshua Levinson, Rick Moore, Randy Moore, and Tanya Moore perform covert
4  and undercover investigations prior to the filing of ADA lawsuits on behalf of Defendants Moore
5  Law Firm and Mission Law Firm. Their findings are used to supplemental false allegations of
6  encounter with barriers on behalf of ADA plaintiffs. Discovery is ongoing and as new information
7  is obtained, Responding Party will supplement her response.

8  **FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

9        Responding Party incorporates the objections made above in the Preliminary Statement,
10  General Objections and Objections to Definition as though fully set forth herein. Responding Party
11  objects to this interrogatory because it is compound and is comprised of subparts constituting more
12  than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of
13  interrogatories for Propounding Party in this case. Responding Party further objects to this
14  interrogatory because it is vague, ambiguous, and unintelligible. Responding Party objects to this
15  interrogatory to the extent that it calls for a legal opinion or conclusion. Responding Party further
16  objects to this interrogatory as overbroad and unduly burdensome to the extent it seeks information
17  that is readily or more accessible to Propounding Party from Propounding Party's own files or from
18  documents or information in Propounding Party's possession such that responding to such
19  interrogatories is substantially the same or less for Propounding Party as for Responding Party.
20  Responding Party objects to this interrogatory to the extent it seeks attorney work product. Subject
21  to and without waiving said objections, Responding Party responds as follows.

22        Plaintiff is informed and believes the following: Defendants Geoshua Levinson, Rick
23  Moore, Randy Moore, and Tanya Moore perform covert and undercover investigations prior to the
24  filing of ADA lawsuits on behalf of Defendants Moore Law Firm and Mission Law Firm. Their
25  findings are used to supplemental false allegations of encounter with barriers on behalf of ADA
26  plaintiffs. The Moore Law Firm, through Randy Moore and Tanya Moore, recruited would-be ADA
27  plaintiffs by the promise of enabling them the opportunity to make money by filing mass ADA
28  lawsuits. Randy Moore and Tanya Moore provided finder's fees to ADA plaintiffs for each ADA

-25-

1 | lawsuit filed. The Moore Law Firm would routinely file ADA lawsuits without receipts from the
2 | actual ADA plaintiff for which an ADA complaint was filed. The Moore Law Firm would also
3 | supplement ADA complaints with false allegations of encounter with barriers that the ADA plaintiff
4 | did not actually encounter or experience. This information was obtained from covert inspections
5 | conducted by representatives of the Moore Law Firm and used for the purpose of supplementing
6 | allegations in ADA complaints to coerce settlements from ADA defendants.

7 | Discovery is ongoing and as new information is obtained, Responding Party will supplement
8 | her response.

9 | **INTERROGATORY NO. 17:**

10 | IDENTIFY any and all PERSONS who may have knowledge of the facts supporting
11 | YOUR contention "after Defendant Ronald Moore agreed to join the conspiracy, Defendants
12 | Tanya Moore, Randy Moore, and Sacks ("the Ringleaders") began mass filing ADA
13 | complaints in the Eastern and Northern Judicial Districts of California on behalf of
14 | Defendant Ronald Moore which included false claims about the extent of Defendant Ronald
15 | Moore's disability, his alleged visits to the business establishments being sued, false claims
16 | regarding encountering barriers, his alleged visits to the business establishments being sued,
17 | false claims regarding having suffered 'difficulty, discomfort, or embarrassment', false
18 | claims regarding his intent to return to the business establishment in an effort to establish
19 | standing" as stated in paragraph 51 of the COMPLAINT.

20 | **RESPONSE TO INTERROGATORY NO. 17:**

21 | Responding Party incorporates the objections made above in the Preliminary Statement,
22 | General Objections and Objections to Definition as though fully set forth herein. Responding Party
23 | objects to this interrogatory because it is compound and is comprised of subparts constituting more
24 | than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of
25 | interrogatories for Propounding Party in this case. Responding Party further objects to this
26 | interrogatory because it is vague, ambiguous, and unintelligible. Responding Party objects to this
27 | interrogatory to the extent that it calls for a legal opinion or conclusion. Responding Party further
28 | objects to this interrogatory as overbroad and unduly burdensome to the extent it seeks information

that is readily or more accessible to Propounding Party from Propounding Party's own files or from

documents or information in Propounding Party's possession such that responding to such

interrogatories is substantially the same or less for Propounding Party as for Responding Party.

Responding Party objects to this interrogatory to the extent it seeks attorney work product. Subject

to and without waiving said objections, Responding Party responds as follows.

Individuals with knowledge of these facts include: Defendants in this matter and ADA

plaintiffs of Defendants Moore Law Firm and Mission Law Firm. Discovery is ongoing and as new

information is obtained, Responding Party will supplement her response.

**FIRST SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17:**

Responding Party incorporates the objections made above in the Preliminary Statement,

General Objections and Objections to Definition as though fully set forth herein. Responding Party

objects to this interrogatory because it is compound and is comprised of subparts constituting more

than one interrogatory, as each subpart properly counts as separate interrogatories against the limit of

interrogatories for Propounding Party in this case. Responding Party further objects to this

interrogatory because it is vague, ambiguous, and unintelligible. Responding Party objects to this

interrogatory to the extent that it calls for a legal opinion or conclusion. Responding Party further

objects to this interrogatory as overbroad and unduly burdensome to the extent it seeks information

that is readily or more accessible to Propounding Party from Propounding Party's own files or from

documents or information in Propounding Party's possession such that responding to such

interrogatories is substantially the same or less for Propounding Party as for Responding Party.

Responding Party objects to this interrogatory to the extent it seeks attorney work product. Subject

to and without waiving said objections, Responding Party responds as follows.

Individuals with knowledge of these facts include: Defendants in this matter and ADA

plaintiffs of Defendants Moore Law Firm and Mission Law Firm.

Specifically, Plaintiff is informed and believes that individuals with knowledge about the

mass filings of false ADA litigation includes: Ronald Moore, Tanya Moore, Randy Moore, Geoshua

Levinson, Marejka Sacks, Rick Moore, Ronny Loreto, Lynn Moore, Whitney Law, Isaac Medrano,

Marsha Levinson, and David Guthrie. Contact information of all of these individuals is already in

-27-

1  the possession of Defendants and their counsel.

2      Discovery is ongoing and as new information is obtained, Responding Party will supplement

3  her response.

4

5  Dated:  September 6, 2019          SANIEFAR LAW
                                     SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
6
                                     By  _____
7                                                    /s/ Moji Saniefar
                                              MOJI SANIEFAR
8                                             RAYMOND C. MARSHALL
                                              GREGORY F. HURLEY
9                                             WHITNEY A. HODGES
                                              Attorneys for Plaintiff
10                                            FATEMEH SANIEFAR

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FATEMEH SANIEFAR'S OBJECTIONS AND FIRST SUPPLEMENTAL RESPONSES TO

# <u>VERIFICATION</u>

I, Fatemeh Saniefar, am the Plaintiff in the matter entitled, *Saniefar v. Ronlad Moore, et al.*, Case Number 1:17-cv-00823-LJO-BAM. I have read the foregoing document entitled, **PLAINTIFF FATEMEH SANIEFAR'S OBJECTIONS AND FIRST SUPPLEMENTAL RESPONSES TO DEFENDANT MOORE LAW FIRM'S FIRST SET OF SPECIAL INTERROGATORIES,** and know the contents thereof; and the same is true of my knowledge, except as those matters which are therein stated upon my information and belief, and as to those matters, I believe them to be true.

I declare under the penalty of perjury under the laws of the state of California that the foregoing is true and correct.

Executed on September 6, 2019 at Fresno, California.


DATE:   September 6, 2019

_____
Fatemeh Saniefar

# CERTIFICATE OF SERVICE

At the time of service, I was over 18 years of age and not a party to this action. I am employed in the county of San Mateo, State of California. My business address is 7469 Mission Street, 2nd Fl., Daly City, CA 94014.

On September 6, 2019, I served true copies of the following document(s) described as:

FATEMEH SANIEFAR'S OBJECTIONS AND FIRST SUPPLEMENTAL RESPONSES TO MOORE LAW FIRM'S FIRST SET OF SPECIAL INTERROGATORIES; with Verification

in this action by placing a true copy thereof enclosed by the methods stated below to the following:

Steven Inouye
David Jones
Gordon Rees Scully Mansukhani, LLP
633 West Fifth Street, 52nd Floor
Los Angeles, CA 90071
sinouye@grsm.com
djones@grsm.com

| | | |
|---|---|---|
| X | **BY MAIL:** I deposited such envelope(s) for collection and mailing at my business address. In the ordinary course of business, such envelope(s) will be deposited with the U.S. Postal Service on that same day. |
| ___ | **BY HAND DELIVERY:** I caused such envelope(s) to be hand delivered to the designated addressee(s). |
| ___ | **BY FEDERAL EXPRESS:** I caused such envelope(s) to be delivered via Federal Express to the addresses(s) designated (per agreement). |
| ___ | **BY FACSIMILE:** I caused said documents to be transmitted to the telephone number(s) of the addressee(s) designated. |
| X | **BY E-MAIL:** I caused said documents to be transmitted via e-mail to the addressee(s) designated (per agreement). |

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 6, 2019 at Daly City, California.

_____
Moji Saniefar

-1-